# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 6502 | **DATE** | 8/31/2001 |
| **CASE TITLE** | U.S.A. ex rel Jeff Sharp vs. consolidated Medical Transport et a | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: For all of the foregoing reasons, we deny the motion to dismiss the United States' amended complaint against all defendants. We grant the motion to dismiss Count II of the second amended complaint against CoMed and its related entities and the hospital providers. We grant the motion to dismiss Count III against the individual defendants. We grant relators leave to amend their complaint to conform to this opinion on or before 9/14/2001.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | SEP 0 4 2001 | |
| ✓ | Docketing to mail notices. | | date docketed | |
| | Mail AO 450 form. | | docketing deputy initials | 80 |
| | Copy to judge/magistrate judge. | | | |
| TSA | courtroom deputy's initials | 01 AUG 35 AM 8: 06 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA, ex )
rel. Jeff Sharp, )
                           )
          Plaintiff, )
                           ) No. 96 C 6502
      v. )
                           ) Wayne R. Andersen
CONSOLIDATED MEDICAL ) District Court Judge
TRANSPORT, INC., TOWER )
AMBULANCE SERVICE, INC., )
DALEY'S AMBULANCE SERVICE, )
LTD., JOHN W. DALEY, III, )
THOMAS WAPPEL, JOHN DALEY, )
JR., and BRIAN T. WITEK, )
                           )
          Defendants. )

DOCKETED
SEP 0 4 2001

## MEMORANDUM, OPINION AND ORDER

In this *qui tam* action brought pursuant to the False Claims Act ("FCA"), two former

employees ("plaintiff relators") of defendant Consolidated Medical Transport, Inc., doing

business under a number of different names (collectively "CoMed"), have sued CoMed and its

officers, John Daley, Brian Witek and Gary Miller, as well as St. Bernard Hospital ("St.

Bernard"), Mount Sinai Medical Center of Chicago ("Mount Sinai') and other "John Doe"

medical providers. Among other things, plaintiffs have alleged that defendants have engaged

in a scheme to defraud the United States by deliberately billing to Medicare the cost of

ambulance services for patients for whom the services were not medically necessary and,

therefore, should not have been paid by Medicare. Plaintiffs also allege that defendant CoMed

provided kickbacks to the medical providers in exchange for referrals of Medicare patients in

violation of the Anti-Kickback Statute and, therefore, they are liable under the FCA. The



United States has intervened in part of the case and filed an Amended Complaint of its own against CoMed and its officers. Defendants have moved to dismiss this Amended Complaint, as well as the Second Amended Complaint filed on behalf of the plaintiff relators. For the reasons stated below, we deny defendants' motion to dismiss the United States' Amended Complaint. Further, although we recognize that a violation of the Anti-Kickback Statute may form the basis of an FCA claim, we grant defendants' motions to dismiss Count II of the Second Amended Complaint because relators have insufficiently pled the elements for such a claim. For the same reasons, we dismiss Count III in so far as it alleges a violation of the FCA based on the anti-kickback statute against the individual defendants. All other allegations in Count III are to stand. We deny the remainder of the motions.

## BACKGROUND

Plaintiff relators Jeff Sharp and John Klaczak ("plaintiffs") bring this action individually and on behalf of the United States. Sharp was employed by defendant Consolidated Medical Transport, Inc. ("CoMed") as an emergency medical technician and dispatcher. Klaczak was employed as the General Manager of Stat, Inc., an ambulance company, until its sale to defendant Tower Ambulance Service ("Tower") in February of 1994.

As set forth in plaintiffs' Second Amended Complaint, the Department of Health and Human Services ("HHS") administers, through the Health Care Financing Administration, the Supplementary Medical Insurance Program for the Aged and Disabled, more commonly known as Medicare. Medicare is a federal health insurance program for people who are 65 years of age or older and for others who qualify because they have certain disabilities. HHS

2

administers Medicare in Illinois and Indiana through a private insurance contract. Those private insurance contractors review claims for reimbursement submitted by Medicare providers and make payments on claims which they find eligible for reimbursement from federal funds.

Illinois and Indiana have established their own Medicaid programs which pay for the reasonable and necessary medical costs incurred by indigent citizens who have qualified to receive aid. The federal government reimburses the state Medicaid programs at a fifty percent rate.

Both the Medicare and Medicaid programs reimburse the cost of ambulance transportation to the provider if the patients transported are infirm or otherwise unable to travel to receive medical care by any other mode of transportation. However, neither program reimburses for any other mode of transportation or for the ambulance transportation of individuals who could reasonably travel by another means.

