IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN KLACZAK and JEFF SHARP, individually and as *ex rel.* UNITED STATES OF AMERICA, ) ) ) ) | |
| Relators, ) ) | |
| v. ) ) | Case No. 96 C 6502 |
| CONSOLIDATED MEDICAL TRANSPORT ) INC., d/b/a COMED TRANSPORT, INC. ) TOWER AMBULANCE SERVICE, INC., ) DALEY'S AMBULANCE SERVICE, LTD., ) ESTATE OF JOHN W. DALEY, JR., ) JOHN W. DALEY, III, BRIAN T. WITEK, ) RICHARD S. WITEK, TOM WAPPEL, ) ST. BERNARD HOSPITAL, ) MT. SINAI HOSPITAL MEDICAL CENTER OF ) CHICAGO, JACKSON PARK HOSPITAL, ) TRINITY HOSPITAL, SOUTH SHORE ) HOSPITAL, SOUTH SUBURBAN ) HOSPITAL, HOLY CROSS HOSPITAL, ) BETHANY HOSPITAL, ST. JAMES ) HOSPITAL, LORETTO HOSPITAL, and ) "JOHN DOE" MEDICAL PROVIDERS, ) ) | Hon. Mark Filip |
| Defendants. ) | |

## MEMORANDUM AND OPINION

In this *qui tam* action, plaintiffs John Klaczak and Jeff Sharp ("Relators"), individually

and on behalf of the United States, are suing Consolidated Medical Transport ("CoMed"), as well

as the various other defendants named in the caption of this case.[1] The United States partially

---

[1]  The Court assumes that the reader has a certain degree of familiarity with the history of
this case, particularly that history which is not relevant to the disposition of this motion. Judge
Andersen has issued two opinions detailing the background of this case. *See Klaczak v. Consol.
Med. Transp., Inc.*, No. 96-6502, 2002 WL 31010850, at *1-3 (N.D. Ill. Sept. 9, 2002); *United
States ex rel. Sharp v. Consol. Med. Transp., Inc.*, No. 96-6502, 2001 WL 1035720, at *1-3
(N.D. Ill. Sept. 4, 2001).

intervened in this matter, and declined to intervene in other aspects of the Relators' claims. (D.E. 15). (In this regard, for example, it appears that the United States declined to intervene in the claims against the Defendant hospitals. (*See id.*)) The Relators allege, among other things, that certain defendants violated the False Claims Act ("FCA") by entering into agreements for ambulance services, which agreements constituted a kickback scheme in violation of the Medicare Anti-Kickback Statute, 32 U.S.C. § 1320 *et seq.* Count V of Relators' Second Amended Complaint is an FCA claim brought against St. Bernard Hospital, Mt. Sinai Hospital, Jackson Park Hospital, Trinity Hospital, South Shore Hospital, South Suburban Hospital, Holy Cross Hospital, Bethany Hospital, St. James Hospital, Loretto Hospital (collectively, "Defendants"), and "John Doe" Medical Providers. Relators allege that, in violation of the Anti-Kickback Statute, Defendants have "knowingly and willfully accepted illegal remunerations offered to them by CoMed in the form of drastically reduced rates for their Part A transports in exchange for which they referred to CoMed their Part B transports." (Second Am. Compl. (D.E. 85) ¶ 81.) Before the Court is the Defendants' Motion (D.E. 180) in Limine to Exclude the Expert Testimony of Frank W. Nagorka and Eva Jo Sparks under Federal Rules of Evidence 104 and 702.[2] For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

This suit was filed in October 1996, and in the years since then, this case has produced a long and relatively complex procedural history, much of which is not relevant to the resolution of

---

[2] The individual defendants in this case orally moved to join this motion. (*See* D.E. 181). As a practical matter, their motion may be moot, as the individual defendants (who were the subject of the intervention of the United States) have settled with the government. As a result, the claims that the government is pursuing, at least on its own behalf, as well as the claims against the individual defendants, are now resolved.

Defendants' Motion.[3]  What is relevant, however, is that during 2004, this Court set a disclosure

and report schedule for experts in this matter.  The Realtors disclosed Frank W. Nagorka

("Nagorka") and Eva Jo Sparks ("Sparks") as their experts and provided Defendants with copies

of Sparks's and Nagorka's expert reports.  Defendants have moved to exclude Sparks's and

Nagorka's testimony and reports, arguing that their testimony generally (and their expert reports

specifically) fail to meet the required standards for admissibility and would fail to assist the jury

in understanding the facts of this case. (D.E. 180 at 2.)  Defendants also contend that Sparks's

and Nagorka's testimony is "inadmissible and inappropriate as a matter of law and . . . that

neither [Sparks nor Nagorka] is qualified to testify as to the opinions that they ultimately offer."[4]

(*Id.*)

Before reaching the merits of Defendants' Motion, a brief review of an opinion and order

that Judge Andersen issued in this case on September 4, 2001, is necessary to put Defendants'

Motion in context. *See United States ex rel. Sharp v. Consol. Med. Transp., Inc.*, No. 96-6502,

2001 WL 1035720 (N.D. Ill. Sept. 4, 2001).  In that opinion, Judge Andersen ruled that "if the

[R]elators can show that the alleged scheme is in fact an illegal kickback scheme [in violation of

the Anti-Kickback statute], and that the government would have barred claims had it known of

the existence of the underlying scheme, a violation of the FCA would be proven." *Id.* at *10.

Judge Andersen found that "[u]nder these circumstances, the alleged facts would constitute a

---

[3]     This Court received this case via reassignment upon taking the bench in 2004.

[4]     The Court makes no finding at this time that Realtors' experts are qualified to offer any of
the testimony identified in their reports.  The reports did not contain *curriculum vitae* and the
issue of qualification was not addressed in any meaningful way in the parties' briefs.  Defendants
may raise qualification challenges as this matter approaches trial, if appropriate, and the parties
are free to request a *Daubert* hearing at that later juncture if one is appropriate.