The Medicare programs reimburse 80% of the cost of ambulance travel directly to the ambulance provider. The remaining 20% is the obligation of the beneficiary and is termed a "co-payment". However, if a beneficiary is admitted into the hospital, the hospital must pay the ambulance provider and then Medicare will reimburse the hospital.

Plaintiffs allege that CoMed, which includes defendants Consolidated Medical Transport, Inc., Tower, Fagen-Miller Ambulance Service, Inc., and Daley's Ambulance Service, Ltd., fraudulently filed claims requesting reimbursement for providing ambulance transportation to individuals who do not medically need to transported by ambulance. Plaintiffs make specific allegations (by way of example) that patients Delores M., Lois P.,

3

Scott M. and D.H, were transported by ambulance when such transport was not a medical necessity for them. Plaintiffs allege that CoMed fraudulently sought payment for these individuals as well as many others. Plaintiffs allege that CoMed knowingly filed tens of thousands of false claims over the years.

Plaintiffs also allege that CoMed entered into exclusive contracts with hospitals. As an incentive, CoMed offered to transport in-patient individuals at prices which were allegedly a "mere fraction of that which Medicare reimbursed." CoMed allegedly offered to transport in-patients at rates below CoMed's cost so that hospitals would exclusively use CoMed to service out-patient transportation. Relator plaintiffs allege that CoMed entered into this agreement with St. Bernard Hospital, Mt. Sinai Hospital Medical Center of Chicago, and unnamed "John Doe" medical providers.

In Count I, plaintiffs allege that CoMed violated the False Claims Act, 31 U.S.C. § 3729(a)(1), by knowingly presenting medically unnecessary claims to private insurance contractors and, thereby, defrauding the United States. In Count II, plaintiffs allege that CoMed, St. Bernard, Mt. Sinai and "John Doe" providers violated the False Claims Act because CoMed provided kickbacks to the hospitals in the form of decreased rates for transporting in-patients in exchange for the referral of Medicare patients in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b)(2). That statute prohibits the paying of money (or anything of value) to induce referrals of Medicare patients. Because plaintiffs allege that the medical providers knowingly and wilfully accepted the illegal remuneration in violation of that statute, plaintiffs allege that they have violated the FCA. In Count III, plaintiffs allege that John W. Daley, an owner and president of CoMed, Brian Witek, an owner and Vice-

President of CoMed, and Gary Miller, an owner and Vice-President of CoMed, each personally violated the False Claims Act. These three individuals are alleged to have instigated, directed and benefitted from the fraudulent conduct described in the Second Amended Complaint. The False Claims Act provides treble damages to plaintiffs who prove a claim. 31 U.S.C. §3729(a)(1). In Count IV, plaintiffs allege that CoMed, Daley, Witek and Miller also violated the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/3, and are liable to the State of Illinois for treble the amount of damages, as well as a civil penalty for each false claim.

As provided for in the FCA, plaintiffs filed this *qui tam* action under seal and served it upon the United States. 31 U.S.C. §3730(b)(2). The United States then reviewed the plaintiffs' allegations and decided to intervene in part of the suit. 18 U.S.C. §3730(b)(3). The United States subsequently filed the Amended Complaint. In this Amended Complaint, the United States repeats many of the allegations contained in plaintiff relators' Complaint. The United States alleges that CoMed has participated in the Medicare ambulance program since March 31, 1995. (CoMed's assets have since been sold pursuant to an order of the bankruptcy court.) The United States further alleges that defendants knowingly defrauded Medicare by transporting individuals to hospitals knowing that such ambulance transportation was not medically necessary. The United States alleges that the defendants conducted this unnecessary transportation as a part of a planned scheme to defraud the government. Based on an audit of a statistical sample of patients, the United States states in its complaint that 48% of all the claims billed by defendants to Medicare were unnecessary, and should not have been paid. The United States then conducted a second audit of a statistical sample of defendants'

claims and found that 67% of the claims were medically unnecessary.

In Count I, the United States alleges that the submission of claims which defendants knew were to reimburse medically unnecessary transports constitutes a violation of the False Claims Act. (This essentially is what plaintiffs' claim in Count I of their Second Amended Complaint.) In Count II, the United States alleges that defendants violated the False Claims Act by making false records and statements to obtain payment from the United States. As a result of the alleged fraud, the United States claims actual damages in the amount of $8,971,580.00, and further claims that the defendants are liable under the treble damages provision of the FCA. Counts III through V are common law counts, including payment by mistake of fact (Count III), unjust enrichment (Count IV) and common law fraud (Count V).