3

fraudulent scheme materially bearing on the government's decision to pay the claims submitted to it." *Id.* The Relators must prove that "had the government known about the kickback scheme, it would have refused payment of the claims, and, further, that the defendants were aware that this was the case when they engaged in their fraudulent conduct." *Id.* The Relators have apparently endeavored to follow Judge Andersen's directions, with their expert reports taking a marked shortcut (producing, as discussed below, proffered expert testimony in the form of various inappropriate legal conclusions) on the issue of Defendants' liability.

With respect to the Relators' proffered experts, Mr. Nagorka is a paramedic and lawyer whose report ultimately concludes that "the ambulance provider agreements . . . constituted a kickback scheme in violation of the Anti-Kickback Statute." (D.E. 180, Ex. A ("Nagorka Report") at 1, 44.) In reaching this conclusion, Nagorka's report, which reads more like a legal brief than an expert report, sets forth numerous assertions about the applicable law, reviews various agreements between the Defendants and defendant ambulance companies, and asserts that the Defendants and their agreements violated the Anti-Kickback Statute. (*See id.* at 14 ("The ambulance provider agreements entered into by Bethany Hospital and Consolidated Medical Transport violate the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)).").) Nagorka also asserts that the Defendants and their agreements are not protected by any laws concerning safe harbor protections (*see, e.g., id.* at 2 (stating that the agreements "fail to meet the 'safe harbor' requirements")), and Nagorka further asserts that discounts received by the Defendants from CoMed were "illegal remunerations." (*See, e.g., id.* at 15 ("The rates provided to Bethany Hospital by CoMed are illegal remunerations under the Anti-Kickback Statute."); *see also, e.g.,* ("The discounts that Bethany Hospital received from CoMed on transports that Bethany Hospital

4

was financially responsible for (e.g., DRGs, Medicare Part A transports, in-patient transports) are illegal remunerations.").)

Ms. Sparks is a Certified Fraud Examiner (D.E. 180, Ex. B ("Sparks Report") at 1), who, according to her report, the Relators expect to "testify relating to the application of Medicare rules and regulations as applied to" this case. (*Id.*; D.E. 182 at 10.) Sparks's report begins by discussing the Medicare system. (D.E. 180, Ex. B at 1-6). Her ultimate opinion is that, among other things, the Defendants and defendant ambulance companies "knowingly entered into a kickback scheme" and "knowingly filed Cost Reports with Medicare containing false certifications and statements." (*Id.* at 21.) She opines that each claim presented to Medicare and Medicaid by the Defendants and the defendant ambulance companies "which were provided or procured through the underlying kickback scheme . . . is a fraudulent claim on the Government." (*Id.*) Of particular relevance to Defendants' Motion is Sparks's conclusion that Defendants "knowingly concealed from Medicare the improper kickback schemes" and that Defendants "kn[ew] that any disclosure . . . would result in denial of all claims made to Medicare." (*Id.* at 10.)

## ANALYSIS

A district court must exercise its informed discretion to determine whether to admit expert testimony or not. *See, e.g., Good Shepard Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). After reviewing the proffered expert reports, and after reviewing applicable precedent, the Court finds that much of the testimony of the Relators' proffered experts, and particularly much of the testimony of attorney Nagorka, should not be admitted at trial. The legal conclusions offered by Relators' experts will not assist the jury in understanding

5

the evidence or in determining the facts at issue. Independently, such testimony presents an impermissible risk of usurping the role of the Court as it relates to the jury. In addition, and independently, the potential for jury confusion attendant to such testimony warrants exclusion pursuant to Federal Rule of Evidence 403. The Court also, as explained below, excludes various purported expert testimony from Sparks and Nagorka as to what the Defendants purportedly knew or whether the Defendants intended to commit fraud. Such testimony is not helpful to the jury, as the jury is well positioned to make this type of assessment in the absence of a battle of expert testimony about what parties knew or did not know, or did or did not subjectively intend to do. In addition, such testimony is independently excluded pursuant to Rule 403.

Federal Rule of Evidence 702 provides that an expert witness may testify as to "scientific, technical, or other specialized knowledge" where such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Seventh Circuit precedent, however, prohibits expert witnesses from offering opinions or legal conclusions on issues that will determine the outcome of a case. *See, e.g.*, *Good Shepherd*, 323 F.3d at 564 ("The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible.") (citing *United States v. Sinclair*, 74 F.3d 753, 758 n.1 (7th Cir. 1996)); *accord, e.g.*, *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."); *Niebur v. Town of Cicero*, 136 F. Supp. 2d. 915, 920 (N.D. Ill. 2001) ("[T]he Court of Appeals is crystal clear that an expert may not 'improperly tell[] the jury why [a party's] conduct was illegal.' Expert witnesses are not allowed to draw 'legal conclusions' . . . .") (quoting, first, *Haley v. Gross*, 86 F.3d 630, 645 (7th Cir. 1996), and second,

6

*West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997)); *In re Initial Public Offering Servs. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law.") (collecting numerous cases); *id.* ("[W]hile an expert may provide an opinion to help a judge or jury understand a particular fact, 'he may not give testimony stating ultimate legal conclusions based on those facts.'") (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

Precedent teaches that one reason for these rules is to prevent the situation where the expert usurps or infringes upon the role of the judge. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 294 n.6 (7th Cir. 1981) ("It is not for witnesses to instruct the jury as to applicable principles of law, but the judge."); *accord, e.g., Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards."). The Seventh Circuit has noted that, if a court would admit such expert testimony, a court would improperly signal to the jury that it is appropriate to look to the parties' experts for legal guidance. *See Harbor Ins. Co. v. Cont'l Bank Corp.*, 922 F.2d 357, 366 (7th Cir. 1990).