## DISCUSSION

When deciding a motion to dismiss, we consider all of the allegations of the complaint to be true, and view all well-pleaded facts and any reasonable inferences drawn from the facts in the light most favorable to the plaintiff. Sherwin Manor Nursing Center, Inc. v. McAuliffe, 37 F.3d 1216, 1219 (7th Cir.1994). Dismissal is proper only if it is clear from the complaint that no set of facts consistent with its allegations would entitle the plaintiff to relief. Hishon v. King & Spaulding, 467 U.S. 69 (1984). With these standards in mind, we turn to defendants' myriad challenges to the sufficiency of the complaints before the Court.

I.  Applicability of the Medicare Anti-Kickback Statute to Claims Brought Under the FCA

CoMed and the hospital defendants have argued that the court should dismiss Count II of the Second Amended Complaint which alleges that CoMed and the hospital defendants have

violated the FCA because they entered into an illegal kickback scheme violative of the

Medicare Anti-Kickback statute, 42 U.S.C. §1320 et seq.   The individual defendants move to

dismiss Count III against them for the same reason.  Although the United States has declined

to join in this part of the relator's case, it nevertheless joins the relators in opposition to this

motion.

This is a case of first impression in our circuit and, in fact, there is a dearth of case law

relevant to the issue from any court.  We note, however, that the cases which have dealt with

this issue, or substantially similar issues, reveal a clear trend in the courts to recognize a cause

of action under the FCA for a violation of the Anti-Kickback statute under certain

circumstances.  Before we address these cases, and the arguments defendants make in

opposition to them, we examine the relevant statutes.

The FCA imposes civil liability upon "[a]ny person" who "knowingly presents, or

causes to be presented, to...the United States...a false or fraudulent claim for payment or

approval." 31 U.S.C. §3729(a).   The United States may bring the action itself, or a private

party may initiate suit for themselves and the United States under the *qui tam* provisions.  31

U.S.C.  §3730(a) and (b)(1).

*Qui tam* actions initially must be filed under seal and served on the United States.

("Q*ui Tam*" is short for the Latin phrase *"qui tam pro domino rege quam se ipso hac parte*

*sequitur"* which means 'who pursues this action on our Lord the King's behalf, as well as his

own." See 3 W. Blackstone, Commentaries, 160.)   The Attorney General then has at least

sixty days to review the suit to determine whether it should intervene in all or part of the

action.  31 U.S.C. §3730(b)(2).  If the Attorney General declines to do so, "the person [the

7

relator] bringing the action shall have the right to conduct the action." 31 U.S.C. § 3730(b)(4)(B). However, that party does so under considerable statutory constraints. For example, the relator may not dismiss the case unless the court and the Attorney General both agree to do so. 31 U.S.C. § 3730(b)(1). Further, even after the United States initially declines to intervene in the suit, it may later decide to join the action provided the district court consents. 31 U.S.C. § 3730(c)(3).

If the United States decides to join the suit, it has "the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c)(1). Although the relator remains a party, the United States may dismiss the case without his consent after notice and a hearing, 31 U.S.C. § 3730(c)(1)(A), or settle the case with court approval, 31 U.S.C. § 3130(c)(2)(B). The court may limit the right of the relator in the examination of witnesses at trial or to otherwise participate in the litigation. 31 U.S.C. § 3730 (c)(2)(C). Further, even before the United States joins the action, discovery in the relator's case may be stayed if the United States demonstrates that such discovery would interfere with its own civil or criminal investigation of any claims arising out of the same facts. 31 U.S.C. § 3730(c)(4). The plaintiff may share in a portion of the damages resulting from the prosecution of the case, ranging from between 15 to 25% if the United States intervenes in the case, or 25 to 30% if the United States declines to do so. 31 U.S.C. § 3730(d)(1) and (2).

The FCA is the government's "primary litigative tool for combating fraud." United States ex rel. Kelly v. Boeing Co., 9 F.3d 743, 745 (9th Cir. 1993) (quoting Senate Judiciary Committee, False Claims Amendments Act of 1986, S. Rep. No. 99-345, 2d Sess. at 2 (1986),

reprinted in 1986 U.S.C.C.A.N. 5266). The legislative history of the FCA reveals a Congressional intent to encompass a wide range of false or fraudulent conduct. The FCA was intended to cover "each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation..." S. Rep. No. 345, 99-2d Sess. at 9 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5275) (emphasis added.) In addition, the legislative history states that "claims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program ...." Id. As one court stated, "it is clear that the False Claims Act was intended to cover not only those situations in which the claims themselves are false, but also those situations in which a claimant engages in fraudulent conduct with the purpose of inducing payment by the government." United States of America ex rel Pogue v. American Healthcorp, Inc., 914 F. Supp. 1507, 1511 (M.D. Tenn.1996).