The Court need not decide at this time (nor have the parties asked for) the precise language of the instructions that the Court will give to the jury at the conclusion of any trial in this case.[5] Even a rough sketch of what those instructions may look like (in light of the relevant

---

[5] A trial date has not been set in this case, and the parties have not submitted proposed jury instructions. Judge Andersen stated that "[t]his is a case of first impression in [the Seventh Circuit] and . . . [that] there is a dearth of case law relevant to the issue from any court." *Sharp*, 2001 WL 1035720, at *4. The time that has passed since Judge Andersen's ruling has not added any definitive level of clarity to what jury instructions might look like, although the Court's research uncovered cases addressing use of the Anti-Kickback Statute to attempt to establish a violation of the FCA, which cases were not available to Judge Andersen. *See, e.g., United States*

7

law and Judge Andersen's prior rulings), however, reveals the many material legal conclusions and assertions contained in the Nagorka and Sparks reports. Judge Andersen "recognize[d] that a violation of the Anti-Kickback Statute may form the basis of an FCA claim." *Sharp*, 2001 WL 1035720, at *1; *id.* at *8 ("[C]ourts recognize that FCA liability may be premised on the violation of a different federal statute that otherwise lacks a private cause of action."). The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) makes it a felony to:

> knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b). As explained above, Judge Andersen held that "if the [R]elators can show that the alleged scheme is in fact an illegal kickback scheme [in violation of the Anti-Kickback statute], and that the government would have barred claims had it known of the existence of the underlying scheme, a violation of the FCA would be proven." *Sharp*, 2001 WL 1035720, at *10. Under Judge Andersen's ruling, the issue of whether Defendants violated the Anti-Kickback Statute is outcome determinative and will be the subject of a jury instruction at trial.

Moreover, established Seventh Circuit precedent, as well as case law from this district, specifically teaches that an expert may not offer opinion testimony as to whether a defendant

---

*ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612 (N.D. Ill. 2003) (holding that violation of Anti-Kickback statute can be basis for False Claims Act violation); *United States ex rel. Barrett v. Columbia/HCA Health Care Corp.*, 251 F. Supp. 2d 28 (D.D.C. 2003) (similar).

violated a statute or regulation, at least where that statute or regulation is at issue in the case. *See Good Shepard*, 323 F.3d at 564 (holding that expert testimony that included "conclusions that the [defendants] violated the [Fair Housing Amendments Act]" was properly excluded) (citing *Sinclair*, 74 F.3d at 757 n.1); *McCabe v. Crawford & Co.*, 272 F. Supp. 2d 736, 740 (N.D. Ill. 2003) (holding that plaintiff's expert, a law professor who specialized in consumer law, "may not expound on what complies and does not comply with the [Fair Debt Collection Practices Act]; these are inappropriate legal conclusions"); *Cent. Die Casting and Mfg. Co., Inc. v. Tokheim Corp.*, No. 93-7692, 1998 WL 812558, at *9 (N.D. Ill. Nov. 19, 1998) ("The Court agrees that an expert's opinion concerning whether a statute or regulation was violated is likely an inadmissible legal conclusion . . . ."). Accordingly, any opinion as to whether Defendants violated the Anti-Kickback Statute, or met (or did not meet) with the safe harbor strictures, or whether any discounts received were illegal remunerations, is improper. *See, e.g.*, *Good Shepard*, 323 F.3d at 564; *Sinclair*, 74 F.3d at 758 n.1; *McCabe*, 272 F. Supp. 2d at 740.

The Relators' briefing, with all respect, is not particularly helpful. The Relators "do not contest the proposition that experts cannot render impermissible legal conclusions." (D.E. 182 at 2.) But rather than explain which, if any, of the specific legal conclusions contained in their experts' reports is a "permissible" legal conclusion (whether any actually would be is suspect, given the precedent cited above), Relators advance, as best the Court can tell, three general arguments. First, Relators argue that "as a practical matter not all opinions can be easily identified as permissible factual conclusions or impermissible legal conclusions." (*Id.*) Second, Relators argue that "[c]ourts have admitted testimony that clearly sets forth a legal conclusion[,] and Rule 704 of the Federal Rules of Evidence permits opinions on the ultimate issue." (*Id.*)

9

Third, Relators argue that, even if the Court excludes certain of Sparks's and Nagorka's testimony, that exclusion does not mandate that they should be excluded from testifying at trial. (*Id.* at 2, 4.) The Court addresses these arguments in turn.

Realtors begin with the proposition that certain words have both legal and non-legal or lay meanings. According to the Relators, an expert opinion may encompass the lay meaning of such a word, and (given the potential dual meaning of certain words) what appears to be a legal conclusion on its face may actually not be one. By way of illustration, the Realtors point to Defendants' objection that "Sparks even goes as far as to affirmatively state that the Defendants committed fraud, an ultimate legal conclusion that directly invades the province of this Court." (*Id.* at 3 (quoting D.E. 180 at 7).) In support of what appears to be Relators' implicit argument that Sparks's opinion that the Defendants committed fraud is not an improper legal conclusion, Relators cite *In re Air Crash Disaster at Lockerbie Scotland on December 2, 1988 ("Lockerbie")*, 37 F.3d 804 (2d Cir. 1994). In that case, the Second Circuit stated, in analyzing a fairly peripheral issue within a lengthy appeal, that it was not an abuse of discretion for the district court to admit testimony of one of the plaintiffs' expert witnesses who testified that he thought that the defendant had "engaged in 'fraud' and 'deceit.'" *Id.* at 826. The court went on to explain that "it was clear from the . . . [the expert witness's] direct and cross examination that he used those terms in a nonlegal sense." *Id.*