Unlike the FCA, the Anti-Kickback Act is a criminal statute. It prohibits any type of payment, whether paid "directly or indirectly, overtly or covertly, in cash or in kind," that is knowingly and willfully intended to induce someone to refer Medicare, Medicaid, or other state health program patients, or to order goods or services reimbursable under such programs. 42 U.S.C. § 1320a-7b(b)(1). The Act specifically prohibits an individual from soliciting or receiving any remuneration from any person (1) "in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program," or (2) "in return for purchasing, leasing, ordering, or arranging for or recommending purchasing,

9

leasing, or ordering any good, facility, service, or item for which payment may be made in whole or part under a Federal health care program...." Id. 1320a-7b(b)(1)(a) & (B). These offenses are classified as a felony, punishable by fines of up to $25,000 and imprisonment for up to five years. (Of course, application of the Sentencing Guidelines usually results in a sentence considerably less than the statutory maximum.) An offender of the statute must act "knowingly and willfully." 42 U.S.C. § 1385nn(b)(1). The prevailing view is that this requires the government to prove that the offender knew that the conduct in which he engaged was wrongful, but not that it violated a specific legal duty defined in the statute. Cf. United States v. Jain, 93 F.3d 436 (8th Cir. 1996) with Hanlester Network v. Shalala, 51 F.3d 1390 (9th Cir. 1995).

In 1987, Congress authorized the Secretary of Health and Human Services to exclude from the Act certain payment practices which would on their face, seem to violate it. These regulations, known as safe harbors, were intended to address "uncertainty among health care providers as to which commercial arrangements are legitimate, and which are proscribed." S. Rep. No. 100-109, at 27 (1987), reprinted in 1987 U.S.C.C.A.N. 682, 707-08. In addition, Congress created an administrative procedure for the Secretary to exclude offenders from the Medicare program, provided that a hearing be afforded to the alleged offender to allow an administrative judge to adjudicate whether the requisite criminal intent has been proven. S. Rep.100-1009, at 13, reprinted in 1987 U.S.C.C.A.N. (1987).

Defendant makes several arguments in opposition to the use of the Anti-Kickback statute as a predicate for an FCA violation. First, they argue that the Seventh Circuit explicitly has held that the Anti-Kickback statute does not provide a private right of action to

enforce its proscriptions. In <u>West Allis Memorial Hospital, Inc.</u>, 852 F.2d 251 (7th Cir. 1988), the Seventh Circuit analyzed the Medicare Kickback Statute in the context of a preliminary injunction sought by one health care provider to stop its competitor from violating the statute. The court noted that there is a strong presumption against recognizing a private right of action under a criminal statute. <u>Id.</u> at 253. The court stated that the Supreme Court had set forth four factors to consider to determine whether such a right existed : (1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted"; (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one"; (3) whether it is "consistent with the underlying legislative scheme to imply such a remedy for the plaintiff"; and (4) whether "the cause of action was one traditionally relegated to state law." <u>Cort v. Ash</u>, 422 U.S. 66, 78 (1975).

The Seventh Circuit did not find anything in the statute or its legislative history to provide such a remedy to Medicare providers "which may be injured as a result of a competitor's noncompliance with the provisions of that statute." It recognized that it was the province of the United States to enforce this law. <u>Id.</u> at 254. However, the holding of <u>West Allis</u> goes no further and gives the court little guidance here. The relators do not seek a private right of action as defendants' competitors which may be injured by defendants' actions. Instead, as *qui tam* relators under the FCA, they sue in the name of the United States to remedy an injury in fact to the United States (although they also have a personal interest in the outcome because of their potential share of the damages.) The Supreme Court has granted them standing to sue under Article III in part because of their "representational standing" for the United States. <u>Vermont Agency of Natural Resources v. Stevens</u>, 529 U.S. 765, 773

11

(2000). We also do not believe that recognition of the right to sue under the FCA based on an alleged violation of the Anti-Kickback statute is an "end run around" the West Allis holding (as defendants suggest) because our holding limits such suits to those cases filed by *qui tam* relators. Our jurisdiction over a *qui tam* FCA claim is limited to suits brought by relators who are the original source of the alleged violations of the Anti-Kickback Act. 31 U.S.C. § 3730(e)(4). This restriction on *qui tam* suits is significant. In fact, it would bar us from hearing the suit between the two competitors that the Seventh Circuit faced in West Allis. Therefore, we do not believe that West Allis prevents the court from recognizing a cause of action under the FCA predicated on an alleged violation of the Medicare Anti-Kickback statute.