The *Lockerbie* case does not assist the Relators. *Lockerbie* did not question "the general rule" "that an expert may not testify as to what the law is, because such testimony would impinge on the trial court's function." *Id.* at 826-27 (collecting cases). *Lockerbie* also cautioned that "[p]ermitting an expert to give a legal conclusion" may often be improper because it "implicitly

provide[s] a legal standard to the jury." *Id.* at 827 (collecting cases). "Thus, expert testimony expressing a legal conclusion should ordinarily be excluded . . . ." *Id.*

More specifically, given the context and matters at issue in this case, Relators cannot credibly argue that Sparks is using the term "fraud" in a nonlegal sense. Relators are claiming that Defendants committed fraud within the meaning of one or both of the False Claims Act and the Anti-Kickback Statute. Nor can Relators credibly argue that the passage of time will somehow reveal that Sparks's report uses the term fraud in a nonlegal sense. Realtors are suing Defendants under the FCA, and the issues of whether Defendants committed fraud and subjectively intended to commit fraud are material to establishing Defendants' potential legal liability—liability, incidentally, under federal statutory regimes and related precedent that are, at least at times, arguably byzantine. Abundant caselaw confirms the impropriety of such purported expert testimony. *See, e.g.*, *Steadfast Ins. Co. v. Auto Mktg. Network, Inc.*, No. 97 C 5696, 2004 WL 783356, *6 (N.D. Ill. Jan. 28, 2004) (barring experts from testifying as to whether an insurance claim was filed in bad faith, as the "experts are in no better position than the jury to assess Steadfast's subjective intent"; allowing such experts to testify about intent would be improper because it "would be little more than 'tell[ing] the jury what result to reach'") (quoting *Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997)); *Dahlin v. Evangelical Child and Family Agency*, No. 01 C 1182, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002) (holding that an expert cannot testify that certain actions constituted fraud because it "is a quintessential jury determination on which the Court will instruct a jury concerning the factors it is to consider" and because the expert is no "more qualified than an ordinary juror" to determine intent) (collecting cases); *Isom v. Howmedica, Inc.*, No. 00 C 5872, 2002 WL 1052030, *1-2 (N.D. Ill. May 22,

11

2002) (barring proposed expert testimony concerning opposing party's intent because expert is no more qualified than jury to assess party's intent); *see also Woods*, 110 F.3d at 1221 (affirming district court's decision to preclude plaintiff's expert from testifying about whether defendants were "deliberately indifferent" in prison civil rights case, because such testimony gives "the false impression that . . . [the expert] knows the answer to this inquiry"; such testimony improperly "runs the risk of interfering with a district court's jury instructions" and "hardly can be viewed as being helpful to the jury"). Sparks's testimony, by her own admission, is directed, in part, at Medicare Fraud and Abuse Rules and Regulations, and she opines that "each claim presented to Medicare and Medicaid by the Defendant[s] . . . is a fraudulent claim on the Government." (Sparks Report at 21.) This is precisely the sort of testimony—about fraud in the legal sense, as well as about a party's subjective state of mind, a subject on which the expert is no better qualified than a jury—that precedent forbids.

Relators also implicitly suggest that the legal conclusions in Sparks's and Nagorka's reports are permissible because courts have admitted testimony that sets forth legal conclusions and Federal Rule of Civil Procedure 704 "permits an expert to express an opinion that embraces an ultimate issue to be decided by the trier of fact." (D.E. 182 at 4.) In support, Plaintiffs cite *Miskis v. Howard*, 106 F.3d 754, 762 (7th Cir. 1997). *Miskis*, however, does not support Relators' argument that either Sparks or Nagorka are permitted to proffer legal conclusions in this case. *Miskis* distinguished factual versus legal causation, *see id.* at 762, holding that admission of the expert's opinion at issue in that case (which was directed at factual, not legal, causation) was not "manifestly erroneous" or an abuse of discretion. *Miskis* did not (as Relators appear to suggest), hold that a legal conclusion on the ultimate issue of causation was the proper

12

subject of admissible expert testimony, much less that it was required to be admitted. Indeed, other caselaw teaches that such testimony is properly excluded. *See, e.g., Good Shepard*, 323 F.3d at 564; *McCabe*, 272 F. Supp. 2d at 740; *Isom*, 2002 WL 1052030, at \*3.

Relators also proffer various "examples of cases in which the [c]ourt[s] allowed expert testimony/opinions that the opposing party argued were impermissible legal conclusions." (D.E. 182 at 6.) Realtors contend that what is "clear from these cases is that one cannot assume [that] the Court will disallow expert testimony simply because the opposing party classifies it as a legal conclusion." (*Id.* at 7.) This Court takes no issue with this unobjectionable generality. However, to the extent Relators cite these cases in support of some sort of implied argument that the various legal conclusions offered by Relators' proposed experts are admissible, the Court finds that, after reviewing these cases and the proposed testimony, such an argument is unpersuasive.

Indeed, *West v. Waymire*, 114 F.3d 646 (7th Cir. 1997), a case cited by the Realtors, actually undermines such a conclusion. *West* noted that the plaintiff's expert's affidavit was "admissible to show . . . [negligent supervision], [but] was not admissible to show . . . a municipal policy . . . [of refusing to protect against certain dangers for purposes of *Monell* liability under 42 U.S.C. § 1983]," which was a "legal conclusion that an expert witness is not allowed to draw." *West*, 114 F.3d at 652 (collecting cases). *West*, therefore, actually supports the position (which is consistent with the Seventh Circuit's holdings in *Sinclair* and *Good Shepard*) that, as a general rule, an expert may not testify as to a legal conclusion. And, notably, courts within this district have cited *West* in support of this very proposition. *See Dahlin*, 2002 WL 31834881, at \*3 n.2; *Isom*, 2002 WL 1052030, at \*2 n.1 (N.D. Ill. May 22, 2002); *Niebur*, 136 F.