The defendants also cite other authority which they suggest is persuasive on this point. However, these cases do not deal with the unique situation presented by a *qui tam* suit under the FCA in which the relator sues in the name of the United States. For example, in Acton Ambulance Service, Inc. v. Atlanticare Heath Services, Inc., the court held that the allegations of an illegal kickback scheme in violation of state and federal Medicaid and Medicare antifraud statutes could not form the basis of a Sherman Act claim. 815 F. Supp. 33 (D. Mass. 1993). The court offered virtually no analysis as to why it reached this conclusion, but noted that plaintiff in that case did not really contest this point. Id. at 37. Similarly, in Korenyi v. Dept. of Sanitation of the City of New York, the court declined to recognize a claim under 42 U.S.C. §1983 which was premised on a violation of a different federal kickback proscription. 699 F. Supp. 388, 396 (E.D.N.Y. 1988). Quoting Cort v. Ash, 422 U.S. at 80, the court held that "a bare criminal statute, with absolutely no indication that civil enforcement of any

12

kind was available to anyone" should not give rise to a private right of action. 699 F. Supp. 388, 396 (E.D.N.Y. 1988). The kickback statute at issue did not contain any language which could be interpreted to provide for civil enforcement, therefore, the court refused to recognize one. Again, the district court in that case did not analyze the interplay between the FCA, the use of which is limited to plaintiffs who are the original source of the allegations, and the kickback statute before it. Therefore, its holding has limited applicability to this case.

We do recognize, as defendants point out, that the Korenyi court also found it significant that the kickback statute was not applicable in every situation to which its language seemingly applied. Defendants correctly note that the government does not always prosecute alleged violations of the Medicare Anti-Kickback which arguably might be covered by its broad proscriptions. From this premise, they argue that allowing suits under the FCA, which the government may or may not choose to prosecute criminally, might unfairly subject healthcare providers to unwarranted civil suits. Although we believe that there is merit to this point, we do not believe that it carries the day. As we will discuss further below, we do not believe that such so-called *de minimis* violations would be cognizable under the FCA anyway. Further, in *qui tam* suits, the government maintains significant control over the law suits (whether or not it decides to join them) which further undermines the notion that allowing such suits to proceed would open the door to frivolous complaints. And we certainly do not believe that allowing certain *qui tam* suits predicated on the kickback statute would cause health care providers to "shut their doors", as one of the defendants hyperbolically suggests.

In contrast to the cases cited above, which have limited relevance to this case, the clear trend of courts that have examined the same questions, or ones substantially similar to the

13

question before the court, is to allow such complaints to be brought under certain circumstances. As the government points out, the courts long have recognized that a violation of another federal statute, rule or regulation may render claims false or fraudulent under the FCA, holding that the violation of the attendant statute, in conjunction with the submission of a claim to the United States, may violate the FCA. See, e.g., United States v. Rockwell Int'l Corp., 795 F. Supp. 1131 (N.D. Ga. 1992) (holding that a contractor's violations of the Truth in Negotiations Act could form the basis of a FCA action); United States v. White, 765 F.2d 1469, 1479-80 (11th Cir. 1985) (time cards altered in violation of the Truth in Negotiation Act may form basis of FCA claim); United States v. General Dynamics Corp., 19 F.3d 770 (2d Cir. 1994) (different Anti-Kickback statute did not preempt claims tainted by statute). Defendants argue that these cases are not relevant because the government itself was bringing the action, but this argument is specious. The relevance of these cases lies not in the identity of the party bringing the action, but rather the fact that the courts recognize that FCA liability may be premised on the violation of a different federal statute that otherwise lacks a private right of action. In addition, as we already have discussed, only a limited class of private citizens may bring *qui tam* suits and the federal government continues to exert significant control over the litigation even if it decides to forgo joining the case.