13

Supp. 2d at 920.

Moreover, in many of the cases cited by Relators, the court determined, based on the specific facts of the respective case, that the proffered opinion was, in fact, *not* a legal conclusion. *See United States v. Brown*, 7 F.3d 648, 651, 653-54 (7th Cir. 1993) (finding that district court committed no "clear abuse of discretion" in admitting testimony of prosecution's expert concerning whether amount of drugs was consistent with user or distributor status, because the expert's testimony "merely assisted the jury in interpreting the significance of the evidence by comparing [the defendant's] activities to typical behavior patterns of crack users and distributors" and "did not interfere with the jury's exclusive role")[6]; *United States v. Oles*, 994 F.2d 1519, 1523 (10th Cir. 1993) (reviewing for plain error only, as there was no trial objection, and holding that witnesses' reference to the legal term "kiting," where those "witnesses neither attempted to legally define check kiting nor explained the elements of a check kiting offense," was not plain error); *Helfin v. Stewart County, Tenn.*, 958 F.2d 709, 715 (6th Cir. 1992) (holding, over a dissent, that trial court did not abuse its discretion concerning expert, who testified as an expert concerning correctional institutions and did not claim to have any expertise on the legal requirements for recovery from jail officials for dereliction of duty, that defendants were deliberately indifferent because expert simply used the term in "the way an ordinary layman would").[7] The fact that other courts have failed to find an abuse of discretion concerning

---

[6] *See also United States v. Brown*, 7 F.3d 648, 654 n.3 (7th Cir. 1993) (noting that such testimony is always potentially excludable, if warranted, pursuant to Fed. R. Evid. 403).

[7] *But see Woods*, 110 F.3d at 1221 (affirming district court's decision to preclude plaintiff's expert from testifying about whether defendants were "deliberately indifferent"in civil rights case, because such testimony gives "the false impression that . . . [the expert] knows the answer to this inquiry"); *id.* (teaching that admission of such testimony "hardly can be viewed as . . .

14

admitted testimony, after determining that often belated and untimely objections were unfounded on factual grounds, does not change the nature of the Realtors' expert testimony here. In addition, none of the Relators' cases casts meaningful doubt on the well-established principles outlined at length above that demonstrate the impropriety of much of the testimony of the proffered experts of the Relators here.

In sum, none of the cases Relators cite support the conclusion that Nagorka and Sparks should be permitted to offer opinion testimony on ultimate issues of law in this case. For instance, this is not a case, as in some of the other cases Relators cite, where the proposed experts are testifying as a means to assist in determining the frequency with which certain contractual language is used in an industry. *See WH Smith Hotel Servs. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) (holding that the district court, in bench trial, properly admitted expert testimony regarding custom and usage in connection with interpretation of an ambiguous provision of an operating agreement); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 552 (5th Cir. 1981) (holding that the district court properly admitted expert testimony that boilerplate language in prospectus "was standard language for a prospectus used in connection with the issuance of a new security" and thus was unlikely to have been viewed as negating the effect of other misleading statements in prospectus). And in some of the cases cited by Realtors, there is no indication that either party objected to the introduction of expert testimony involving legal conclusions. *See e.g.*, *Autoskill Inc. v. Nat'l Educ. Supp. Sys.*, 994 F.2d 1476, 1493 (10th Cir. 1993) (noting that judge, at a bench trial, considered expert testimony regarding what aspects of a

---

being helpful to the jury").

computer program were protectable under copyright law)[8]; *Whittaker Corp. v. Edgar*, 535 F. Supp. 933, 943 (N.D. Ill. 1982) (reflecting that experts testified regarding whether a transaction would be taxable; admissibility does not seem to have been litigated).

Relators' reliance on the text of Federal Rule of Evidence 704 is also misplaced. Legal conclusions, of course, depending on the particular posture of a case, may be "ultimate issues." That said, the Court notes that Federal Rule of Evidence 704, which abolished the "ultimate issue" rule, does not function in isolation. *See* Fed. R. Evid. 704 Advisory Committee Notes ("The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time.")

Moreover, Seventh Circuit precedent teaches that "that Federal Rules of Evidence 702 *and* 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case." *Sinclair*, 74 F.3d at 758 n.1 (emphasis added); *accord Good Shepherd* 323 F.3d at 564. Indeed, the plain text of Federal Rule of Evidence 704 requires that an expert opinion, notwithstanding that it may reach an "ultimate issue," must be "otherwise admissible." Fed. R. Evid. 704. In this regard, an expert's opinion must, among other things, "assist the trier of fact to understand the evidence or to determine a fact in issue," within the meaning of Federal Rule of Evidence 702. Fed. R. Evid. 702. The Seventh Circuit instructs that "expert testimony is helpful to the jury if it concerns a matter beyond the understanding of the average person, assists the jury in understanding facts at issue, or puts the facts in context." *United States v. Welch*, 368

---

[8] *See also Autoskill Inc.*, 994 F.2d at 1497 n.25 (noting that trial judge explained that he was not relying on purported expert's legal assertions and conclusions).