The court in United States ex rel. Pogue v. American Healthcorp, Inc., relied on these principles when it held that a health care provider which submitted claims to federal government for reimbursement in violation of the Anti-Kickback statute may violate the FCA. 914 F. Supp. 1507 (M.D. Tenn. 1996). The court rejected the argument that because defendant actually provided the government with the services for which it had billed, the

14

government could not state a claim against it under the FCA. Id. at 1508. (Defendants here make the same argument.) The court noted that when the Supreme Court held that there was no need to demonstrate actual damages under the Surplus Property Act, it relied on its previous decision affirming the judgment of a court in an FCA case which held that the government's failure to prove actual damages was not fatal to its claim. Rex-Trailer Co v. United States, 350 U.S. 148, 152 (1956), relying upon United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943). We agree and, therefore, reject defendants' argument that the relators must show actual damages to prevail here.

The court in Pogue implicitly recognized that a claim for services rendered which results from a process tainted by fraud impairs the integrity of the government program. This causes harm. The court cited cases similar to those discussed above and allowed claims under the FCA if the government would not have paid the claim had it known about the violation of the federal statute or regulation. For example, in Ab-Tech Constr Inc. v. United States. 31 Fed. Cl. 429 (1994), aff'd, 57 F. 3d 1084 (Fed Cir. 1995), the government alleged that a company which had been awarded a government contract pursuant to the Small Business Administration's ("SBA") minority-owned business program had violated a regulation requiring that it seek SBA approval of its subcontracts. The government further alleged that claims for payment which this company submitted for services performed under this subcontract violated the FCA. Defendant claimed that such allegations could not form the basis of a claim under the FCA. The court agreed with the government, holding that the company's concealment of its prohibited contract arrangement caused the government to pay out funds in the mistaken belief that its was furthering the SBA program goals. In other

words, the court recognized the common sense principle that the intentional withholding of information critical to the government's decision to pay is the essence of a fraudulent claim. Id. at 434.

Similarly, in United States v. Incorporated Village of Island Park, 888 F. Supp. 419, 439 (E.D.N.Y. 1995), the court held that the FCA is "violated not only by a person who makes a false statement or a false record to get the government to pay a claim, but also by one who engages in a fraudulent course of conduct that causes the government to pay a claim for money." The court relied on the broad language of the legislative history of the Act cited above to support this conclusion. Therefore, it found that the defendants which allegedly gave preferential treatment to white applicants for housing in violation of HUD regulations could be liable under the FCA for claims they made to obtain subsidized mortgages from HUD. Nothing in these claims was false on its face, but the scheme that resulted in the actual submission of the claims was fraudulent.

The Pogue court also cited United States ex rel. Roy v Anthony, No. C1-93-0559, 1994 WL 376721 (S.D. Ohio July 14, 1994), in which the court found sufficient complaint that alleged that defendants violated the False Claims Act when they submitted claims to Medicare for services that resulted from referrals for which defendants received and paid kickbacks. The court specifically stated that the plaintiff in that case had not alleged that the services were not necessary or were not performed, but recognized that merely alleging a violation of the underlying Medicare Anti-Kickback Act could be sufficient.

As the Pogue court recognized, the FCA clearly is not designed to encompass every kind of fraud on the government. 914 F. Supp. 1507, 1511, quoting United States v.

<u>McNinch</u>, 356 U.S. 595, 598 (1958). It, therefore, attempted to strike a balance between those acts which merely violate an underlying federal statute applicable to the claim, and "those fraudulent acts that cause the government to pay out sums of money to claimants it did not intend to benefit." 914 F. Supp. at 1512. Thus the court found that Pogue could only bring the claim if he could show that defendants engaged in fraudulent conduct with the purpose of inducing payment from the government. <u>Id</u>, at 1513. Put another way, a plaintiff must show that defendants concealed their fraudulent activity in an effort to convince the government to pay Medicare claims it would not otherwise have paid.

The Fifth Circuit in <u>United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.</u> further elaborated on this premise when it held that, when a government has conditioned payment of a claim upon a claimant's certification of compliance with a statute or regulation, a claimant submits a claim falsely certifying compliance with that statute or regulation, even if the services for which payment is claimed were rendered. 125 F.3d 899, 901 (5th Cir. 1998). <u>See also</u> <u>United States ex rel Hopper v. Anton</u>, 91 F.3d 1261, 1266 (9th Cir. 1996). Therefore, the court held that when they certified their annual cost reports that they had complied with Medicare laws and regulations, defendants that maintained a kickback relationship could be liable under the FCA. The court remanded the case to the district court for further fact development.

On remand, the court ruled that the complaint stated a claim under the FCA based, in part, on an affidavit in which a government witness affirmed that the agency conditioned payment and provider eligibility on the veracity of the annual cost report. 20 F. Supp. 1017, 1041 (S.D. Tex. 1998). The court also ruled on a second question remanded to it. It held that

a violation of a similar Medicare law that prohibits self-referrals among defendant entities and physicians financially linked to them was actionable under the FCA. See 42 U.S.C. §1395nn. This statute, unlike the anti-kickback statute, explicitly states that claims submitted in violation of the statute will not be paid.