F.3d 970, 974 (7th Cir. 2004) (citing Fed. R. Evid. 702). Legal conclusions as to ultimate issues generally do not assist the trier of fact because they simply tell the trier of fact what result to reach. *See, e.g.*, *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Generally, the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it. When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury.") (collecting numerous circuit court authorities; internal quotation marks omitted; emphasis in original); *Woods*, 110 F.3d at 1220-21; *Paradigm Sales, Inc. v. Weber Marking Sys., Inc.*, 880 F. Supp. 1247, 1255 (N.D. Ind. 1995) ("Fed. R. Evid. 704(a) provides that 'otherwise admissible' opinion testimony is not rendered inadmissible because it embraces an ultimate issue, but legal conclusions are not 'otherwise admissible' under Rule[] . . . 702 because they are not helpful to the trier of fact."). Relatedly, precedent teaches that proffered expert assertions about another's subjective intent or knowledge are not helpful to the jury, which is equally if not much better suited to make these assessments than the parties' competing paid experts. *See Isom v. Howmedica, Inc.*, No. 00 C 5872, 2002 WL 1052030, *1 (N.D. Ill. May 22, 2002) (barring proffered expert testimony concerning party's intent, and stating that "even though Federal Rule of Evidence 704(a) abrogates the common-law rule barring expert opinions on an 'ultimate issue,' we must nonetheless analyze whether an 'expert' opinion on this topic would assist the jury and if so, whether its probative value is outweighed by its danger for unfair prejudice"); *Dahlin v. Evangelical Child and Family Agency*, No. 01-1182, 2002 WL 31834881, at *3 (N.D. Ill. Dec. 18, 2002) (same quote, and barring proffered expert testimony of clinical psychologist as

17

to whether the defendant committed fraud); *accord, e.g.*, *Woods*, 110 F.3d at 1220-21. As a result, Federal Rules of Evidence 702 and 704, along with Federal Rule of Evidence 403 and the precedent interpreting and applying those rules, are consonant with the Court's ruling and do not counsel in favor of admission of the Relators' suspect testimony.

With the aforementioned principles in mind, the Court turns to the substance of the two proffered expert reports.

A.     Nagorka's Report Is Stricken In Substantial Part

Nagorka's report is comprised almost entirely of impermissible legal conclusions. The gist of his opinion is succinctly stated in the "Overview and Opinions" section of the report. In that section, Nagorka states that "[i]n my opinion . . . the ambulance provider agreements entered into by the Defendants Hospitals . . . constituted a kickback scheme in violation of the Anti-Kickback statute (42 U.S.C. § 1320a-7b(b))". (Nagorka Report at 1.) In support of this conclusion, Nagorka's report recites what he views as the applicable law and reaches the conclusion that the each of the Defendants has violated a federal criminal statute and various federal regulations. While this may be the proper subject of a brief, or perhaps a closing argument, it is not the proper subject of an expert opinion. *See, e.g.*, *Good Shepherd*, 323 F.3d at 564 ("The district court correctly ruled that expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible.") (citing *United States v. Sinclair*, 74 F.3d 753, 758 n.1 (7th Cir. 1996)); *accord, e.g.*, *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion."). Such an assertion (and many similar ones, discussed further below) invades the province of this Court and the province of the jury and will not assist the jury

18

as contemplated by Federal Rule of Evidence 702.

In the wake of the broad legal conclusion stated in the overview, Nagorka's report continues into an extended legal discussion of the Anti-Kickback statute. (Nagorka Report at 1-2.) The report continues into an even longer legal discussion of the purported inapplicability of any "safe harbor" provision—at least as Nagorka would define the "safe harbor" protections based on his extended assertions concerning the content, meaning and proper interpretation of, *inter alia*, federal statutory and regulatory provisions, the preamble to a federal regulation, and an Inspector General Advisory Opinion. (*Id.* at 2-14.) The report then proceeds to a review of various purported provider agreement between the Defendant hospitals and the Defendant ambulance companies. (*Id.* at 15-44.)

After carefully reviewing the Nagorka report, the Court exercises its discretion to exclude most of it. The aforementioned major sections are replete with numerous legal assertions. (*See, e.g.*, Nagorka Report at 2 ("Section 1320a-7(b)(b)(1) is the mirror image of Section 1320a-7(b)(b)(2), thereby making the party giving the remuneration (the ambulance companies) in the same legal position as the party receiving the remuneration (the Defendant hospitals")); *id.* ("[T]he discounts that the Defendant hospitals received . . . are illegal remunerations"); *id.* ("[T]he ambulance service agreements . . . fail to meet the safe harbor requirements.")[9]; *id.* at 14 ("The ambulance provider agreements entered into by Bethany Hospital and Consolidated Medical Transport violate the Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)).")[10]; *id.* (opining

---

[9] *See also, e.g.*, Nagorka Report at 15, 17, 18, 20, 21, 23, 24, 26, 27, 29, 30, 32, 33, 35, 36, 38, 38, 41, 42, 44 (all substantially identical).

[10] *See also, e.g.*, Nagorka Report at 15, 16, 18, 20, 21, 23, 24, 26, 27, 28, 30, 31, 33, 34, 36, 37, 39, 40, 42 (all substantially identical).

that various discounts do not qualify under purported safe harbor parameters as delimited by Nagorka); *id.* at 16 ("The rates provided to Bethany Hospital . . . are illegal remunerations under the Anti-Kickback statute.").[11]) They also contain block quotations from purported applicable statutory and regulatory regimes (Nagorka Report at 1-2, 3, 4, 5, 6, 11-13), which invade the province of the Court in defining that relevant law, which are unhelpful to the jury, and which create an unacceptable risk on balance of jury confusion given their limited utility as offered in the form of expert testimony. *Accord* Fed. R. Evid. 403.[12] The report also contains extended discussions and extrapolations of certain potentially relevant legal material, such as an Inspector General Advisory Opinion (Nagorka Report at 6-10).[13] These discussions are not helpful to the jury and invade the province of the Court in defining the relevant law. In this latter regard, the

---

[11] *See also, e.g.*, Nagorka Report at 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, 41, 42, 43 (all similar).