We do not believe that every violation of a federal regulation or law governing the program under which the claim is brought should automatically constitute a violation of the FCA. This would impermissibly broaden the scope of the FCA. However, as the cases suggest, material violations of such laws affecting payment of the claim should be actionable. In other words, we only find that only those complaints which allege that, the government would not have paid the claim had it known about the underlying violation, present a valid cause of action under the FCA. In this case, therefore, plaintiffs must plead (and ultimately prove) that had the government known about the kickback scheme, it would have refused payment of the claims and, further, that the defendants were aware that this was the case when they engaged in their fraudulent conduct. It does not make sense to the court to hold, as relators suggest, that defendants which certify compliance with the Medicare laws, while secretly maintaining a kickback arrangement, automatically violate the FCA. If the certification in question has no bearing on the government's decision to pay the claims, there is no reason why it should trigger liability under the FCA. However, if the relators can show that the alleged scheme is in fact an illegal kickback scheme, and that the government would have barred claims had it known of the existence of the underlying scheme, a violation of the FCA would be proven. Under these circumstances, the alleged facts would constitute a fraudulent scheme materially bearing on the government's decision to pay the claims submitted

to it.

Recognition of these claims under the FCA is consistent with the Congressional purpose behind both statutes. As we already have discussed, the court does not believe that this would be an "end run around" the kickback statute's failure to provide a private right of action because *qui tam* actions are limited to those plaintiffs who have representational standing for the government. In addition, the government retains significant control over the litigation, and the class of plaintiffs who can bring such cases are limited to those who are the original source of the information constituting the claim. (The fact that the last reported decision on this issue is from 1998 belies the notion, expressed by defendants, that a holding will open the flood gates against health care providers.) We also do not believe that "technical violations" of the anti-kickback statute (those violations which would be excused by the government and, therefore, not prosecuted,) would form the basis of many spurious suits against healthcare providers. Under the court's ruling, the relators must plead and prove the materiality of the underlying violation to state a claim. For the same reason, allowing these limited claims to proceed does not dilute the burden of proof under the Anti-Kickback Act (which requires criminal intent) to that provided in the FCA (which encompasses certain negligent conduct.) If a plaintiff cannot prove a knowing violation of the kickback statute, it will be impossible for that plaintiff to prosecute successfully the suit under the FCA.

Applying these standards to relators' complaint, we find that the allegations are insufficient to state a claim under the FCA. Although relators set forth facts which describe the alleged kickback scheme, they do not allege facts which suggest that any of the defendants entered into this arrangement for the purpose of obtaining payment of the claims which

19

otherwise would not have been paid had the government known of the scheme. We reject, however, the hospital providers' argument that they should be automatically exempted from liability because they did not present the claim for payment to the government. The FCA explicitly extends liability to any party who causes false claims to be presented. Therefore, if relators plead that the hospital providers here knowingly entered into the kickback arrangement to cause claims to be presented which would not have been paid had the government known about the underlying kickback scheme, those providers may be liable under the FCA. Relators do not do this. Instead, for the first time in the brief, relators suggest that the hospitals concealed the kickback arrangement when they falsely certified full compliance with the applicable Medicare statutes. However, they neither plead these facts in their Complaint, nor do they plead that the medical providers' statement of compliance had any bearing whatsoever on the government's decision to pay the claims that were submitted. Therefore, they have not stated a claim against the hospital providers.

We therefore, dismiss Count II of the Second Amended Complaint, as well as Count III insofar as it alleges that the individual defendants are liable under this theory, but we grant leave to the relators to amend their Complaint to conform with this opinion.

II.    Constitutionality of the *Qui Tam* Provisions of the FCA.

Against the great weight of authority, all of the defendants have challenged the constitutionality of the *qui tam* provisions of the FCA, claiming that these provisions violate the Separation of Powers Doctrine and the Take Care Clause of Article II of the United States Constitution. That clause states that the Executive must "take care that the Laws be faithfully executed." Defendants' argue that Congress may not allow private citizens to prosecute

20

litigation on behalf of the Executive without impinging unduly on this constitutional requirement, and that the FCA also violates the separation of powers doctrine. Their primary support for their argument is <u>Riley v. St. Luke's Episcopal Hospital</u>, 196 F.3d 514 (5th Cir. 1999). The court was, therefore, surprised to discover that the holding in that case has since been vacated by the Fifth Circuit *en banc*. 252 F.3d 749 (5th Cir. 2001). The court reminds counsel for the parties that they have a continuing ethical obligation to inform the court about changes in the law that affect their arguments.