[12] Given the lack of clarity in the Nagorka report and the report's repeated practice of intertwining improper assertions about governing law and improper assertions about whether such legal regimes were violated, the Court also excludes as unhelpful and as potentially confusing to the jury testimony about the nature of the provider agreements. *See, e.g.* Nagorka Report at 10 ("Even a cursory review of the ambulance provider agreements . . . demonstrate that the contracts were 'exclusive supplier agreements.'"). *Accord Torres v. County of Oakland*, 758 F.2d 147, 150-51 (6th Cir. 1985); *McCabe v. Crawford & Co.*, 272 F. Supp. 2d 736, 740 (N.D. Ill. 2003) ("Because expert testimony can be powerful and misleading, judges must act as gatekeepers and exclude expert testimony where the possible prejudice of the testimony outweighs its probative force.") (citations omitted). (Incidentally, if the matter is as obvious as Nagorka contends, a properly-instructed jury will not need Nagorka's assistance in this regard.) Nagorka's conclusions and assertions about the contracts present an unacceptable risk of presenting the jury with Nagorka's extensive (and often, at least in this section of the report, implicit) testimony concerning applicable legal rules of decision.

[13] *See, e.g.*, Nagorka Report at 6 ("The comments provided in the above-listed portions of the preamble to the "safe harbor" regulations (42 C.F.R. § 1001.952), demonstrate that the discounts provided to and received by the Defendant hospitals . . . do not comply with the requirements of the discount exception to the Anti-Kickback Statute.").

Nagorka report also often elides from its legal conclusions, interpretations, and assertions concerning the applicable legal rules to legal assertions about the ultimate issues in the case. *See, e.g.*, footnotes 9-11, *supra*. This sort of testimony is not helpful to the jury. *See, e.g., Good Shepard*, 323 F.3d at 564 (citing *Sinclair*, 74 F.3d at 757 n.1); *McCabe v. Crawford & Co.*, 272 F. Supp. 2d at 740. It also is subject to exclusion under Rule 403 because Nagorka's assertions about the ultimate legality of various challenged practices contain various implicit legal determinations that invade the province of the Court. *See, e.g., Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985) ("The problem with testimony containing a legal conclusion is in conveying the witness' [sic] unexpressed, and perhaps erroneous, legal standards to the jury. This invades the province of the court to determine the applicable law and to instruct the jury as to that law.") (internal quotation and citations omitted); *McCabe v. Crawford & Co.*, 272 F. Supp. 2d 736, 740 (N.D. Ill. 2003) (discussing court's gatekeeper obligations).

Nagorka's report is not excluded in its entirety. In limited portions of his report, Nagorka opines concerning market conditions in the ambulance services industry and whether, for example, the rates provided to the Defendant hospitals are commercially reasonable. *See, e.g.*, Nagorka Report at 15 ("The rates provided to Bethany Hospital by CoMed are not commercially reasonable in the absence of CoMed receiving Bethany Hospital's referrals of Medicare Part B transports and Medicaid transports."); *id.* ("A BLS round trip transport for $68.25 plus mileage at $2.95 is below CoMed's actual cost for such transport."); *id.* at 17 ("¶ 4.2(b) establishes that the rates being charged to Holy Cross Hospital were below the 'retail rates.'"); *id.* at 43 (discussing testimony concerning invoices and admissions concerning payments to St. James Hospital). Mr. Nagorka can testify to such matters without invading the province of the Court, invading the

21

province of the jury, creating an imprudent risk of jury confusion and waste of time, and without violating the extensive precedent developed in this area. Mr. Nagorka will be able to testify in such a limited capacity at trial—subject to any further *Daubert* challenges or other evidentiary or substantive rulings that may affect the scope of the trial or his role in it.

B.     Sparks's Report Is Stricken In Part

Relators contend that "Sparks'[s] proposed testimony would be helpful to the jury because the Medicare [s]ystem is clearly beyond the common knowledge of the jury." (D.E. 182 at 10.) Defendants acknowledge that Sparks's report does provide background information "as to the Medicare System and provider reimbursement and hospital cost reports" (D.E. 180 at 6) as well as Medicaid (D.E. 183 at 4). After reviewing Sparks's report, the Court makes the preliminary conclusion that such testimony may be helpful to the trier of fact, and the Court declines to admit or exclude such testimony in its entirety as this time. If Defendants have specific objections to this type of testimony, they may move to exclude it at trial.[14]

In this regard, for example, the Sparks report begins with an extended overview of the Medicare System and its operation. Although this section of the report relates, at least tangentially, to some statutory and legal rules, that is not the essence of the testimony, which presents an overview about the general programs that have been created within Medicare and the payment mechanisms that exist within them. (*See, e.g.*, Sparks Report at 1-2). Sparks's report

---

[14] Any objections based on a lack of foundation for Sparks's opinions are more properly addressed at trial. The Court declines to exclude or admit any opinion that may be subject to a foundation objection at this time. Similarly, the Court did not consider Defendants' arguments regarding Sparks's damage calculations, as these arguments were raised for the first time in Defendants' reply brief. In addition, this opinion is certainly not a blanket ruling that all of Sparks's putative testimony is admissible under Fed. R. Evid. 403. Such objections can be addressed at trial or in the period immediately preceding it.

also discusses various forms, certifications, and documentation required by the Medicare oversight systems. (*See id.* at 6-7).