In any event, we are persuaded by the reasoning in the second <u>Riley</u> decision which comports with our own previous decisions, as well as all other authority on this question. See <u>United States ex rel. Chandler v. The Hektoen Institute for Medical Research, et. al.</u>, 35 F. Supp. 2d 1078, 1082 ("This court follows the vast majority of courts that have considered this issue and finds that the FCA does not run afoul of the separation of powers doctrine."); <u>United States ex rel. Robinson et al. v. Northrup Corp.</u>, 824 F. Supp. 830, 837-38 (N.D. Ill. 1993) ("[L]ike every other court to consider the separation of powers challenges to *qui tam* suits under the FCA, this court concludes that the [FCA's] *quit tam* provisions do not encroach upon the Executive Branch prerogatives."). We, like the Fifth Circuit in the second <u>Riley</u> decision, also take heed of the Supreme Court decision in <u>Vermont Agency of Natural Resources v. United States ex rel. Stevens</u>, 529 U.S. 765 (2000), which acknowledged the historical importance of *qui tam* law suits and recognized that such history was "well nigh conclusive" on the issue of whether a relator has standing under Article III in FCA cases. <u>Id.</u> at 792. As the Fifth Circuit pointed out in its ruling, "it is logically inescapable that the same history that was conclusive on the Article III question in <u>Stevens</u> ....is similarly conclusive

21

with respect to the Article II question concerning this statute." 2001 WL 568727, *1. The "take care" clause does not require Congress to prescribe litigation by the Attorney General as the sole means of enforcing the law. In addition, as the United States points out, the Executive Branch maintains significant control over the litigation even when the *qui tam* relator brings the action. Therefore, we see no constitutional impediment to a *qui tam* suit and decline to dismiss either complaint on this ground.

III.    Rule 9(b) and Other Issues

All of the defendants have attacked the sufficiency of the fraud allegations in the complaints of both the relators and the United States under Fed. R. Civ.P. Rule 9(b). We have examined the complaints carefully and are satisfied that both of them adequately describe the particulars of the alleged fraud to defendants. The court had no difficulty determining how and when the alleged fraud was perpetrated and by whom. In addition, we disagree with the individual defendants' contention that they are named as defendants merely because they acted as officers and directors of the corporate entities. On the contrary, the complaints specifically set forth facts which demonstrate that these defendants ran the operations of the company on a daily basis, that they individually took actions to instigate and perpetuate the alleged fraud, including approval of the underlying scheme, and that they personally continued to authorize false billing to Medicare on behalf of patients, the vast majority of whom they allegedly knew were not entitled to receive the ambulance transport for which they billed. In addition, these individuals are alleged to have personally benefitted from the alleged fraud.

We disagree with defendants that the allegations are vague or conclusory, but rather find that they plainly describe the alleged fraud. Undoubtedly, defendants will learn more

22

about plaintiffs' contentions during discovery and, given the length of the investigation prior to the government's decision to intervene in the case, already have learned much more than the typical defendants at the inception of a fraud action.

Defendants also raise a whole host of procedural defects with the relators' complaint, none of which we find persuasive. They argue that these relators are not the original source of the information upon which the FCA claims are made. Perhaps not. But we cannot make this determination on the basis of the pleadings and, as the relators point out, defendants have not cited any authority to support their assertion that relators needed to affirmatively plead this statutory requirement. Similarly, we cannot determine at this stage whether or not relators have complied with the Illinois Whistleblower Reward & Protection Act. We further refuse to dismiss the Complaint on the basis that relators have improperly pled the basis of the court's jurisdiction. It is clear to us that we have jurisdiction at this point. We also reject the argument that plaintiffs have failed to properly allege on whose behalf they have brought this case. It is clear to us that as *qui tam* relators, they have brought the case on behalf of themselves and for the United States government.

### CONCLUSION

For all of the forgoing reasons, we deny the motion to dismiss the United States' Amended Complaint against all defendants. We grant the motion to dismiss Count II of the Second Amended Complaint against CoMed and its related entities and the hospital providers. We grant the motion to dismiss Count III against the individual defendants. We grant relators

23

leave to amend their complaint to conform to this opinion on or before September 14, 2001.

It is so ordered.

_____
Wayne R. Andersen
United States District Judge

Dated: _August 31, 2001_