The Court does, however, strike portions of Sparks's report that are improper under the principles outlined above and holds that she may not testify to these matters at trial. Specifically, the Court strikes portions of her report that opine as to the Defendants' states of mind. She may not testify as to any of the Defendants' respective states of mind at a trial in this matter.[15] There is no indication (her certification as a fraud examiner notwithstanding) that she is any more qualified than the average juror to make such a determination. *See, e.g., Woods*, 110 F.3d at 1221; *Steadfast Ins. Co. v. Auto Marketing Network, Inc.*, No. 97-5696, 2004 WL 783356, at *6 (N.D. Ill. Jan. 26, 2004); *Dhalia*, 2002 WL 31834881, at *3. The Court similarly strikes her report to the extent that it opines that the Defendants committed fraud within the meaning of the operative statutes and holds that she may not testify as to whether any of the Defendants intended

---

[15] *See, e.g.*, Sparks Report at 8 ("In knowing violation of the Anti-Kickback Statute, Defendants COMED, Tower and Daley's **knowingly and willfully offered illegal remunerations** to the Defendant Hospitals . . . .") (emphasis in original); *id.* at 9 ("Violation of the State of Illinois Whistleblower Reward and Protection Act: Defendants . . . knowingly concealed from Medicaid the improper kickback schemes that they had with the Defendant Hospitals knowing that any disclosure of said schemes would result in denial of all of the claims . . . ."); *id.* at 10 (stating that Defendants "knowingly concealed from Medicaid the improper kickback schemes"); *id.* at 17 ("The Defendant Hospitals knew that their arrangements with the Defendant Ambulance Companies were kickback schemes . . . ."); *id.* at 19 ("Defendant Hospital Officer[s] knowingly and willingly participated in Medicare Fraud . . . because of the existence of the kickback scheme which the Defendant Hospitals knowingly entered into with the Defendant ambulance companies."); *id.* at 21 ("The Defendant Hospitals and Defendant Ambulance Companies knowingly entered into a kickback scheme . . . ."); *id.* ("The Defendant hospitals knowingly filed Cost Reports with Medicare containing false certifications and statements."); *see also id.* at 6 ("Defendant Hospitals received discounts on Part A ambulance transports in return for Part B referrals to COMED Transport, Inc.") (emphases omitted). Sparks also cannot testify as to the state of mind of regulators. *See, e.g.*, Sparks Report at 19-20 (opining, without apparent foundation, about the beliefs of the CMS).

to and did commit fraud at a trial in this matter. *See Dhalia*, 2002 WL 31834881, at *3.[16]

C.    The Experts Will Be Expected to Testify Within The Confines of The Permissible Testimony in Their Reports.

Defendants ask the Court to exclude not only Nagorka's and Sparks's expert reports, but also their testimony. The Relators argue that, even if the Court excludes portions of Nagorka's and Sparks's expert reports, the Court should not preclude them from testifying at all. The Relators suggest that Nagorka could testify as to the ambulance services industry and that Sparks could testify as to the Medicare system generally. Defendants respond that the experts' reports do not contain such testimony and that the Relators should not be allowed to rewrite the reports at this juncture. Given that the Court has not completely excluded the testimony of either putative expert, the Court need not address whether either should be entirely barred from testifying. However, the Court will not permit either individual to testify as to subjects that are not fairly encompassed within or relate to the portions of their reports that are appropriate under the law. As a result, neither expert (nor any expert that the Defendants may ultimately offer) will be able to opine about subjects that are not encompassed within properly disclosed expert reports.

In support of their position, the Relators rely on *McCabe v. Crawford & Co.*, 272 F. Supp. 2d 736, 740-41 (N.D. Ill. 2003), for the proposition that "it would be improper to exclude the testimony of an expert witness because his or her expert report contains legal conclusions." (D.E. 182 at 4.) *McCabe* does not, however, help the Relators here. In *McCabe*, the court found, like the Court in the instant case, that a purported expert had offered improper legal conclusions

---

[16] Nagorka's report contains improper assertions of the same general variety. *See, e.g.*, Nagorka Report at 2 ("Clearly, the remunerations . . . were offered and received to induce or in return for the exclusive agreement for the referral of business reimbursed under Medicare and Medicaid.").

in his expert report and subsequently granted a motion to exclude that report. *McCabe*, 272 F. Supp. 2d at 740-41. The court then held that the expert was not barred from testifying at trial because the expert "may offer something of value in regards to industry standards and practice." *Id.* Before the party could offer that expert at trial, however, the court held that the party would have to submit another expert report that complied with Federal Rule of Civil Procedure 26(a)(2).[17] *Id.* at 741. Thus, *McCabe* cannot be read to have allowed an expert to testify outside the confines of his report. Rather, the court in *McCabe* simply extended expert discovery to allow the expert to submit a report disclosing the opinions, if any, to which he would ultimately testify.

Here, by contrast, the Relators at least suggest that they should be able to circumvent the entire expert discovery regime set up by Rule 26 by attempting to recast the content of Nagorka's and Sparks's reports in order to allow them to testify to opinions not timely disclosed. The Court will not allow such maneuvering and will, instead, hold Nagorka and Sparks to any disclosed opinions that have not been excluded by this Order. *See generally Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998) ("If the expert's report contains only incomplete opinions, the court may choose to restrict the expert's testimony to those opinions alone."). The Court notes that the Relators have not asked the Court to extend discovery in order to submit an additional report by either witness,[18] and given that they have been given a full and fair

---

[17] Rule 26(a)(2) requires a party to disclose, via written report, "a complete statement of all opinions to be expressed [by the purported expert] and the basis and reasons therefore." Fed. R. Civ. P. 26(a)(2)(B).

[18] The Court notes that such additional reports would almost certainly not constitute supplementation of previously disclosed opinions as the Relators have not indicated that anything contained in the initial expert reports was "incomplete or incorrect." *See* Fed. R. Civ. P.

opportunity to submit expert reports in the course of extensive discovery, the Court would refuse any such request. Thus, to the extent that the Relators have tendered a valid report by Nagorka or Sparks, and only to that extent, the Relators' experts will be allowed to testify to the opinions contained in or that reasonably grow out of those limited portions of the report.

## CONCLUSION

For the foregoing reasons, Defendants' motion is granted in part and denied in part.

So ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: *May 26, 2005*

---

26(e)(1).