IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN KLACZAK and JEFF SHARP, Individually and as *ex rel.* UNITED STATES OF AMERICA, | ) ) ) | No. 96 C 6502 |
| | ) | |
| Relators, | ) | Judge Mark Filip |
| | ) | |
| v. | ) | |
| | ) | |
| CONSOLIDATED MEDICAL TRANSPORT, *et al.* | ) ) ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

On October 4, 1996, Relators, John Klaczak ("Klaczak") and Jeff Sharp ("Sharp")

(collectively, "Relators"), filed under seal this *qui tam* action pursuant to the False

Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* (D.E. 1.) After investigating Relators'

allegations, the United States intervened in a portion of the case that ultimately settled,

but it declined to intervene in the portion of the case that is still ongoing and that is the

subject of this opinion.

The Second Amended Complaint—the operative pleading—alleges that

Consolidated Medical Transport, Inc. ("CoMed"), Tower Ambulance Service, Inc.

("Tower"), and Daley's Ambulance Service, Ltd. ("Daley's") (also, collectively, the

"Ambulance Defendants"); John W. Daley, III, Brian T. Witek, Richard S. Witek, Tom

Wappel, and the Estate of John W. Daley, Jr. (also, collectively the "Individual

Defendants"); and Advocate Bethany Hospital, Advocate South Suburban, Advocate

Trinity Hospital, Holy Cross Hospital, Jackson Park Hospital, Loretto Hospital, Mt. Sinai

Hospital, St. Bernard Hospital, and St. James Hospital (also, collectively, the "Hospital

Defendants"), violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), by knowingly and willfully receiving remuneration (as to the Hospital Defendants) from the Ambulance Defendants (and the Individual Defendants, their owners) in exchange for referrals of Medicare and Medicaid business.  (D.E. 85.)  Relators further maintain that the Hospital Defendants violated the FCA because, by certifying on their Medicare cost reports that they had complied with the AKS when they actually knew they allegedly had engaged in a kickback scheme, the Hospital Defendants knowingly caused false or fraudulent claims to be presented to the United States for payment or approval.  (*See, e.g.*, D.E. 281.)

The Hospital Defendants—who are largely hospitals located in the economically poorest areas of Chicago and its suburbs—are the only remaining defendants in this case.[1]  The case is before the Court on the Hospital Defendants' motions for summary judgment (D.E. 234, 235, 236, 240, 252, 259, 265) and the parties' cross-motions to exclude putative expert testimony.  (D.E. 230; D.E. 292.)  As explained below, the Court grants the Hospital Defendants' joint and individual motions for summary judgment.

Although the basis for the Court's ruling is set out at length below, in summary, the Courts grants summary judgment to the Hospital Defendants for a number of reasons. There are, generally speaking, three "global" defects in Relators' case that warrant summary judgment.  There are also numerous failures of proof at the "local" level, in that Relators have failed to develop a meaningful record for a number of specific hospitals, relying not on specific facts but rather generalizations and innuendo.  Accordingly, there

---

[1]        The case was dismissed as to the Individual Defendants following a settlement agreement.  (D.E. 208.)  It appears that the Ambulance Defendants dropped out as a result of CoMed's bankruptcy proceedings.  (*See* D.E. 80 at 4.)

are concomitant gaps in the record as to those hospitals that further warrant summary judgment in their favor.

The first global defect in Relators' case is their failure to create a triable case with respect to the illicit remuneration element. In order to prove that the Hospital Defendants violated the AKS, Relators must prove that the Hospital Defendants accepted illegal remuneration, meaning something of value, in return for referrals. Relators have failed to identify a reliable benchmark against which the Court could determine whether the contracts satisfy the statutory definition of remuneration. Relators' initial theory that the contracts themselves are proof of remuneration is not plausible for a number of reasons, as explained below. Relators have also failed to prove that, as a matter of law, discounts below the amount the Ambulance Defendants charged Medicare constitutes remuneration, and have not shown that the Medicare rate is a reasonable proxy for "fair market value." Relators have not built a record as to fair market value for ambulance services during the relevant time period and Relators cannot otherwise offer competent proof with respect to fair market value at trial. In sum, Relators have failed to assemble a properly-developed record supporting their assertions on this element of their case.

The second global defect in Relators' case is their failure to create a triable case with respect to the Anti-Kickback Statute's heightened *scienter* requirements—*i.e.*, "knowingly" and "willfully" engaging in criminal misconduct. Relators have no direct evidence with respect to the Hospital Defendants' supposed knowing and willful acts of criminal misconduct. Furthermore, Relators have not shown that any of the Hospital Defendants knew what CoMed charged Medicare or what CoMed charged other contractual customers. Relators' attempts to draw illicit inferences from the Hospital

Defendants' conduct is consistently frustrated by legitimate, uncontradicted explanations for their acts. In sum, Relators' purported proof with respect to *scienter* in the assembled record is so deficient that no rational jury could find an AKS violation.

The final global defect is that Relators' case, at a conceptual level, is fundamentally implausible. Relators maintain, in so many words, that the agents of the Hospital Defendants were so intent on lowering Medicare Part A costs that they knowingly and willfully risked harsh administrative sanctions and civil and/or criminal liability for the respective hospitals, as well as potential criminal liability for themselves, with no allegation that any agent ever even sought any personal kickback or bribe or supposed personal enrichment of any kind for themselves. Put somewhat differently, to believe Relators' theory, the jury would have to believe that employees of the Hospital Defendants were willing to go to jail to help their respective non-profit organization fulfill its mission, which largely involved the provision of low-cost or free health care to the needy in and around Chicago. Even if the initial premise of Relators' theory were not so implausible, the Hospital Defendants took actions fundamentally inconsistent with their alleged motive, such that, based on the record evidence, no rational jury could infer that the Hospital Defendants knowingly and willfully accepted illicit remuneration in violation of federal law. For example, many hospitals were permitted to take "quick-pay" discounts of up to 45% even if they paid bills years later, yet Relators have failed to prove that any of the Hospital Defendants took advantage of these discounts. Relators maintain that the Hospital Defendants were not contractually obligated to act as a guaranty for unpaid bills, yet the Hospital Defendants, in practice, accepted responsibility for patients that had no coverage and no means to pay, and many Hospital Defendants

negotiated "no hassle" provisions in the contracts that protected patients at the expense of the hospitals' respective bottom lines. No rational jury could believe that the Hospital Defendants were willing to risk criminal sanctions to cut costs while voluntarily assuming substantial costs associated with patient care.

In addition to Relators' global failures of proof, Relators have also failed to address other defects in their case against respective individual Hospital Defendants that further (and sometimes independently) warrant summary judgment. In addition to the joint memorandum in support of the summary judgment motions, the Hospital Defendants filed supplemental memoranda highlighting Relators' failure of proof with respect to each individual hospital. Relators did not even file responses to these supplemental briefs and motions, and their general brief in opposition to summary judgment is fatally deficient with respect to individual factual circumstances. For example, Relators fail to develop any meaningful argument with respect to St. James, which never had a written contract and never had an explicit referral agreement—supposed cornerstones of Relators' otherwise defective theories. To take another example, with respect to South Suburban, Relators' theory fails because South Suburban's contracted rates were above the Medicare allowable rate in each contract year—another supposed cornerstone of Relators' case. The individual failures of proof are discussed in the final section of the opinion, and those failures further support the propriety of summary judgment as to various individual defendants.

I.      Factual Background

To provide essential context for Relators' allegations, the Court sets forth background information concerning Medicare and Medicaid prior to discussing the

specific factual issues presented. This background section concludes with a discussion of this case's procedural history.

        A.      Medicare and Medicaid

        1.      Medicare

The Supplementary Medical Insurance Program for the Aged and Disabled, commonly known as Medicare, is a federal health insurance program for people who are either 65 years of age or older or qualify because they have certain disabilities. (D.E. 80 at 3.) The Department of Health and Human Services ("HHS") administers the Medicare program; however, HHS uses private insurance contractors ("carriers") to administer claims. (*Id.*)

Medicare has four parts: Part A (Hospital), Part B (Medical), Part C (HMO and PPO Plans), and Part D (Prescription Drug Coverage). *See* Centers for Medicare & Medicaid Services, U.S. Department of Health and Human Services, *Medicare at a Glance* 1 (July 2006) (available at http://www.medicare.gov/Publications/Pubs/ pdf/11082.pdf) (last visited September 20, 2006). Relators' allegations concern Medicare Parts A and B only.

        a.      Medicare Coverage of Ambulance Services

Ambulance services are a covered benefit under both Part A and Part B of the Medicare program. *See* Office of the Inspector General, U.S. Department of Health and Human Services, OEI-12-99-00280, *Medicare Ambulance Payments: A Framework for Change* 1 (April 1999) (hereinafter cited as "OEI-12-99-00280"). Parts A and B cover substantially similar services. (D.E. 294, Ex. 13A (Isley Report) at 6-7.) While the basic element of the service provided under Part A and Part B is similar, the identities of the

payors differ, the trip distances often differ, the costs of providing the respective services differ, and the relative utilization frequency of the services differ, as explained below.

In this regard, ambulance providers bill the hospital, rather than Medicare, for Part A transports. (*See*, *e.g.*, 290 ¶ 8.) Prior to 1983, hospitals were paid their "reasonable costs" for Part A ambulance transports and these costs were developed via individual Medicare cost reports. (D.E. 271 ¶ 28.) Since then, "a hospital's payments are received through a system referred to as a 'Diagnosis Related Group' (DRG) classification," meaning that "a hospital receives one global payment for all patient care needs and expenses to include medical care, room and board, food, procedures, medications, and supplies." (D.E. 294, Ex. 13A at 4-5.) Hospitals have an incentive to economize on costs for Part A services because "the hospital is responsible for any additional cost outside the predetermined payment set by Medicare Part A for the specific payment condition." (*Id.* at 5.) In addition, Medicare strongly encourages, and perhaps even requires, hospitals to act as prudent buyers and to seek lower prices where available and appropriate for goods and services. (*See* D.E. 270 at 8 (Medicare directive in its *Reimbursement Manual* that, "'The prudent and cost conscious buyer not only refuses to pay more than the going price for an item or service, he/she also seeks to economize by minimizing cost. This is especially so when the buyer is an institution or organization which makes bulk purchases and can, therefore, often gain discounts because of the size of its purchases. In addition, the bulk purchase of items or services often gives the buyer leverage in bargaining with suppliers for other items or services . . . Any alert and cost conscious buyer seeks such advantages, and it is expected that Medicare providers of

services will also seek them.'") (quoting *Medicare Provider Reimbursement Manual* § 2103).)

Generally speaking, Part A ambulance transports are less costly because they involve pre-scheduled, less costly transport of stabilized inpatients.[2]  (D.E. 267 ¶ 12.) These Part A transports also generally result in lower billing and collection costs for the ambulance company.  (*Id.*)

Generally speaking, Part A pays for ambulance services when a hospital inpatient is transported to and from another hospital for specialized treatment, OEI-12-99-00280 at 1; hence, Part A ambulance transports are typically round-trips.  (D.E. 301 ¶ 5.) However, it appears that the Part A transport rates specified in the Hospital Defendants' contracts with the Ambulance Defendants were for one leg of a transport, unless specifically noted as a round-trip fee.  (D.E. 294, Ex. 18 (Peterson Dep.) at 47.)

Part B covers at least two levels of ambulance services, Basic Life Support (BLS) and Advanced Life Support (ALS)[3], OEI-12-99-00280 at 3, but does not cover other means of transporting patients, such as wheelchairs, taxis, or vans.  *Id.* at 1.  Medicare classifies both BLS and ALS transports as emergency and non-emergency.  (D.E. 294, Ex. 13A at 5).  "'Emergency' is generally defined as a service provided after the sudden

---

[2]      Relators object to Defendants' proffered expert Larry Lee Isley's "unsworn expert report."  (*See*, *e.g.*, D.E. 288 ¶ 12.)  However, Isley has submitted an affidavit that complies with Rule 56(e).  (D.E. 315.)  Isley initially omitted to supply the conforming affidavit; while the Court sometimes strikes parties' filings without prejudice where they have failed to comply with such requirements, and affords them an opportunity to fix the omission and rebrief the issues, that seemed like an imprudent and wasteful step in this case.  More specifically, the summary judgment briefing and related factual materials submitted in this case span several thousand pages, and the case was already seven years old when this Court inherited it upon taking the bench in 2003.  Requiring the parties to incur costs of resubmitting the thousands of pages of summary judgment materials, and permitting what likely would be months of additional delay, was unnecessary, given that the merits of the issues were already briefed and there is a substantial interest in the judicial system in resolving cases, if appropriate, as here, sooner rather than later, at least where a case is now almost ten years old.  Finally, the Court notes that Relators did not object to the procedure set forth in the Court's September 1, 2006 minute order directing Isley to file a conforming affidavit, if he was prepared to swear to the evidentiary submission.

[3]      For the purposes of Medicare reimbursement, BLS and ALS transports are distinguished by the respective credentials of the vehicle crew.  OEI-12-99-00280 at 1.

onset of a medical condition, manifesting itself by acute symptoms of such severity that the absence of immediate medical attention could reasonably result" in serious injury to the patient. (*Id.* at 5-6.) Medicare regularly pays for emergency ambulance services (*e.g.*, service providers do not face substantial risk of having such claims denied). (*Id.*)

Part B imposes stringent criteria for covering non-emergency ambulance services, including that: (1) Part A coverage is unavailable; (2) the vehicle and crew meet certain requirements; (3) the transport is medically necessary; and (4) the trip, as a general rule, stays within certain distance and destination limitations. OEI-12-99-00280 at 3. An ambulance transport is "medically necessary" when a beneficiary's medical condition at the time of transport is such that other means of transportation would endanger the beneficiary's medical condition. *See* Office of the Inspector General, Department of Health and Human Services, OEI-05-02-00590, *Medicare Payments for Ambulance Transports* 1 (January 2006). Providers are not required to submit additional documentation for billing purposes but they must retain appropriate documentation supporting their claims. *Id.* at 3-4.

Defendant Mt. Sinai's proffered expert, Dr. Larry Lee Isley ("Isley"), established (largely without any attempt at contradiction) that, during the relevant time period, Medicare's "enforcement of the [eligibility criteria was] resulting in additional work and expense for ambulance providers to bill, collect, and manage these [non-emergency] transports." (D.E. 294, Ex. 13A at 14.) Stricter enforcement of the Part B eligibility criteria also exposed ambulance providers to substantial risks of financial loss because it was difficult to bill patients directly for rejected claims. (*Id.* at 14-15 ("Under Part A transports, it was reasonable to assume the ambulance provider would be reimbursed 100

percent of the contracted rate. Under Medicare Part B . . . especially with those transports originating in a hospital to another destination, ambulance providers could reasonably expect only 60-70 percent of those transports to meet Medicare's 'medical necessity' criteria. Unless the providers conducted certain very precise steps prior to the transport the company could not seek payment from the patient for [denied claims].").) Furthermore, "the Account Receivables (A/R) for Medicare Part B transports could range from 90 to 180 days, while Part A receivables typically range from 30 to 90 days." (*Id.* at 15.)[4]

During the relevant time period, Medicare's stated policy was to use a reasonable charge methodology to pay for Part B ambulance services. OEI-12-99-00280 at 1. Under this methodology, Medicare would pay 80% of the reasonable (or allowed) charge, and the beneficiary would be responsible for the remaining 20% of the charge.[5] Medicare based payment on the bill it received from ambulance suppliers. *Id.*

The record assembled reflects that, during the 1990s, the Medicare allowable rate was not necessarily or even typically based upon "fair market value" for ambulance services.[6] (*See, e.g.*, D.E. 294, Ex. 13A.) In 1999, for example, OIG attempted to

---

[4]       In the interests of completeness and precision, the Court notes the following. First, the Court's recitation of the factual material cited above in no way implies that any of the parties could reasonably have expected to receive reimbursement from any given patient, or any given percentage of the patient base generally, of the Hospital Defendants. As stated, many of the Hospital Defendants care for and treat individuals in the poorest areas of Chicagoland—*e.g.*, Loretto Hospital is located in the Austin area of Chicago, on Chicago's West Side, and St. Bernard's Hospital is located at 64th Street and the Dan Ryan, in Chicago's Englewood neighborhood. *See, e.g.,* Rummana Hussain, *Racial Segregation Holds Firm Grip, Report Says,* Chicago Sun-Times, June 22, 2005 at 31. Second, the factual data recited above concerning likely times for payment of any accounts receivable for Part B transports may not have been applicable to "Stat"—which was an ambulance transportation company that was purchased by Tower during the early 1990s. The record reflects at least some testimony that Stat, at least at its inception in the late 1980s, received payment from Medicare within fourteen days from the date of billing. (D.E. 301 ¶ 58.)
[5]       The record does not indicate that the Ambulance Defendants were able to bill-back the Hospital Defendants for unpaid Part B co-pays.
[6]       Relators have not attempted to delineate the market rates for ambulance transports in the relevant geographical areas during the relevant time period, making it difficult for Relators to contend or demonstrate that Medicare allowable rates were equivalent to market rates. Furthermore, Relators' *Daubert* motion did not object to the portion of Isley's report addressing this subject, and Relators have not introduced any evidence suggesting that,

compare Medicaid payment rates to those of commercial and other Federal payors; such comparisons were not possible due to the complexity of the payment methods of both Medicare and other payors. (*See* D.E. 294, Ex. 13A at 9 (citing Office of the Inspector General, Department of Health and Human Services, *Medicare Payments for Ambulance Services– Comparisons to Non-Medicare Payers*, OEI-09095-00411 (January 1999)).) Furthermore, OIG determined that current Medicare payment methods reflected historical charges and were not based on reliable cost data. (D.E. 294, Ex. 13A (citing OEI-12-99-00280).) An analysis of Medicare's outpatient fee schedule also supported the conclusion that the allowable rate was not synonymous with fair market value. (D.E. 294, Ex. 13A at 7 ("Under Medicare's 2002 outpatient provider-based reimbursement regulations, the same surgical procedure may be reimbursed 55 percent greater" depending upon the designation of the facility); *id.* at 9 ("OIG . . . states that payment levels to ambulance providers were not based on the actual cost of providing services within a geographic region. Medicare's methodology of payment based on historical charges allowed providers operating in overlapping service areas to be reimbursed at different rates."); *id.* at 9-10 ("In a 1998 comparison of ambulance charges across the country, the reasonable charges for a BLS transport ranged from $90.00 to $421.00, and for ALS ranged from $125.00 to $550.00. In reality, the Medicare Part B reimbursement system was so inconsistent that there was no practical means to establish a [fair market value ("FMV")] in an area or region without conducting a competitive bid process."); *id.* at 10 ("[T]he federal government's reimbursement structure does not set market rates for

---

during the relevant time period, the Medicare allowable rate was equivalent to "fair market value." Instead, it appears that Relator's theory, seemingly derived from Werfel's advice to his ambulance clients, is that anything below the allowable rate violates the AKS. (*See*, *e.g.*, D.E. 301 ¶¶ 136-37.) This theory does not seem to be supported in the actual record presented; moreover, and independently, it certainly does not constitute any evidence that the Defendant Hospitals committed any willful and knowing violation of any statute—which is the applicable *scienter* requirement.

two distinct reasons: (1) reimbursement methodology shows no . . . pattern to cost; and (2) Medicare has repeatedly demonstrated two different reimbursements for the same service.").) Relators have adduced no evidence that the Medicare allowable rate is equivalent to, or even approximates, fair market value for ambulance services.

b.    Medicare Cost Reports

All Part A providers, including the Hospital Defendants, file a cost report following the close of their cost reporting year for the purposes of reconciling their allowable costs and the payments they have received from their fiscal intermediaries on an interim basis. *See* 42. U.S.C § 1395g; 42 C.F.R. § 413.20(b). The cost report begins with an accounting of the costs a provider has incurred; costs not eligible for partial or full reimbursement are deducted. *See* 42 C.F.R. § 413.24. The provider then uses a cost accounting methodology to allocate allowable costs to the provider's routine and ancillary departments for which charges are made. *See id.* When all the costs are stepped down to the costs of the routine and ancillary departments, an allocation is made between Medicare and non-Medicare patients to determine Medicare's share of the costs. *See id.* In the actual cost report, Worksheet A is an overview of the Hospital's finances, Worksheet B is an allocation of overhead, Worksheet C is a "Computation of Ratio of Costs to Charges," Worksheet D is an apportionment to Medicare, and the aforementioned costs are carried forward to Worksheet E. *See Medicare Provider Reimbursement Manual* §§ 2800-17. Cost reports must include a signed statement from the provider's administrator or chief financial officer certifying the accuracy of the electronic file or the manually prepared cost report.[7]  42 C.F.R. § 413.24(f)(4)(iv).

---

[7]    This requirement was made effective for hospitals' cost reporting periods ending on or after September 30, 1994. *See* 42 C.F.R. § 413.24(f)(4)(iv).

2.      Medicaid

Medicaid is a means-tested entitlement program that is typically funded in equal parts by the federal government and state governments.  Illinois Department of Public Aid, *Illinois Medicaid-A Primer: FY 2003* 2 (2003).  Illinois Medicaid—the state program primarily administered by the Illinois Department of Public Aid—provides preventive and primary health care, hospital, pharmacy, long-term care, and other medical services.  *Id.*  Medicaid requires that Illinois must cover, among other things, hospital care and transportation.  *Id.* at 7.

Illinois Medicaid classifies providers of transportation services as emergency or non-emergency.  *See* Illinois Department of Health and Family Services, *Handbook for Providers of Transportation Services—Chapter T-200: Policy and Procedures for Transportation Services* T-201(1) (September 2005).  Enrolled providers may bill the program for a number of services, including, *inter alia*, emergency ambulance (transportation of a patient whose medical condition requires immediate treatment), non-emergency ambulance (transportation of a patient whose medical condition requires transfer by stretcher and medical supervision), and medicar (transportation of a patient whose medical condition requires the use of a hydraulic or electric lift or ramp, wheelchair lockdowns, or stretcher when the patient's condition does not require medical supervision or equipment).  *Id.* at T-201(2).  According to IDPH regulations, Illinois Medicaid provides coverage for ALS and BLS services when necessitated by the patient's medical condition.  *Id.* at T-203(1).

Illinois Medicaid requires that charges made to the program "be the provider's usual and customary charges as made to the general public for the same service."  *Id.* at

T-202(1).  Providers are reimbursed for allowable transportation services provided to patients who are not eligible for Medicare at the lesser of the provider's usual and customary charge or the maximum rate as established by DHFS, pursuant to 89 Ill. Adm. Code 140.492 and 140.493.  *Id.* at T-202(2).  When patients are eligible for both Medicare and Medicaid, providers are reimbursed at the lower of the provider's usual and customary charge or the maximum rate as established by DHFS, pursuant to 89 Ill. Admin. Code 140.493, or the Medicare allowable rate.  *Id.* at T-202(2)-(3).  DHFS sets maximum rates for administration of oxygen during BLS transports and for all ancillary charges associated with ALS transports.  *Id.* at T-202(3).

B.      The Alleged Kickback Scheme and Alleged Subsequent False Claims

The Second Amended Complaint alleges that the Hospital Defendants violated the FCA (specifically, 31 U.S.C. § 3729(a)(1)) by: (1) willfully engaging in an illegal kickback scheme that violated the AKS (specifically, 42 U.S.C. § 1320a-7(b)(2)); and (2) falsely certifying cost reports, which caused Medicare to pay out false or fraudulent Part B claims, which it would not have done if not for the certifications.  (D.E. 85 ¶¶ 78-84.)

1.      The Basic Contours of the Alleged Scheme

The crux of the alleged kickback scheme is a purported *quid pro quo*—the Defendant Hospitals accepted discounts on Part A transports in exchange for affording CoMed an exclusive or preferred position with respect to Part B transports.  (*See*, *e.g.*, D.E. 80 at 4.).  This allegation is different from those common in many types of alleged kickback cases: there are no allegations that anyone at any of the Hospital Defendants personally accepted any bribe, kickback, or remuneration of any kind; nor are there any allegations that there was any billing of the Government for any services that were not

actually provided. This is certainly not to say that the alleged AKS scheme, if actually

proven to be colorable on an assembled record (which has not occurred here), could not

constitute an AKS violation as a matter of law. However, the nature of the alleged

scheme—individuals at hospitals knowingly and willfully engaging in federal criminal

misconduct, for no personal gain, presumably so as to allow their institutions to have a

more stable financial footing so as to serve their largely underprivileged patient-base, is

not the scenario that one often sees in the caselaw.[8] *Compare*, *e.g.*, *United States v.

Starks*, 157 F.3d 833, 836 (11th Cir. 1998) (AKS defendants found to willfully and

knowingly violated the law where they accepted substantial bribes and/or commercial

kickbacks in exchange for patient referrals, which payments were made in remote

locations such as restaurants and parking lots because of a desire that the activities

remain unseen).

     With regard to the alleged scheme, Relators maintain that the scheme was made

possible by a purported "perfect storm" of: the Hospital Defendants' incentive to keep

Medicare Part A costs low (D.E. 281 at 3), the Ambulance Defendants' ability to bill

Medicare directly for Part B transports (*id.* at 4), the Hospital Defendants' substantial

population of Medicare and Medicaid patients (*id.* at 5-6), the dynamic that Part B

transports vastly outnumber Part A transports (*id.* at 6), and the Ambulance Defendants'

willingness to use Part A transports as a loss-leader (D.E. 301 ¶ 188) for what Relators

assert was "a continuous volume of lucrative Medicare/Medicaid Part B transports." (*Id.*

at 4-5.)

---

[8]     In fact, Relators do not cite to, and the Court's independent research did not reveal, a civil or criminal case involving the AKS in which a hospital was found liable or convicted for the sole act of accepting discounts on Part A services in exchange for Part B referrals. This is not to say that such a theory would be legally defective (if supported by a sufficient factual record, of course, which is not the case here); however, the factual scenario would be distinct from those often seen.

This basic structure of a potentially-illegal scheme has received some critical scrutiny. David Werfel ("Werfel"), Medicare consultant for the American Ambulance Association, has expressed concern about the propriety of ambulance providers offering discounts to hospitals in a position to refer Medicare or Medicaid business. (D.E. 301 ¶¶ 135, 174.) As an attorney, Werfel would advise ambulance companies not to offer discounts substantially below the Medicare allowable charge. (*Id.* ¶¶ 157, 175-76.) Furthermore, Werfel, on behalf of the AAA, requested that the Health Care Finance Administration ("HCFA") publish a Medicare National Fraud Alert for ambulance services on the issue of discounts. (*Id.* ¶ 178.) In addition, Werfel, in July 2003 (*i.e.*, years after this case was filed), wrote an opinion letter to an ambulance company regarding the level of discounts that can be offered to hospitals (for DRGs), and opined "you want to tie your lowest rates to facilities to the Medicare allowable or, very slightly below the Medicare allowable." (*Id.* ¶ 177.)

In 1999, OIG published "OIG Advisory Opinion No. 99-2," which addressed whether a proposed arrangement "for discounted ambulance services provided to residents of Medicare skilled nursing facilities" would "result in prohibited remuneration under the [AKS] or would constitute grounds for the imposition of sanctions under the [AKS]." *Id.* (citations omitted). In the contract analyzed by OIG, the "contractual rates for BLS and ALS services represent discounts of up to 50% of the "reasonable charge" established by Medicare for Ambulance Company X's services in the State A area." *Id.* OIG suggested that "such price reductions create a risk that a supplier [*i.e.*, the ambulance company] may be offering remuneration in the form of discounts on business for which the purchaser pays the supplier, in exchange for the opportunity to service and

bill for higher paying Federal health care program business reimbursed directly by the program to the supplier." *Id.* OIG identified at least two arrangements as particularly suspect: "discounted prices that are below the supplier's cost, and discounted prices that are lower than the prices that the supplier offers to a buyer that (i) generates a volume of business for the supplier that is the same or greater than the volume of Part A business generated by the PPS SNF, but (ii) does not have any potentially available Part B or other Federal health care program business." *Id.*

        2.      The Alleged Kickback Scheme in Practice

The Hospital Defendants, at various periods of time during the years 1991 through 2001 (the "Contract Years"), contracted with the Ambulance Defendants to provide ambulance transport services for their patients. (D.E. 282 ¶ 19.) St. James orally negotiated at least one transport rate while the remaining hospitals had written agreements with CoMed at various times during the Contract Years (collectively, "Ambulance Contracts"). (*Id.*)

The Ambulance Contracts share a number of common features. CoMed was obligated to provide Advanced Life Support ("ALS") and Basic Life Support ("BLS") ambulance transports seven days a week, twenty-four hours a day, with appropriate transport response times. (*Id.* ¶ 20.) Pursuant to the Ambulance Contracts, CoMed agreed to provide ALS and BLS services to the Hospital Defendants in a timely and professional manner. (*Id.* ¶ 21.) These transports (and ancillary services) were to be provided to patients of the Hospital Defendants at negotiated rates (*e.g.*, flat rate per transport) that were lower than CoMed's rates charged to customers without contracts (often, but not always, identified on the contracts as "retail" or "non-contracted rates").

(*Id.*)  Under the Ambulance Contracts, the Hospital Defendants were responsible for paying all invoices that were billed directly to them for inpatient transports; CoMed received the negotiated rate.  (*Id.* ¶ 22.)

The majority of the contracts included a provision, Section 3.1(a), stating that "Customer agrees to contact [CoMed] for all medical ambulance transportation to be provided to it's [sic] patients" (hereinafter, "Standard 3.1(a) Language").  (*See, e.g.*, D.E. 294, Ex. 1C (Holy Cross 1995-1996 contract).)  The parties dispute whether the contracts made CoMed the "exclusive" provider of ambulance services.  (*See, e.g.*, D.E. 301 ¶ 23.) CoMed actively sought preferred status in contract negotiations because, in Mr. Cybulski's view, patients would choose the default provider unless they had a preference for a specific transport company.  (D.E. 294, Ex. 7 (Cybulski Dep. at 24).  (Mr. Cybulski was the founder of Stat, a small ambulance company that was acquired by Tower, which in turn merged into CoMed; Mr. Cybulski negotiated many of the Ambulance Contracts for the ambulance companies.)

The parties agree that, under the majority of the contracts, CoMed was at least the preferred provider, meaning that CoMed was contacted first, and other ambulance services were used when CoMed was unable to provide prompt service.[9]  (D.E. 301 ¶ 118.)  Thus, at a minimum, preferred-provider arrangements may have afforded CoMed greater opportunity to obtain Medicare Part B business than CoMed would have had in the absence of the contracts.  (*See, e.g., id.*)

---

[9]  Generally speaking, if Stat got a transport call from a hospital and was unable to do it, Stat would call another ambulance provider to see that the transportation was provided.  (D.E. 301 ¶ 116.)  If the transport that was performed by the other ambulance provider on behalf of Stat was payable by Medicare, the substitute ambulance provider would bill Medicare directly.  (*Id.* ¶ 117.)  For contract-rate transports performed by other providers, Stat would bill the hospital for the transport.  (*Id.* ¶ 118.)

The majority of the contracts had provisions stating that the hospital would pay "retail rates" or "non-contracted" rates if the hospital did not pay the invoice within a specified period of time (ranging from 30 to 90 days). (*See*, *e.g.*, D.E. 294, Ex. 1D, Ambulance Fee Schedule (Holy Cross 1996-97 contract).) In addition, many of the contracts included additional discounts of up to 45% for prompt payment ("quick-pay discounts"). (*See*, *e.g*, *id.*, Ex. 1M § 4.2(b) (Loretto Hospital 1997 contract).) Relators maintain that these provisions were never enforced, and that the Hospital Defendants were given a discount regardless of whether they paid in the specified time period. (D.E. 290 ¶¶ 208-217.)

Jon Peterson was engaged by the Hospital Defendants to "determine whether any material differences existed between the negotiated rates for Part A ambulance services, on the one hand, and the Medicare Part B and Illinois Medicaid payment rates that were payable to [CoMed]." (D.E. 317 ¶ 2.) After examining voluminous records, Peterson concluded that there is no evidence that Holy Cross, Jackson Park, Loretto, or St. Bernard's actually took the quick-pay discounts.[10] (*See*, *e.g.*, D.E. 254, Ex. C at 16 (Holy Cross); D.E. 238, Ex. A at 16-17 (St. Bernard); D.E. 260, Ex. C at 16 (Loretto); D.E. 233, Ex. B at 16 (Jackson Park).) Due to limited access to records, Peterson was unable to opine on whether Bethany, South Suburban, or Trinity took advantage of the quick-pay discounts. (*See* D.E. 239.) Neither party has adduced any evidence concerning Mt. Sinai's quick-pay discount practices. St. James did not have a written contract and no evidence suggests there was a custom of quick-pay discounts that were offered to St. James regardless of when it paid received invoices.

---

[10] A hospital would have to "take" the discount by paying less than the invoice amount; the invoices were billed at the contract rate. (*See*, *e.g*,. D.E. 294, Ex. 12-3 (St. Bernard invoice).)

It appears that, at least facially, many of the contracts provided rates lower than the Medicare Allowable rate.[11]  (*See*, *e.g.*, D.E. 317 (Peterson Reports on individual hospitals).)  However, the negotiated rates (without the quick-pay discounts applied) are, in many cases, equivalent to or higher than the Medicaid rate.[12]  (*See id.*)

The Hospital Defendants maintain that a superficial examination of rates compares apples and oranges.  In this regard, the Hospital Defendants' experts argue, without meaningful contradiction, that Medicare Part B rates cannot be fairly compared to the contracted rates without making a number of adjustments to the contracted rates.  First, the Medicare Allowable rate, which is based upon historical costs, does not reflect the industry custom of discounts.  (D.E. 271 ¶ 30.)  Second, the Medicare Allowable Rate does not reflect contractual provisions for exclusive vendor relationships, automatic contract renewal, and fixed pricing.  (*Id.*)  Third, the contracts either shifted the costs of administrative and billing expenses, along with risk of non-payment, from the Ambulance Defendants to the Hospital Defendants (or, alternatively conceived, permitted CoMed to avoid costs, which allowed them to offer a lower rate).  (*Id.* ¶¶ 31-33; *see also* D.E. 282 ¶ 33.)

Peterson analyzed a voluminous set of billing and accounting records maintained by the Hospital Defendants, save for Mt. Sinai.  (*Id.* ¶¶ 3, 7.)  He then applied Medicare cost-accounting principles to those records to develop adjusted contract rates.  (*Id.* ¶ 7.)  Peterson concluded that, once the rates were adjusted for cost-shifting aspects of the contracts, that there was no material difference between the contracted rates and the

---

[11]  Relators routinely object to the use of summary tables in the Hospital Defendants' 56.1 Statement of Facts.  *See*, *e.g.*, D.E. 283 ¶ 2.)  However, Relators have used a summary table to demonstrate Medicare Allowable rates during the relevant time period.  If the Court struck all summary tables in the respective 56.1 Statements, then Relators would lack proof of an essential element of their case.

[12]  This is important because "safe harbor" requires that discounts be offered to Medicare *or* Medicaid, and Relators have little evidence with respect to Medicaid.

Medicare allowable rate, or that any difference was a reasonable discount given industry custom and practice.  (*See*, *e.g.*, *id.* ¶¶ 2, 7.)  Peterson does not have any information that anyone from any hospital or CoMed did any type of analysis similar to what he has done on behalf of the Joint Defense Team.  (D.E. 301 ¶ 248.)  At the time the Hospital Defendants entered into the Ambulance Contracts, they did not have the benefit of Peterson's analysis nor did they have knowledge of the Medicare reimbursable rates for part B transports.  (*Id.* ¶ 249.)

Relators steadfastly deny that the contracts made the hospitals the payors of last resort.  (*See*, *e.g.*, D.E. 282 ¶ 34.)  Relators' position is based upon their gloss on Peterson's deposition testimony, which Relators interpret to mean "there was not a contractual obligation to guarantee payment for certain unpaid ambulance transportation costs that were billed by ambulance company to third-party payors."  (*Id.* (citing D.E. 294, Ex. 18 (Peterson Dep.) at 276).)  However, Peterson is not an expert in contract interpretation (*id.* at 73), and even if he had sufficient expertise in the subject, he would not be permitted to offer his opinion on how, as a matter of law, the contract should be construed.  (*See* D.E. 204 at 7 (collecting cases).)  However, expert testimony may be allowed when it addresses on custom and practice in a particular trade, as it relates to a contract dispute.  (*See id.* at 15 (citing, *inter alia*, *WH Smith Hotel Servs. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994)).)  On this point, Peterson testified, based upon his review of the Hospital Defendants' actual billing records, that the hospitals, in fact, would pay for bill-backs, *i.e.* would reimburse the Ambulance Defendants for bad debts, regardless of whether the hospitals were technically obligated to do so.  (D.E. 294, Ex. 18 at 276-77; *see also id.* at 277 ("St. Bernard's Hospital and the other hospitals

appeared to have effectively acted as the payor of last resort, or the guarantor.").) Thus, to the extent that Peterson's testimony is relevant and admissible as to the meaning of the contracts, it supports the Hospital Defendants' claim that the contract rates should be adjusted to account for their assumption of patients' unpaid debts. (*See, e.g.,* D.E. 270 at 28.)

Relators maintain that the Hospital Defendants' certification of Medicare cost reports caused false or fraudulent claims to be presented to and paid out by Medicare. (*See*, *e.g.*, D.E. 281 at 48.) Relators have identified three different theories of liability for false claims: express certification, implied certification, and enabling third-party false claims. (*See*, *e.g.*, D.E. 281 at 48.)

The first theory—express certification—applies to an alleged "claim that falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 698 (2d Cir. 2001). As discussed previously, when a Part A provider submits a cost report, the administrator or CFO must certify the report as complying with Medicare regulations, including the AKS. *See* 42 C.F.R. 413.24.

The second theory—implied certification—is "based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment." *Mikes*, 274 F.3d at 699. It appears that Relators' theory is that, regardless of the precise language of the certification, the Hospital Defendants were impliedly certifying the validity of their claims when they sought reimbursement under Part A.

The final theory is based on traditional causation principles—the Hospital Defendants, by participating in the kickback scheme, caused false claims to be presented by CoMed. *See, e.g., United States ex rel. Franklin v. Parke-Davis, Div. Of Warner-Lambert Co.*, 147 F. Supp. 2d 39, 53 (D. Mass. June 25, 2001). It is not pellucid whether this theory relies upon certification—Relators' theory may be that, independent of certification, the false or fraudulent claims submitted by the Ambulance Defendants were the foreseeable consequence of the Hospital Defendants' participation in the alleged kickback scheme and thus can be attributed to the Hospital Defendants. *See, e.g., id.* Or, the theory may be that the false certification caused Medicare to accept the Ambulance Defendants' false claims.

C.      The Ambulance Defendants' Role in the Alleged Kickback Scheme

David Cybulski formed Stat in 1988; Relator Klaczak was a Stat shareholder. (D.E. 301 ¶¶ 47-48.) Mr. Klaczak, along with David Cybulski ("Cybulski"), represented Stat in contract negotiations with hospitals. (*Id.* ¶ 81.[13]) In negotiating contracts with the hospitals, one of Stat's objectives was to obtain the denomination as the hospital's primary preferred provider in order to get a volume of business from the hospital. (*Id.* ¶¶ 50-51.) Relator Sharp was a dispatcher at Stat; he did not routinely transport patients. (D.E. 294, Ex. 20 at 27.)

---

[13]      Of the two relators, Messrs. Sharp and Klaczak, it does not appear that either played an active role in negotiating any of the relevant contracts with any of the Hospital Defendants. The closest involvement either Relator had in the negotiation process was Mr. Klaczak's going with Mr. Cybulski on some marketing calls to hospitals while at Stat. (D.E. 301 ¶ 49.) The record does not suggest that Mr. Klaczak worked for Tower and Mr. Sharp testified that Mr. Klaczak did not work at CoMed. (*See* D.E. 294, Ex. 20 at 61-62) Mr. Sharp's business-related interactions with the Hospital Defendants while at Stat were limited to "maybe [dropping] off some Dunkin Donuts or something like that," and he was never involved in sales pitches or contract negotiations. (*Id.* at 44.) Mr. Sharp's deposition does not suggest that he had any involvement in contract negotiations while at Tower or CoMed. (*See generally id.*)

When Tower purchased Stat, Klaczak was not offered a position to stay on with Tower (*id.*, Ex. 14 at 35), while Sharp continued in his role as an emergency medical technician. (D.E. 301 ¶ 100.) As part of his compensation, Cybulski received one percent of the total monthly revenue collected by Tower for services rendered to Trinity, Jackson Park, Saint Bernard, South Suburban, and Holy Cross. (*Id.* ¶¶ 73-74.)

In or about 1995, Tower and Daley's merged to form CoMed. (*Id.* ¶ 100.) CoMed employed Sharp as an emergency medical technician/dispatcher until approximately December 1997. (*Id.* ¶ 100.) Cybulski was an account manager for CoMed and handled negotiations with various area hospitals. (*See*, *e.g.*, *id.* ¶ 243.) The record does not indicate that Klaczak was employed by CoMed at any time.

Soon after the merger, Jerald Gordon ("Gordon") left CoMed, in part because he had been removed from the Bethany Hospital account and had been replaced by Cybulski. (*Id.* ¶¶ 189-90.) Gordon expressed his view that some of the rates that Cybulski had negotiated were "whore rates," meaning "do it for nothing, give it away, do it for less than your cost of business." (*Id.* ¶ 188.) Gordon knew what some other ambulance companies were charging because some of the hospitals would show him the contracts from the other companies. (*Id.* ¶ 224.) Michael Orze, who worked at Tower and CoMed doing contract billing, was also surprised at some of the (unspecified in the record) rates that were given to the hospitals, because the unspecified rates were significantly lower than the ordinary rates. (*Id.* ¶¶ 160, 288.) There is no allegation that anyone at any of the Hospital Defendants was privy to any of these discussions.[14]

---

[14] The Hospital Defendants have affirmatively stated without contradiction that they did not even know basic information about CoMed's business, such as its cost structure or the prices it charged Medicare and competing hospitals (*see*, *e.g.*, D.E. 270 at 31); there is no contention in the summary judgment papers that the Hospital Defendants were privy to internal CoMed discussions.

There were internal discussions at CoMed regarding an attempt to increase the contract rates of some of Cybulski's hospital accounts. (*Id.* ¶ 77.) Sharp was advised by Cybulski that they could make up any losses on discounted rates by increased volume of Part B transports because Part B transports significantly outnumbered Part A transports. (*Id.* ¶ 78.) The record suggests that Cybulski's assessment was, at least in part, correct—the majority of Tower's transports for the Hospital Defendants were Medicare Part B transports, the next lowest in volume was Medicaid transports, the next lowest in volume was third-party transports, and Part A transports were the lowest volume. (*Id.* ¶ 79.) The record does not reflect whether Cybulski was correct that CoMed profited from the additional referrals. Again, there is no allegation that anyone at any of the Hospital Defendants was privy to these internal discussions.

After investigating the allegations in the complaint filed under seal, the United States ultimately intervened in the case against the Ambulance Defendants and Individual Defendants only. (*See* D.E. 80.) The factual basis of the United States' claims against the Ambulance Defendants and the Individual Defendants was substantially different than the factual basis underlying the Relators' claims in the instant case against the Hospital Defendants—in which the United States declined to join. Specifically, the factual basis of the United States' claims against the Ambulance Defendants and the Individual Defendants was that they knowingly and willfully engaged in an overbilling scheme predicated on widespread billing for medically unnecessary services, largely in connection with kidney dialysis patients. In this regard, in an independent assessment of medical necessity, John M. Stone, M.D., an expert retained by the United States, estimated that 67% of CoMed's transports in the sample population were not medically

necessary. (D.E. 301 ¶ 346.) On the basis of this report and other evidence that CoMed was systematically billing Medicare for unnecessary transports, the United States sought actual damages from the Ambulance Defendants and the Individual Defendants in the amount of $8,971,580.00. (*See* D.E. 80 at 6.) There has never been any allegation that the Hospital Defendants knowingly participated in any such scheme, or even that they would have had access to relevant information in that regard.

On or about July 2000, CoMed filed for bankruptcy protection (D.E. 85 ¶ 4); its assets were later sold pursuant to an order of the Bankruptcy Court. (D.E. 80 at 6.) On June 28, 2005, after the United States and the Individual Defendants reached a settlement agreement, the Court granted the United States's motion to dismiss the Individual Defendants from the case. (D.E. 208.) What therefore remains is the instant case—the Relators' claims alone against the Hospital Defendants on the alleged kickback scheme distinct from the bogus kidney-dialysis overbilling.

D.     The Hospital Defendants

1.     St. James

St. James Hospital and Health Centers ("St. James") operates a hospital campus located in Chicago Heights, Illinois, which is a southern suburb of Chicago. (D.E. 287 ¶ 1.) Thomas Senesac ("Senesac") has been employed by St. James since 1984, and he has been the Chief Financial Officer since 1992. (D.E. 301 ¶ 327.)

The majority of St. James's patients rely upon Medicare or Medicaid for the payment of their medical bills. (*Id.* ¶ 2.) In any given year, the patient population is roughly 45% Medicare enrollees and 18% Medicaid enrollees. (*Id.*) St. James was responsible for paying for ambulance transports that were covered under St. James's Part

A payment. (D.E. 301 ¶ 12.) The typical Part A transport involved a round-trip transport of a patient to a specialized testing facility and back to St. James. (*Id.* ¶ 13.) Under Part A, St. James received a DRG payment from Medicare for each patient, meaning that if the actual costs of treatment exceeded the DRG payment, St. James would be responsible for the difference. (*Id.* ¶ 14.)

In 1990, St. James opened an MRI building on its hospital campus in Chicago Heights. The MRI building was approximately 250 feet from the main hospital. (*Id.* ¶¶ 3-4.)

During the early-to-mid 1990s, Daley's provided ambulance-transport services for St. James; in 1995, CoMed began servicing St. James. (*Id.* ¶¶ 5-6.) However, St. James never had a written agreement with any ambulance company, including Daley's or CoMed. (D.E. 241 ¶ 7.) In this regard, it appears that Cheryl Nemeth ("Nemeth"), St. James's Controller, orally negotiated a flat rate of $80 for transports to the MRI facility. (*Id.*) Furthermore, over time, it appears that St. James and the ambulance providers settled on customary charges for ALS and BLS transports. (*Id.*) However, St. James lacked knowledge that these rates were discounts or were not indicative of fair market value. (*Id.* ¶ 13.) To the contrary, St. James believed that the negotiated rate was reasonable because the MRI building was 250 feet away and Daley's had an ambulance barn in Chicago Heights, near the hospital.[15] (*Id.* ¶ 15.) St. James did not receive prompt-pay discounts (*id.* ¶ 13) and neither Daley's nor CoMed reduced or forgave St. James's outstanding bills. (*Id.* ¶ 14.)

---

[15] Relators' objection is groundless—Senesac clearly testified as to St. James's belief that the flat rate was commercially reasonable based upon the close proximity of the facility and the ambulance barn. (*See, e.g.,* D.E. 294, Ex. 68-69.)

When Medicare patients required transportation to the MRI building during hospitalizations, a clerical employee in the MRI building generally contacted Daley's to make arrangements. (D.E. 241 ¶ 10.) For all other ambulance transports, including Medicare Part B transports, patients were given the opportunity by employees in the hospital's Social Service Department to select the ambulance company, unless the individual was unconscious or unable to respond. (*Id.*)

St. James maintained a list of several local companies so as to assist patients in selecting ambulance companies. (*Id.*) St. James's patients often selected Daley's or CoMed for ambulance services because, among other things, Daley's had an ambulance barn in close proximity to the hospital and had a reputation for providing prompt, courteous, and good service. (*Id.* ¶ 12.) However, St. James's patients did not exclusively select Daley's or CoMed. (*Id.*)[16] Furthermore, nothing in the record suggests that St. James was obligated to refer patients to Daley's or CoMed; Relators have not demonstrated that Daley's or CoMed ever suggested that the $75 rate would not be honored if they were not sufficient referrals from St. James. Relators have also failed to adduce evidence that the St. James personnel involved in negotiating with the ambulance companies had any influence over ambulance provider choices.

In July 2000, St. James opened an additional campus in Olympia Fields, Illinois; the new campus was only 4.8 miles from the Chicago Heights campus. (D.E. 301 ¶ 105.)

---

[16] Relators object on the ground that St. James's Answers to Interrogatories states that St. James, starting in 1995, used only Daley's/CoMed. (D.E. 287 ¶ 12.) However, the interrogatory only addresses St. James's use of CoMed services, and thus is not probative of the hospital's use of other transport companies. (See Interrogatory #2 ("State the years during which the Hospital had CoMed perform ambulance transports on behalf of Hospital patients pursuant to any written or oral agreement. As to each such year, please state: (a) whether the agreement with CoMed was written or oral; (b) the terms of the agreement; and (c) the name, address, and job title of the person who had the main responsibility of negotiating the contract on behalf of the Hospital with CoMed.").) Furthermore, St. James's answer to Interrogatory No. 3 indicated that "Beginning approximately 1995 through 1997, CoMed was among the ambulance companies which St. James called upon, to perform individual ambulance services. There was no prior understanding that St. James would call CoMed." (*See* D.E. 294, Ex.19-2 (St. James's Answers to Relators' First Set of Interrogatories) at 2-3.)

St. James subsequently formed Alverno Ambulance ("Alverno") to shuttle patients between the two campuses. (*Id.*) One of the reasons that the new ambulance company was profitable is because the number of Medicare Part B transports exceeded transports that were the responsibility of other payors. (*Id.* ¶ 106.) The record does not reflect Alverno's profit margins nor does it indicate the relevant contribution of Part B transports to its profit margins.

Senesac was familiar with the laws and regulations regarding the provisions of health care services. (*Id.* ¶ 284.) More specifically, Senesac was aware that receiving something of value, such as discounted rates (*id.* ¶ 281), in exchange for a referral could potentially be illegal. (*Id.* ¶¶ 282, 285.) Put somewhat differently, Senesac believed that if a rate was below fair market value then it could be in violation of a regulation or guideline, but if it is in line with the fair market value, then he would not be concerned. (*Id.* ¶ 240.) Furthermore, Senesac understood that the kickback arrangement or scheme does not have to be in writing in order for it to be a violation of the regulations and guidelines. (*Id.* ¶ 283.)

Senesac certified St. James's cost reports beginning in 1992. (D.E. 301 ¶ 328.)

2.  South Suburban

South Suburban is located in Hazel Crest, Illinois, a southern suburb of Chicago. South Suburban's patient-population mix was slightly over 50% Medicare, around 10% Medicaid, and around 35% "Insurance/Other."[17] (D.E. 239 ¶ 2.) South Suburban is

---

[17]    Relators repeatedly object to the use of summary tables in L.R. 56.1 Statements of Fact. (*See, e.g.,* D.E. 283 ¶ 2.) For reasons stated elsewhere, such objections are not well-taken. Moreover, in addition to the reasons previously cited, disallowing summary tables would result in bloated statements of fact as parties would need tens of paragraphs to establish what they otherwise could in a concise format. Furthermore, the Hospital Defendants are not using these summary tables as obfuscation in hope that Relators will miss an essential fact. *See, e.g.*, *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000).

operated by Advocate Health and Hospitals Corporation ("Advocate"), which also operates Trinity and Bethany.  (D.E. 283 ¶ 1.)

South Suburban had contracts beginning in 1994 through 1998.  (D.E. 283 ¶ 7.) Cybulski negotiated the agreements with Brian Kelly.  (D.E. 301 ¶ 63.)

The May 1994 contract between Stat and South Suburban includes the standard Section 3.1(a) language.  (D.E. 294, Ex. T at CMT000244.)  Section 4.2(b) (as amended by Amendment A) requires payment within 60 days from receipt of invoice.  (*Id.* at CMT000249.)  Appendix A establishes a flat rate of $75 for ambulance transports to the South Suburban Cancer Center; it also requires Stat to offer a "no-hassle" collection policy.  (*Id.* at CMT000248.)  The fee schedule specifies ALS and BLS rates, as contrasted with the "Contracted Rate," which offered a 25% discount off the listed ALS and BLS rates.  (*Id.* at CMT000250.)  The fee schedule also specifies a 35% discount off the contracted rate if the invoice is paid within a 30-day period.  (*Id.*)  The contract does not specify that South Suburban must pay retail rates if it fails to pay within the period set forth in Section 4.2(b).  The contract was signed by [illegible], who signed in his or her capacity as "V.P. of Patient Care Services."  (*Id.* at CMT000247.)

South Suburban's June 11, 1996 contract includes the Standard Section 3.1(a) Language.  (D.E. 294, Ex. 1U at CMT000252.)  Section 4.2(b) requires payment within 60 days and states that invoices paid beyond sixty days are subject to retail rates.  (*Id.* at CMT000254.)  Section 4.2(c) states "Terms:____/60 net 75."  (*Id.*)  The fee schedule shows ALS and BLS Rates and contracted rates as a 25% discount; the schedule also indicates a 35% discount for payment within 60 days after receiving an invoice.  (*Id.*) The charges are significantly higher than in the previous year's contract—the BLS

contracted base rate was $135 (compared to $105 the previous contract) and the ALS

contracted base rate was $258.75 (compared $157.50 the previous contract).  (Compare

*id.* at CMT00257 *with id.*, Ex. 1T at CMT000250.)

The September 1997 contract was similar to previous agreements in many

respects.  However, the rate sheet does not indicate contracted vs. non-contracted rates

nor does it offer a quick-pay discount.  (*Id.*, Ex. 1V.)  The contracted rates are $149.70

for ALS and $98.65 for BLS.  (*Id.* at CMT000266.)  The contract was signed by "RR,"

designated as South Suburban's Chief Executive.  (*Id.* at CMT00264.)

The Peterson analysis reflects that the differences between CoMed's Medicare

Part B reimbursement rate and South Suburban's contract rates were, in dollars and

cents[18]:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------|------|------|------|------|------|------|
| Part B | ALS | $157.94 | $195.00 | $205.87 | $195.00 | $207.98 |
| South Suburban | ALS | $258.75 | $258.75 | $258.75 | $258.75 | $258.75 |
| Part B | BLS | $96.14 | $118.35 | $122.09 | $128.70 | $133.12 |
| South Suburban | BLS | $135.00 | $135.00 | $135.00 | $135.00 | $135.00 |

(*Id.* ¶ 15.)

The Peterson analysis further reflects that the differences between CoMed's

Medicaid rate and South Suburban's contract rates were, in dollars and cents:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------|------|------|------|------|------|------|
| Medicaid | ALS | $123.17 | $129.33 | $129.33 | $142.58 | $149.70 |
| South Suburban | ALS | $258.75 | $258.75 | $258.75 | $258.75 | $258.75 |
| Medicaid | BLS | $77.31 | $81.18 | $85.23 | $89.49 | $93.96 |
| South Suburban | BLS | $135.00 | $135.00 | $135.00 | $135.00 | $135.00 |

(*Id.* ¶ 18.)

---

[18]     Relators' objection to the use of summary charts is not well-taken for reasons discussed previously.
Furthermore, if the Court determined that compounding of facts were impermissible, it would have to exclude all
evidence with respect to the Medicare Allowable Rate, which Relators have also summarized in table form.  (*See,
e.g.*, D.E. 290 ¶ 156 (referencing Sparks's chart); *id.* ¶ 173 (referencing Nagorka's chart).)  The consequence of such
an exclusion would be summary judgment for Defendants because Relators would have failed to offer proof on a
basic element of the case.

Peterson, after taking into account the cost-shifting provisions in South Suburban's contracts, estimated the actual gap between the Medicare Part B rates and what he determined were the effective contract rates to be as follows[19]:

| SOUTH SUBURBAN | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|
| Part B – Contract Rate | ALS | ($100.81) | ($63.75) | ($52.88) | ($63.75) | ($50.77) |
| Percentage Explained | ALS | N/A | N/A | N/A | N/A | N/A |
| Part B – Contract Rate | BLS | ($38.86) | ($16.65) | ($12.91) | ($6.30) | ($1.88) |
| Percentage Explained | BLS | N/A | N/A | N/A | N/A | N/A |

(*Id.* ¶ 24.) Peterson's analysis demonstrates that, once the cost-shifting aspect of the contracts are accounted for, that South Suburban's contract rates for ALS substantially exceeded the Medicare allowable rate during each of the contract years. Peterson's analysis also shows that South Suburban's contract rates for BLS were also above the Medicare allowable rate during each of the contract years.

The record does not indicate who certified South Suburban's cost reports during the relevant years.

### 3. Holy Cross

Holy Cross Hospital operates a hospital located at 2701 W. 68th St. in the Chicago Lawn neighborhood of Chicago. (D.E. 284 ¶ 1.) During the years 1993-1997, the payor mix at Holy Cross reflected the following in terms of percentage of patient base:

| Payor | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| Medicare | 68% | 68% | 65% | 63% | 55% |
| Medicaid | 12% | 10% | 20% | 15% | 24% |
| Insurance/Other | 20% | 22% | 15% | 22% | 21% |

---

[19]     Line 1 of the table (Part B - Contract Rate) is the difference between the Medicare allowable rate for ALS and the "adjusted" contract rate. In certain instances, this is a negative number because the adjusted contract rate was higher than the Medicare allowable rate. Line 2 of the table (Percentage explained) indicates how much the adjustment process closed the gap between the Medicare allowable rate and the unadjusted contract rate. For example, if the Medicare allowable rate was $150, the contract rate was listed as $100 on the rate sheet, and Peterson determined, because the contract shifted administrative costs and the hospital assumed debts when patients could not pay or Medicare denied coverage, that the adjusted rate was $140, the percentage explained line would be 80% (40/50).

(D.E. 254 ¶ 2.)

During the period 1991-1998, Holy Cross used CoMed and its predecessor companies, as well as other ambulance companies, for its patient transports to and from the hospital.[20]  (*Id.* ¶ 7.)  Other ambulance companies provided transport services for Holy Cross patients, including Safe Ride Service, Inc., Trace Ambulance, Inc., AMR of Illinois, Inc., Vandenburg Ambulance, and Superior Air-Ground Ambulance Service.  (*Id.*)  The time periods covered by Holy Cross's various preferred-provider contracts are as follows: (1) Stat from December 31, 1991 through February 1993 (*id.* ¶ 8); (2) Vandenburg Ambulance from March 1, 1993 through August 1995 (*id.* ¶ 9); (3) Tower from August 14, 1995 through July 11, 1996 (*id.* ¶ 18); (4) Comed from July 12, 1996 through 1998. (*Id.* ¶ 19.)

Around late December 1994 or early January 1995, Holy Cross wanted to review proposals from ambulance companies other than Vandenburg because its nursing staff was dissatisfied with Vandenburg's level of service and responsiveness.  (*Id.* ¶ 10.)  Thomas Corkery ("Corkery"), the Director of Materials Management at the time, began the process of reviewing candidates for a new preferred-provider contract.  (*Id.* ¶ 11.)  Holy Cross's Purchasing Department took individual proposals specific to Holy Cross or through formal bids.  (*Id.* ¶ 12.)  Holy Cross's previous contracts and proposals were used to determine benchmark pricing for ambulance services.  (*Id.*)

As part of the contract proposal review, Holy Cross compared proposals from Vandenburg, Tower, and other providers, and compared these proposals to a previous

---

[20]     Relators deny this paragraph on the grounds that the contracts were exclusive.  (D.E. 284 ¶ 7.)  However, none of the testimony cited by Relators addresses actual practice at Holy Cross and, in any event, the cited testimony is not inconsistent with the fact that, on occasion, Holy Cross had occasion to use other transport companies. Furthermore, Relators do not deny that Holy Cross had a preferred-provider agreement with Vandenburg that covered more than two years.  (D.E. 254 ¶ 9.)

proposal from Stat that was on file. (*Id.* ¶ 13.) Holy Cross reviewed the proposals against

previous and existing agreements, and compared the pricing in the proposals based upon

market conditions in the Chicago area. (*Id.* ¶ 14; D.E. 301 ¶ 231.) However, Holy Cross

did not obtain pricing terms of the ambulance contracts for other hospitals to protect itself

from potential antitrust liability.[21] (D.E. 254 ¶ 17.)

Holy Cross chose Tower over Vandenburg, even though the Vandenburg offered

lower rates, because Corkery thought Tower would provide better service. (*Id.* ¶¶ 15, 33.)

Corkery had no knowledge of Tower's market rates for patients whose transports were not

billed directly to Holy Cross. (*Id.* ¶ 35.) Furthermore, Holy Cross had no knowledge as to

how CoMed or other ambulance companies were billing Medicare beneficiaries for

services not billed to the hospital. (*Id.* ¶ 34.)

The August 14, 1995 contract includes the Standard Section 3.1(a) Language.

(D.E. 294, Ex. 1C at CMT000079.) Section 4.2(b) states that invoices paid beyond 60

days are subject to retail rates. (*Id.* at CMT000080.) Section 4.2(c) states "Terms____/60

net 75." (*Id.*). Attachment A sets a flat rate of $75 for round-trip transports to a mental

health facility. (*Id.* at CMT000084.) The fee schedule identifies "B.L.S. Rate," "A.L.S.

Rate," "Contracted Rate," and "H.C." (*Id.* at CMT000085.) The H.C. rates were written

into the contract by Corkery in order to clarify Holy Cross's rate if they paid within sixty

days. (D.E. 301 ¶¶ 233-34.) These rates reflected a 40% discount off the contracted rate.

(D.E. 271 ¶ 23.) In addition, Corkery negotiated the oxygen price of $18.75 to no charge.

(D.E. 301 ¶ 205.) The contract was signed by Corkery. (D.E. 294, Ex. 1C at

---

[21]     This was not an unreasonable concern, given, for example, the Supreme Court's decision in *Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332 (1982).

CMT000082.)  Holy Cross's July 12, 1996 contract with CoMed is not materially different from its previous agreement with Tower.  (*Compare id. with id.*, Ex. 1D.)

During the years 1992 through 1998, various Holy Cross personnel, including case managers, social workers, physicians, and health care coordinators, arranged for ambulance transports for Holy Cross patients.  (D.E. 271 ¶ 4.)  If a patient needed an ambulance transport, Holy Cross would contact an outside ambulance service for services that Holy Cross medically could not provide as part of the discharge process, or which required ambulance transportation to a skilled nursing facility.  (*Id.*)

Holy Cross had preferred-provider agreements in which it agreed to contact a particular ambulance provider first when requesting transports.  (D.E. 254 ¶ 5.)  These agreements permitted Holy Cross to make one call to the same ambulance company, which Holy Cross perceived as desirable because it permitted internal operating efficiencies.  These agreements also produced service expectations, response expectations, and standards of performance to be met more consistently.  (*Id.*)  Holy Cross would require preferred providers to provide a commitment in time response.  (*Id.* ¶ 6.)  If the primary service provider was unable to meet its obligation, then a secondary provider would be contacted, depending upon the judgment of the caregiver as to medical immediacy.  (*Id.*)  Relators maintain that CoMed, not Holy Cross, took responsibility for calling the secondary providers.  (D.E. 284 ¶¶ 6-7.)

The Peterson analysis reflects that the differences between CoMed's Medicare Part B reimbursement rate and Holy Cross's contract rates were, in dollars and cents:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------|------|------|------|------|------|------|
| Part B | ALS | $157.94 | $195.00 | $205.87 | $195.00 | $207.98 |
| Holy Cross | ALS | $157.50 | $157.50 | $168.75 | $168.75 | $155.00 |

| Part B | BLS | $96.14 | $118.35 | $122.09 | $128.70 | $133.12 |
|---|---|---|---|---|---|---|
| Holy Cross | BLS | $105.00 | $105.00 | $116.25 | $116.25 | $81.00 |

(D.E. 254 ¶¶ 24-25.)

The Peterson analysis further reflects that the differences between CoMed's Medicaid reimbursement rate and Holy Cross's contract rates were, in dollars and cents:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|
| Medicaid | ALS | $123.17 | $129.33 | $129.33 | $142.58 | $149.70 |
| Holy Cross | ALS | $157.50 | $157.50 | $168.75 | $168.75 | $155.00 |
| Medicaid | BLS | $77.31 | $81.18 | $85.23 | $89.49 | $93.96 |
| Holy Cross | BLS | $105.00 | $105.00 | $116.25 | $116.25 | $81.00 |

(*Id.* ¶ 25-26.)

Peterson, after taking into account the cost-shifting provisions in Holy Cross's contracts, estimated the actual gap between the Medicare Part B rates and what he determined were the effective contract rates to be as follows:

| HOLY CROSS | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|
| Part B – Contract Rate | ALS | $0.44 | $37.50 | $37.12 | $26.25 | $52.98 |
| Percentage Explained | ALS | N/A | 61.00% | 59.79% | 88.76% | 50.09% |
| Part B – Contract Rate | BLS | ($8.86) | $13.35 | $5.84 | $12.45 | $52.12 |
| Percentage Explained | BLS | N/A | 57.12% | 100% | 62.38% | 16.97% |

(*Id.* ¶ 28.)

The ambulance contracts at Holy Cross were not reviewed by anyone to determine whether or not the contract complied with Medicare or Medicaid regulations. (D.E. 301 ¶ 275.) The record does not indicate who certified Holy Cross's cost reports.

4. Jackson Park

Jackson Park Hospital operates a hospital located at 7531 S. Stony Island Avenue in the South Shore neighborhood of Chicago's south side. (D.E. 285 ¶ 1.) During the relevant time period, the majority of Jackson Park's patients were Medicaid enrollees, very few were Medicare patients, and even fewer patients had private insurance. (D.E.

301 ¶ 88; *see also* D.E. 285 ¶ 2 (in 1998, less than 10% of Jackson Park's patients had private insurance, approximately 50% were Medicaid enrollees, and 20-30% were Medicare enrollees).)

In the years leading up to 1991, Jackson Park had a large psychiatric program and treated numerous mental health patients, many of whom were brought to Jackson Park's emergency room by the police. (D.E. 285 ¶¶ 3-4.) It was common for mental health patients to become violent, which placed substantial stress on the emergency room, especially when two or three individuals became violent at the same time. (*Id.* ¶ 4.) Jackson Park's nursing staff were charged with taking care of mental-health patients and determining whether to admit them or to transfer them to another mental-health facility— typically the Tinley Park Mental Health Care Facility ("Tinley Park"), located in Tinley Park, Illinois, a Chicago suburb. (*Id.* ¶ 5.) Chicago Police and Fire Department personnel are not permitted to transport patients outside of city limits. (*Id.* ¶ 6.) Jackson Park had great difficulty in finding private firms willing to transport violent patients to Tinley Park because of the difficulties posed by the patients and the volume of such patients. (*Id.* ¶¶ 6-7.)

Prior to entering into any ambulance-service agreements, Jackson Park utilized an internal service to transport mental health patients. (*Id.* ¶ 8.) However, Jackson Park found that practice to be quite expensive because of the need for additional personnel to ensure driver safety, long wait times at Tinley Park prior to a patient being admitted, and higher insurance costs from frequent patient attacks on drivers. (*Id.* ¶ 9.) Jackson Park eventually abandoned its attempts to internally provide transport services and sought to outsource provision to a private firm. (*Id.* ¶ 10.)

In early 1991, or at some point prior, John Burke ("Burke"), Jackson Park's associate administrator at that time, requested that Daley's and Stat submit contract proposals. (*Id.* ¶¶ 11-12.) On February 1, 1991, Jackson Park entered into a transport-service contract with Stat; the agreement was negotiated by Burke and Cybulski. (*Id.* ¶ 13; D.E. 301 ¶¶ 59-60.) Jackson Park did not draft any contracts or proposals—Stat did all the drafting, although Jackson Park was able to make changes to the contract. (D.E. 285 ¶ 13.)

Prior to outsourcing its transports, Jackson Park was losing money on mental health transports. (D.E. 233 ¶ 25) While Jackson Park did turn a profit from outsourcing its transports, it did reduce its losses by outsourcing. (*Id.*) Jackson Park also believed that outsourcing would ensure that transport services were available when needed. (*Id.*) Stat believed that the contract with Jackson Park would increase its revenues through a volume of transports. (D.E. 301 ¶ 61.) Klaczak questioned Cybulski about the $75 flat fee for Tinley Park transports; he wondered how Stat could do the trip so cheaply, given that Stat had to tie up an ambulance for an extended period of time as part of the transport. (*Id.* ¶ 194.) There is no allegation that Jackson Park was privy to Klaczak's question posed to Cybulski. Furthermore, Cybulski testified that Jackson Park was given a discount for Tinley Park transports because Stat could transport multiple patients in one run. (D.E. 294, Ex. 7 at 59-60.)

As part of the negotiating process, Burke would send proposed contracts to several Jackson Park employees for review. (D.E. 233 ¶ 27) Burke would receive input and suggestions and then incorporate this feedback into his negotiations with the Ambulance Defendants. (*Id.*) However, the terms of the contracts (save for the rate) do not

substantially vary, suggesting that Jackson Park did not actively negotiate non-price terms. (D.E. 285 ¶ 27.)  During the period he negotiated ambulance service agreements, Burke was not personally aware of what a kickback scheme was under Medicare, what the AKS was, or what particular Medicare regulations and guidelines would apply to ambulance-service agreements.  (*Id.* ¶ 28.)  Furthermore, Burke does not recall any discussions about whether the contracts complied with Medicare regulations.  (*Id.* ¶ 29.)  However, Dr. Peter Friedell ("Friedell"), Jackson Park's President, signed the ambulance agreements and he was aware of the AKS, and was kept apprised of changes in Medicare regulations and guidelines.  (*Id.*)  The record is not pellucid with respect to the nature of Friedell's participation in the ambulance contract negotiations (beyond his signing the agreements).

Jackson Park entered into service agreements with Stat every year between 1991 and 1995.  (*Id.* ¶ 14.)  The first contract—the February 1, 1991 contract—specifies that it was a one-year agreement with automatic renewal for successive one-year periods.  (D.E. 294, Ex. 1E.)  It includes the Standard Section 3.1(a) Language.  (*Id.*)  Section 4.2(b) provides that payment is due within 30 days of receipt of the invoice.  (*Id.*)  The rate sheet identifies a flat rate of $75 for Tinley Park Mental Health Center transports.  (*Id.*)  The contract identifies the "B.L.S. Rate" and the "A.L.S. Rate" and then states that Jackson Park would receive a 25% discount.  (*Id.*)  The contract did not include a penalty for late payment but it did include a quick-pay discount of 35% off the contracted rate for submitted bills paid within 45 days.  (*See id.*)  The contract was signed by Friedell.  (*Id.*)

The January 1, 1992 contract is not materially different from the previous year's agreement.  This contract was signed by Friedell and Burke.  (*Id.*, Ex. 1F.)  The January 1, 1994 agreement included similar terms, but the quick-pay discount was increased from

39

35% to 45% for submitted bills paid within 30 days. (*Id.*, Ex. 1H.) Friedell signed the January 1, 1994 contract. (*Id.*) The January 1, 1995 agreement changed the quickpay discount back to 35%. (*See id.*, Ex. 1I.) Both Burke and Friedell signed the January 1, 1995 agreement. (*Id.*)

On January 1, 1996, Jackson Park entered into an agreement with CoMed; the parties formed similar contracts in 1997 and 1998. (D.E. 285 ¶ 15.) Burke negotiated these subsequent agreements with CoMed. (*Id.* ¶ 17.) The conduct of Jackson Park in obtaining ambulance services during that time period remained constant. (*Id.*)

The January 1, 1996 agreement does not materially differ from the Stat contracts, except in that it explicitly states that invoices paid beyond sixty (60) days are subject to being paid at retail rates. (D.E. 294, Ex. 1J at CMT000106.) This agreement was signed by Friedell. (*Id.* at CMT000108.)

The June 18, 1997 agreement reduced Jackson Park's discount on ALS transports to 20% and included a 7% quickpay discount; the rate sheet does not indicate that Jackson Park received a discount on BLS transports. (*Id.*, Ex. 1K at CMT000116.) Furthermore, the base ALS rate is nearly $100 higher than in previous agreements. (*Id.*) The June 18, 1997 agreement was signed by Friedell. (*Id.* at CMT000115.)

The October 1, 1998 contract represented another rise in the non-contracted rates that were specified on the rate sheet. (D.E. 294, Ex. 1L.) However, contracted rates did not rise, meaning that the apparent discount was greater, even though the absolute cost of the contracted rates was higher than in previous years. (*Id.*) Another significant difference was that Section 4.2(b) of that contract required payment within 30 days or it would be subject to retail rates; however, no quick-pay discount was made available. (*Id.*)

Finally, the flat rates for transport to other hospitals increased from past contracts. (*Id.*) Friedell signed the October 1, 1998 agreement. (*Id.*)

Friedell understood the contracts—specifically, paragraph 4.2(b), in its most common form—to mean that Jackson Park would be charged the retail rate specified in the contract if it did not pay bills within 60 days. (D.E. 301 ¶¶ 161-62.) Relators maintain that hospitals received the discounts regardless of when they paid their bills (D.E. 285 ¶ 18); however, Relators have not adduced evidence that Jackson Park specifically took any quick-pay discounts, and Peterson's analysis of Jackson Park's records revealed an absence of any evidence that Jackson Park took any discounts. (D.E. 233, Ex. B at 16.)

Although the contracts specified that the ambulance company would not look to Jackson Park for payment of services provided to Medicare or Medicaid enrollees, Burke (correctly or incorrectly) believed that Jackson Park was obligated to serve as the payor of last result. (D.E. 233 ¶ 19.) Furthermore, and consistent with Burke's understanding, in practice, Jackson Park assumed responsibility for and actually paid the costs of otherwise unpaid ambulance transports. (*Id.*)

Jackson Park maintained printed lists of ambulance providers at nursing stations; the lists included the name and phone numbers of ambulance providers. (*Id.* ¶ 20.) Stat/Tower/CoMed may have been the first provider on the list, but nurses could call any of the providers appearing on the list. (*Id.*) Jackson Park admits that most of its nurses preferred Stat/Tower/CoMed because their ambulances would actually show up. (*Id.* ¶ 21.) Furthermore, Jackson Park did not have contracts with any other providers because other firms could not provide all of the services provided by Stat/Tower/CoMed. (*Id.* ¶

22.)  In practice, Dr. Friedell was not aware of any other providers that Jackson Park used during the 1991-1998 contract period.  (D.E. 285 ¶ 22.)

The Peterson analysis revealed that the differences between CoMed's Medicare Part B reimbursement rate and Jackson Park's contract rates were, in dollars and cents:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|-------|------|------|------|------|------|------|------|
| Part B | ALS | $157.94 | $195.00 | 205.87 | $195.00 | $207.98 | $220.95 |
| Jackson Park | ALS | $157.50 | $157.50 | $157.50 | $157.50 | $180.75 | $160.03 |
| Part B | BLS | $96.14 | $118.35 | $122.09 | $128.70 | $133.12 | $137.54 |
| Jackson Park | BLS | $105.00 | $105.00 | $105.00 | $105.00 | $132.00 | $103.58 |

(D.E. 233 ¶ 33.)

The Peterson analysis further reflected that the differences between CoMed's Medicaid reimbursement rate and Jackson Park's contract rates, in dollars and cents, were:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|-------|------|------|------|------|------|------|------|
| Medicaid | ALS | $123.17 | $129.33 | $129.33 | $142.58 | $149.70 | $165.03 |
| Jackson Park | ALS | $157.50 | $157.50 | $157.50 | $157.50 | $180.75 | $160.03 |
| Medicaid | BLS | $77.31 | $81.18 | $85.23 | $89.49 | $93.96 | $103.58 |
| Jackson Park | BLS | $105.00 | $105.00 | $105.00 | $105.00 | $132.00 | $103.58 |

(*Id.*)

Peterson, after taking into account the cost-shifting provisions in Jackson Park's contracts, calculated the actual gap between the Medicare Part B rates and what he determined were the effective contract rates to be as follows:

| JACKSON PARK | Type | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|--------------|------|------|------|------|------|------|------|
| Part B – Contract Rate | ALS | $0.44 | $37.50 | $48.37 | $37.50 | $27.23 | $57.92 |
| Percentage Explained | ALS | N/A | 68.43% | 43.32% | 66.96% | 69.73% | 50.01% |
| Part B – Contract Rate | BLS | ($8.86) | $13.35 | $17.09 | $23.70 | $1.12 | $33.96 |
| Percentage Explained | BLS | N/A | 64.07% | 40.87% | 35.32% | 100% | 28.43% |

(*Id.* ¶ 35.)

As the President of Jackson Park Hospital, Friedell was, in general terms, kept apprised of the changes in Medicare regulations and guidelines.  (D.E. 301 ¶ 256.)

Friedell's understanding of a kickback scheme is when somebody takes money, or something of value, to provide a service. (*Id.* ¶ 257.) The record does not indicate who certified Jackson Park's cost reports.

     5.     Loretto

Loretto Hospital operates a hospital located at 654 S. Central Ave., in the Austin neighborhood of Chicago's west side. (D.E. 286 ¶ 1.) During the relevant time period, Steven Drucker ("Drucker") was Loretto's President and CEO and Marilyn Buhrke ("Buhrke") was the DRG coordinator and then Associate V.P. of Operations. (D.E. 301 ¶¶ 268-269.)

From 1998 to 2001, the payor mix at Loretto was as follows:

| Payor | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|
| Medicare | 51% | 48% | 47% | 47% |
| Medicaid | 39% | 35% | 36% | 39% |
| Insurance/Other | 10% | 17% | 17% | 14% |

(D.E. 260 ¶ 3.)

The covered inpatient care provided by Loretto to its patients that were Medicare enrollees was paid by Medicare pursuant to the diagnostic related group (DRG) reimbursement system. (D.E. 286 ¶ 14.) Loretto did not submit any claims or invoices to Medicare under Part A for ambulance transports because the DRG payment made by Medicare under Part A to Loretto was a flat rate that included payment for all medical services rendered to such patients. (*Id.*)

During the period of 1996-1998, Loretto had ambulance contracts for various terms with AMR of Illinois and Andres Medicare Service, two competitors of Comed that are not parties to this suit. (D.E. 260 ¶ 7.) In early 1998, Loretto was seeking to enter into ambulance contracts for the upcoming years. Loretto's goal was to find an ambulance

company that provided prompt, high-quality care for the best rate possible. (*Id.* ¶ 5.)

Drucker believes that it was Loretto's practice at that time to request bids or proposals

from a number of ambulance companies, or at least to "go out to get a variety of vendors

to talk to." (*Id.* ¶ 8; *see also* D.E. 294, Ex. 9 (Drucker Dep.) at 41-42.) Drucker also

explains that Loretto did not negotiate for or seek any prompt-pay discounts because of its

fiscal environment, *i.e.*, Loretto was constantly struggling for its financial survival.[22]

(D.E. 260 ¶ 10; *see also* D.E. 294, Ex. 9 (Drucker Dep.) at 59-60. )

On or around March 6, 1998, CoMed and Loretto entered into a three-year contract

for ambulance services. (D.E. 301 ¶ 39.) The agreement provides for an initial three-year

term that was automatically renewable for successive three-year periods unless canceled

by one of the parties. (D.E. 286 ¶ 16.) The contract included the Standard Section 3.1(a)

Language. (D.E. 294, Ex. 1M at CMT000125.) Section 4.2(b) states that any invoice to

be paid beyond 30 days is subject to retail rates. (*Id.* at CMT000126.) The agreement

was signed by Drucker and Buhrke. (*Id.* at CMT000128.) The rate sheet did not identify

CoMed's retail or non-contracted rates, nor did it offer a quick-pay discount off the

contracted rates. (*Id.* at CMT000129.)

In practice, Loretto would pay the contracted rate, regardless of whether they paid

within the specified period. (D.E. 301 ¶ 215.) However, Harder explained that Loretto

had this practice with respect to all vendors and, as a matter of customary practice,

vendors knew of Loretto's practices. (*See*, *e.g.*, D.E. 294, Ex. 9 at 59-60 ("Again, we

ignore those sentences. Again, innercity hospital [sic] takes advantage of any company

that – we have that with all kinds of suppliers, 210 net 30 and stuff like that. We will take

---

[22]        Relators object because the CoMed contract includes a quick-pay discount (D.E. 286 ¶ 10), but, consistent with Loretto's representation, the only Loretto contract in the record does not contain a quick-pay discount. (*See* D.E. 294, Ex. 1M.)

whatever rates we can because we struggle to survive year after year so we are not going to pay higher rates."); *id.* at 65-66 ("Knowing practice, we would ignore any kind of net amounts with different rates if we didn't pay by a certain time because the implication is in the inner city, if you're dealing with a hospital, you know the payment structure and that's general practice.")

Loretto selected CoMed as its ambulance provider in order to secure quality and prompt services so that its patients would not have to endure excessive waits for ambulance services. (D.E. 286 ¶ 12.) The contract made CoMed the "preferred provider"—Loretto was to contact CoMed first, and CoMed agreed to provide ALS and BLS services for all Loretto's patients, twenty-four hours a day, seven days a week. (*Id.* ¶ 15.) However, if CoMed did not respond or was unable to provide the requested service, then Loretto was free to use another transporter. The parties disagree whether, in practice, Loretto or CoMed took responsibility for arranging transport in instances where CoMed could not fulfill Loretto's request. (D.E. 260 ¶ 13.)

The Peterson analysis reflects that the differences between CoMed's Medicare Part B reimbursement rate and Loretto's contract rates were, in dollars and cents:

| Payor | Type | 1998 | 1999 | 2000 | 2001 |
|-------|------|------|------|------|------|
| Part B | ALS | $220.95 | $233.93 | $247.67 | $262.21 |
| Loretto | ALS | $157.18 | $165.04 | $165.04 | $165.04 |
| Part B | BLS | $137.54 | $141.96 | $146.52 | $151.23 |
| Loretto | BLS | $98.65 | $103.58 | $103.58 | $165.04 |

(*Id.* ¶ 20.)

The Peterson analysis further reflects that the differences between CoMed's Medicaid reimbursement rate and Loretto's contract rates were, in dollars and cents:

| Payor | Type | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Medicaid | ALS | $165.03 | $173.40 | $173.40 | $173.40 |
| Loretto | ALS | $157.18 | $165.04 | $165.04 | $165.04 |
| Medicaid | BLS | $103.58 | $108.83 | $108.83 | $108.83 |
| Loretto | BLS | $98.65 | $103.58 | $103.58 | $103.58 |

(*Id.* ¶ 21.)

Peterson, after taking into account the cost-shifting provisions in Loretto's contracts, estimated the actual gap between the Medicare Part B rates and what he determined were the effective contract rates to be as follows:

| LORETTO | Type | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Part B – Contract Rate | ALS | $1.11 | $6.97 | $17.60 | $31.36 |
| Percentage Explained | ALS | 98.26% | 89.88% | 78.70% | 67.73% |
| Part B – Contract Rate | BLS | $18.99 | $17.74 | $21.26 | $21.94 |
| Percentage Explained | BLS | 53.71% | 53.78% | 50.48% | 46.04% |

(*Id.* ¶ 23.)

Furthermore, Peterson estimated that, for the period 1998-2001, the entirety of the difference between the Medicaid rates and the contract rates were explained by the cost-shifting provisions. (*Id.* ¶ 24.)

Loretto maintains that, during the period 1998-2001, Loretto did not have any knowledge as to any difference in price between the contracted rates and what CoMed billed Medicare or Medicaid because it did not know CoMed's billing rates. (D.E. 260 ¶¶ 29-30.) However, Drucker stated at his deposition that he could not remember whether he knew the reimbursement rates for Medicare transports on or around March 1998. (D.E. 294, Ex. 9 (Drucker Dep.) at 83.)

Buhrke was also the compliance officer for Loretto. (*Id.* ¶ 270.) The compliance officer is responsible for keeping up with Medicare regulations and guidelines, and any changes thereto. (*Id.* ¶ 274.) The record does not indicate who signed Loretto's cost reports during the relevant time period.

6. Mt. Sinai

Mt. Sinai Hospital Medical Center of Chicago ("Mt. Sinai") is an Illinois corporation that operates, *inter alia*, a hospital at 1500 S. California Ave. in the North Lawndale neighborhood of Chicago. (D.E. 288 ¶ 3.) Mt. Sinai is one of the largest providers of Medicaid services in Illinois, providing healthcare services to a significant indigent population. (*Id.*)

Mt. Sinai executed contracts with Daley's on December 15, 1992, and CoMed on June 9, 1997 and December 27, 1997. (*Id.* ¶ 9.) Mt. Sinai's goal in entering into the contracts was to secure safe, timely, and cost-effective ambulance transports for its patients. (*Id.*) Under these contracts, Mt. Sinai was billed directly by Daley's/CoMed for Part A transports based upon the contracted rates set forth in the fee schedule. (*Id.* ¶ 10.) Cybulski stated that he negotiated with David Miller ("Miller"), identified as Mt. Sinai's Vice President. (D.E. 301 ¶ 64; *see also* D.E. 288 ¶ 31.)

On December 15, 1992, Mt. Sinai contracted with Daley's for ambulance services. (D.E. 267, Ex. B-1.) This contract is different in form from the Stat, Tower, and CoMed agreements signed by other hospitals in many respects: (1) it did not make Daley's the preferred provider; (2) it includes detailed procedures for claim reconciliation and third-party payors; (3) the contract identifies "usual and customary rates"; and (4) there is no discount for quick-pay or reversion to non-contracted rates for late payments. (*Id.* at MSH0007.) The December 15, 1992 contract specified flat rates for round-trip transports between Mt. Sinai and its MRI facility located across the street. (D.E. 288 ¶ 11.)

On June 9, 1997, Mt. Sinai entered into a six-month contract with CoMed for ambulance services. (D.E. 267 ¶ 9; D.E. 294, Ex. 1N.) Section 11 of the agreement includes a preferred-provider agreement with respect to pediatric transports. (D.E. 294, Ex. 1N at CMT000237.) The

rate sheet identified a 25% discount off the listed rates provided that submitted bills are paid within 90 days of receipt.  (*Id.* at CMT000242.)

Mt. Sinai was at a relative disadvantage in negotiating the June 1997 contract because it had minimal information concerning the fair market value of transport services.  (D.E. 267 ¶ 25.)[23]  In addition, Mt. Sinai and CoMed were engaged in a series of billing disputes stemming from CoMed's failure to charge the negotiated rates for certain ambulance transports.  (*Id.* ¶ 26.)  Consequently, in late 1997, Mt. Sinai, to attempt to better ascertain fair market value for transport services, issued a public request for proposal ("RFP") to local ambulance-transport providers.  (*Id.* ¶¶ 22-23.)  After reviewing the responses to the RFP, Mt. Sinai selected CoMed based upon its responses to the RFP, its qualifications, and its proposed rates.  (*Id.* ¶ 24.)  In reviewing the responses to the RFP, Mt. Sinai placed a premium on obtaining low rates because a substantial component of its patient population was indigent.  (*Id.* ¶ 24.)

Mt. Sinai received other bids with proposed rates that were substantially higher than CoMed's rates.  For example, Superior Ambulance proposed rates for ALS and BLS transport were $363.75 and $176.25, respectively.  (D.E. 301 ¶ 218.)  American Medical Response of Illinois, Inc. ("AMR") identified the lowest rates it could legally offer as $160 for BLS transports and $240 for ALS transports.  (*Id.* ¶ 221.)  The letter mentioned the Anti-Kickback Statute in the context of *Medicaid* reimbursement rates, stating that "no ambulance provider is legally permitted, nor is any contracting facility legally permitted, to enter into a contractual arrangement lower than the current *Medicaid* reimbursement rates."  (*Id.* (emphasis added).)

Larry Volkmar ("Volkmar"), President of Mt. Sinai's hospital division, testified that he "agreed with the content" of the AMR letter.  (*Id.*)  However, Volkmar, who did not start

---

[23]     Relators objection is not well-founded—Isley testified that the RFP process afforded Mt. Sinai information about the fair market value of transport services, which put them in a position to negotiate a better rate.  (Isley Dep. at 47-48.)

working at Mt. Sinai until 2003 (D.E. 288 ¶ 16), stated that he did not know whether Mr. Miller reviewed this letter prior to entering into an ambulance service agreement. (D.E. 294, Ex. 22 (Volkmar Dep.) at 33.) Furthermore, the record does not indicate whether the rates specified in the AMR letter, which are "unit hour rates" rather than per-leg rates, are reasonably comparable to CoMed's proposed rates. (*See* D.E. 301 ¶ 221.) Finally, Relators have not demonstrated that the rates Mt. Sinai accepted from CoMed were below the Medicaid reimbursement rate, which is what the AMR letter purportedly warned against. (*Id.*)

During the course of negotiating the December 27, 1997 contract, CoMed offered to retroactively apply the new negotiated rates to unpaid charges in 1996 and 1997. (D.E. 288 ¶ 30.) The parties disagree whether CoMed made this offer to induce Mt. Sinai to enter into a new agreement with CoMed and/or as restitution for CoMed's alleged overbilling practices. (*Id.* ¶ 31.)

Section 12 of the December 27, 1997 contract is a preferred-provider clause. (*Id.* ¶ 13; D.E. 256, Ext. 1O at CMT000137.) However, Mt. Sinai had the right to utilize providers other than CoMed when CoMed was unable to provide prompt service for any patient, or in the event that a managed care or insurance payor so requires, or when an emergency situation dictates. (D.E. 288 ¶ 13.)[24] Under Isley's definition of "exclusive contract," Mt. Sinai's contract with

---

[24]     Relators object based upon Peterson's testimony (D.E. 294, Ex. 18 (Peterson Dep.) at 22-23), but Peterson does not reference any contract in particular, he did not prepare a report for Mt. Sinai, and his testimony does not contradict Mt. Sinai's understanding of the contract. Furthermore, Relators cite to Cybulski's deposition to prove that the contracts were exclusive, but Cybulski was only discussing the contract with Jackson Park. (*Id.*, Ex. 7 (Cybulski Dep.) at 63-64.) No such paragraph exists in the 1992 contract with Daley's (D.E. 267, Ex. 1). Furthermore, the CoMed contract supports this understanding of the contract (D.E. 288 ¶ 13) in its entirety. (*Id.*, Ex. 2 ¶ 12 ("HOSPITAL agrees to summon COMPANY first for all situations requiring ambulance services to and/or from HOSPITAL, except that such provision does not prohibit HOSPITAL from utilizing any ambulance service which may be required by a managed care or insurance payor. HOSPITAL has the right to utilize other ambulance services in the event that COMPANY is unable to provide prompt service for any patient or when an emergency situation dictates.").) Finally, Cybulski testified that the contract with Jackson Park did not obligate the hospital to call Stat, and that, even if it did, such a provision was unenforceable. (*Id.* at 64 ("Q: So if a patient a Jackson Park needed a transport during the term of this agreement, they would contact Stat for all those transports; is that correct? A: Yes. We would hope they would, but they don't have to, but we would hope they would. Q: Well, pursuant to the term of the agreement, it states that all transports would be. A: We have no way of knowing that if it did or

49

CoMed was not exclusive because Mt. Sinai was not obligated to inform CoMed of its utilization rates of CoMed's services. (*Id.* ¶ 20.) Furthermore, in practice, Mt. Sinai utilized the services of other ambulance companies between 1992 and 1999, and the persons involved in negotiating the contracts were not in a position to direct any transports to CoMed. (D.E. 267 ¶ 21.)

The rate schedule for the December 27, 1997 contract identifies contracted ALS and BLS rates of $157.18 and $98.65, respectively. (D.E. 294, Ex. 1O at CMT000141.)

The rate schedule further provides that any invoice paid after 90 days is subject to non-contracted rates. (*Id.*) The contract does not include a quick-pay discount. (*See generally id.*) The record does not reflect whether Mt. Sinai paid its invoices later than 90 days, and if so, whether it paid the contracted or non-contracted rates.

It is Volkmar's understanding that kickbacks are illegal and that a hospital may not receive a payment, either cash or non-cash benefit, for a referral. (D.E. 301 ¶¶ 255-56.) Volkmar did not work at Mt. Sinai during the Contract Years. (D.E. 288 ¶ 16.) The record does not contain evidence that Mt. Sinai was aware of CoMed's Part B rates.[25] (D.E. 267 ¶ 17.) Furthermore, there is no evidence that the Mt. Sinai representatives negotiating the contracts were aware of the AKS. Finally, the record does not reveal who signed Mt. Sinai's cost reports.

### 7. St. Bernard's

Defendant St. Bernard's operates a hospital located in the Englewood community at 64th Street and the Dan Ryan Expressway in Chicago, Illinois. (D.E. 289 ¶ 1.) In the relevant time period, St. Bernard's patients heavily utilized Medicaid and Medicare for the payment of their

---

didn't.").)

[25]     Relators' objection to Hoekstra's affidavit is not well taken. Paragraph 2 affirms that the declaration is based on "personal knowledge or information and belief after investigation." (D.E. 267, Ex. B ¶ 2.) The fact that he did not sign the contract is immaterial to whether he has a basis to testify after an investigation as to the circumstances surrounding the negotiations.

medical bills.  (*Id*. ¶ 2.)[26]  The payor mix at St. Bernard during the relevant time period reflected the following percentages within the patient base:

| Payor | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|
| Medicare | 31% | 37% | 36% | 34% | 35% |
| Medicaid | 43% | 42% | 46% | 58% | 55% |
| Insurance/Other | 26% | 21% | 18% | 8% | 10% |

(D.E. 238 ¶ 2.)

Ambulance companies billed St. Bernard directly for Part A transports and billed Medicare for Part B transports.  (D.E. 301 ¶ 11.)

In 1993, St. Bernard hired Philip Harder ("Harder") as Chief Financial Officer; part of Harder's job was to negotiate ambulance provider agreements.  (D.E. 289 ¶¶ 3-4.)  Harder had previously negotiated ambulance provider agreements in his prior employment as Director of Finance at Trinity.  (*Id*. ¶ 3.)  Soon after joining St. Bernard, Harder sought to reduce costs by entering into agreements with ambulance companies.  (*Id*. ¶ 5.)  Harder had at least two goals for such agreements—(1) to ensure that the ambulance company would bill third-party payors for costs associated with ambulance transports prior to billing the hospital (D.E. 238 ¶ 5)[27]; and (2) to obtain the best possible service at the best possible aggregate cost.  (*Id*. ¶ 6.)  The parties agree that Harder's principal focus was the second goal—to get the best service at the lowest cost. (D.E. 289 ¶ 29.)  After St. Bernard entered into an agreement with Stat, the monthly cost for ambulance services decreased.  (D.E. 301 ¶ 237.)

St. Bernard's first contract with Stat, entered into on November 1, 1993, was negotiated by Harder and Cybulski (representing Stat).  (*Id*. ¶ 8.)  The contract includes the Standard

---

[26]     Relators do not object to Philip Harder's deposition testimony that "[St. Bernard's was] very heavily utilized by Medicaid and Medicare patients."  (D.E. 238, Harder Dep. at 27.)  Furthermore, Relators' 56.1 Statement asserts that "Medicaid was the highest volume of patients at St. Bernard Hospital, Medicare was the second highest volume, managed care was next in volume, patient self-pay was next in volume, then it would be private insurance." (D.E. 301 ¶ 93.)

[27]     Relators' objection to this paragraph is not well-founded—St. Bernard's statement is supported by the cited deposition testimony.

Section 3.1(a) Language. (D.E. 294, Ex. 1P at CMT000171.) Section 4.2(b) provides that St. Bernard should pay bills within sixty to ninety days. (*Id.* at CMT000172.) The rate sheet specifies that the contracted rate was a 25% discount off of "B.L.S. Rate" and "A.L.S. Rate" and also provides a quick-pay discount of an additional 45% for bills paid within 60 to 90 days. (*Id.*) Appendix A sets forth a flat rate for round-trip transports from St. Bernard to other hospitals. (*Id.* CMT000176.) The contract was signed by Harder. (*Id.* at CMT000174.)

St. Bernard entered into a second contract with CoMed on December 22, 1995. (*Id.* ¶ 10.) This contract, which was also signed by Harder, is not materially different from the previous contract. (*Compare id.*, Ex. 1P *with id.*, Ex. 1Q.)

Harder maintains that he viewed Stat as a desirable vendor because it could effectively obtain payment from third parties. Specifically, he stated in his deposition that Cybulski assured him verbally that Stat would exhaustively pursue all other payor sources. (*Id.*, Ex. 12 at 31.)[28] Harder did believe, however, that the contracts made St. Bernard the payor of last resort in some instances—Stat and CoMed would make an exhaustive attempt to obtain reimbursement, but would bill the hospital at the negotiated rates if the claim went unpaid.[29] (D.E. 238 ¶ 14.) Section 4.1 of the 1993 contract stated that "[Stat] will not look to [St. Bernard] for any payment for patients who were eligible for Medicare Part B or Medicaid benefits on the date of service." (D.E. 294, Ex. 1P at CMT000172.) However, as Harder noted, eligibility for Medicaid and Medicare benefits is "a very slippery slope" because of "expiration of benefits, [and] patients moving in and out of coverage periods because of eligibility and then lack of [eligibility]." (*Id.*, Ex. 12 at 50.)

---

[28]     Relators' objection to this paragraph is not well-founded—St. Bernard's statement is a direct quote from Harder's deposition testimony. (*See* D.E. 294, Ex. 12 (Harder Dep.) at 31 ("[Cybulski] shared verbally with me many times that [Stat] would exhaustively pursue all other payor sources and that appealed to me as a way to immediately bring that monthly cost down.").)

[29]     Relators deny that the contracts made St. Bernard the payor of last resort, but do not deny that Harder believed (accurately or inaccurately) that St. Bernard was contractually obligated to be the payor of last resort.

Harder states that he did not negotiate the terms for exclusivity or preferred provider status because he understood those terms to be standard provisions in ambulance provider agreements. (D.E. 238 ¶ 12.) Harder did not review St. Bernard's prior agreements with ambulance companies to verify that assumption. (*Id*. ¶ 7.)

The Peterson analysis reflects that the differences between CoMed's Medicare Part B reimbursement rate and St. Bernard's contract rates were, in dollars and cents:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------|------|------|------|------|------|------|
| Part B | ALS | $157.94 | $195.00 | $205.87 | $195.00 | $207.98 |
| St. Bernard | ALS | $157.50 | $157.50 | $157.50 | $157.50 | $316.00 |
| Part B | BLS | $96.14 | $118.35 | $122.09 | $128.70 | $133.12 |
| St. Bernard | BLS | $105.00 | $105.00 | $105.00 | $105.00 | $152.00 |

(D.E. 238 ¶ 18.)

The Peterson analysis further reflects that the differences between CoMed's Medicaid reimbursement rate and St. Bernard's contract rates were:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------|------|------|------|------|------|------|
| Medicaid | ALS | $123.17 | $129.33 | $129.33 | $142.58 | $149.70 |
| St. Bernard | ALS | $157.50 | $ 157.50 | $157.50 | $157.50 | $316.00 |
| Medicaid | BLS | $77.31 | $81.18 | $85.23 | $89.49 | $93.96 |
| St. Bernard | BLS | $105.00 | $105.00 | $105.00 | $105.00 | $152.00 |

(*Id.*)

Peterson, after taking into account the cost-shifting provisions in St. Bernard's contracts, estimated the actual gap between the Medicare Part B rates and what he determined were the effective contract rates to be as follows:

| ST. BERNARD | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------------|------|------|------|------|------|------|
| Part B – Contract Rate | ALS | N/A | $5.71 | $15.01 | N/A | N/A |
| Percentage Explained | ALS | N/A | 84.78% | 68.97% | N/A | N/A |
| Part B – Contract Rate | BLS | N/A | $2.75 | $5.97 | $10.67 | N/A |
| Percentage Explained | BLS | N/A | 79.39% | 65.06% | 54.98% | N/A |

(*Id.* ¶ 24.)

Furthermore, Peterson calculated that, for the period 1993-1997, the entirety of the difference between the Medicaid rates and the contract rates were explained by the cost-shifting provisions of the contracts, implying mathematically that no kickback existed. (*Id.*, Ex. B at 16.)

There is evidence that at least some of the invoices Tower sent to St. Bernard's indicated that 45% could be taken off if payment was made within 60 days of the invoice. (*See, e.g.,* D.E. 301 ¶ 312.) However, the invoices themselves were for the contracted rate—in order to get the discount, St. Bernard's would have actively elect to take the discount. (*See* D.E. 294, Ex. 12-3 (St. Bernard invoice).) Peterson concluded, after examining the underlying records, that there was no evidence that St. Bernard's actually took any quick-pay discount. (D.E. 238, Ex. A at 16-17.)

At the time Harder was involved in the negotiations with Stat, Harder had no knowledge of certain information pertaining to Stat—he did not know what Stat billed Medicare, Medicaid, or any other third-party payor for Stat's transports (*id.* ¶ 26), and he did not know Stat's costs of operations. (*Id.* ¶ 27.) Furthermore, Harder did not obtain this information during the course of the contract negotiations. (*Id.* ¶¶ 26-27.) Harder also did not know what CoMed or its competitors charged hospitals other than Trinity or St. Bernard for similar services. (*Id.* ¶ 28.) It also appears that Harder did not express concern about the potential impropriety of the alleged discounts in the contracts nor did he evaluate the contracts in light of applicable Medicare regulations and guidelines. (D.E. 301 ¶ 238.)

However, once he became CFO of St. Bernard, Harder became more concerned about the Medicare regulations and guidelines because he had more responsibilities in that area. (*Id.* ¶ 278.) Harder's understanding of the AKS was that there would be no payments for referrals of

patients to individuals, physicians, vendors, or whomever. (*Id.* ¶ 276.) He further understood the AKS as applying to remuneration other than monetary payments. (*Id.* ¶ 277.)

Harder certified St. Bernard's cost reports during the relevant time period. (*Id.* ¶¶ 335-36.)

### 8. Trinity

Trinity, formerly known as South Chicago Community Hospital, is located at 2320 East 93rd St., in the South Chicago neighborhood of Chicago. (D.E. 283 ¶ 1.) During the relevant period, Trinity's patient-population mix was approximately 45% Medicare, 22% Medicaid, and 33% "Insurance/Other." (*Id.*)

Trinity had written contracts with the Ambulance Defendants beginning in 1994 and through 1999. (*Id.* ¶ 7.) From 1990 to April 1993, Harder was the director of Finance at Trinity; part of his job was to negotiate ambulance provider agreements. (D.E. 283 ¶ 3.) In May 1993, Harder left Trinity to become the CFO at Defendant St. Bernard. (D.E. 294, Ex. 12 at 6.) While at Trinity, Harder supervised Kelly, an accounting manager, who was involved in the negotiation of ambulance contracts at Trinity and Bethany. (D.E. 239 ¶ 3; D.E. 294, Ex. 12 at 14.) In selecting an ambulance provider, Kelly looked at responsiveness in general, response time for transports, quality of equipment and personnel, price, and whether the provider had the capacity and resources to service the hospitals. (D.E. 283 ¶ 4.) Kelly was aware that CoMed and its predecessors had a good reputation for response times in delivering services to hospitals. (*Id.* ¶ 5.) Kelly believed that exclusivity or preferred provider provisions were standard provisions in ambulance agreements with hospitals generally. (*Id.* ¶ 8.) When Kelly or Harder dealt with anyone from Stat, they dealt with Cybulski. (*Id.* ¶ 6.)

The 1994-1995 contract with Stat included the Standard Section 3.1(a) language.  (D.E. 294, Ex. 1W.)  However, this contract included an appendix stating, in relevant part, that "STAT would be [Trinity's] ambulance provider of choice for your patients [sic] transportation needs, however, in the event that your patients requests [sic] another company provide transportation, by all means, the patient [sic] choice comes first.  The patient's request for transportation by another company other that STAT would certainly take precedence over any other arrangement."  (*Id.* at CMT000291.)  With respect to the payment mechanism, Section 4.2(b) states that "[p]ayment to the Company for bills submitted to Customer will be made within sixty (60) days from receipt of invoice.  Any invoice paid beyond 60 days is subject to being paid by Customer at retail rates."  (*Id.*)  Section 4.2(c) states "Terms: ____/60 net 75."  (*Id.*)  The fee schedule specifies higher rates deemed "B.L.S. Rate" and "A.L.S. Rate" and lower rates (25% discount) deemed "Contracted Rate."  (*Id.* at CMT000292.)  The fee schedule also provides that "all ambulance transportations payable by Trinity Hospital will be subject to a thirty-five percent (35%) discount off their contracted rate, providing that submitted bills are paid within a 30-day period."  (*Id.*)  The contract was signed by [illegible], who signed in his or her capacity as "V.P. Finance."  (*Id.* at CMT000289.)

Trinity's January 1, 1996 contract did not materially differ from the 1994-1995 contract; for example, the prices set forth in the fee schedule are the same.  (*See id.*, Ex. 1W at CMT000300.)  The contract was signed by WEG, who was identified as Director of Finance and Facilities.  (*Id.* at CMT000298.)

Trinity's 1998 contract changed the language of 3.1(a) to read "Customer shall use Company primarily but not exclusively for all medical transportation service to be provided to it's [sic] patients."  (*Id.* , Ex. 1Y at CMT000302.)  In addition, 4.2(b) states that invoices paid

beyond 45 days are subject to retail rates.  (*Id.* at CMT000303.)  The fee schedule shows

"contracted" and "non-contracted rates"; the former are discounted more than 50% off the latter

and former are slightly lower than those in South Suburban's previous contracts.  (*Id.* at

CMT000306; *id.*, Ex. 1W at CMT000300.)

The Peterson analysis reflects that the differences between CoMed's Medicare Part B

reimbursement rate and Trinity's contract rates were, in dollars and cents:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------|------|------|------|------|------|------|
| Part B | ALS | $157.94 | $195.00 | $205.87 | $195.00 | $207.98 |
| Trinity | ALS | $157.50 | $157.50 | $157.50 | $157.50 | $157.50 |
| Part B | BLS | $96.14 | $118.35 | $122.09 | $128.70 | $133.12 |
| Trinity | BLS | $105.00 | $105.00 | $105.00 | $105.00 | $105.00 |

(D.E. 239 ¶ 13.)[30]

The Peterson analysis further reflects that the differences between CoMed's Medicaid

reimbursement rate and Trinity's contract rates were as follows, in dollars and cents:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------|------|------|------|------|------|------|
| Medicaid | ALS | $123.17 | $129.33 | $129.33 | $142.58 | $149.70 |
| Trinity | ALS | $157.50 | $157.50 | $157.50 | $157.50 | $157.50 |
| Medicaid | BLS | $77.31 | $81.18 | $85.23 | $89.49 | $93.96 |
| Trinity | BLS | $105.00 | $105.00 | $105.00 | $105.00 | $105.00 |

(D.E. 239 ¶ 16.)

Peterson, after taking into account the cost-shifting provisions in Trinity's contracts,

estimated the actual gap between the Medicare Part B rates and what he determined were the

"effective" contract rates to be as follows:

| TRINITY | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|---------|------|------|------|------|------|------|
| Part B – Contract Rate | ALS | $.44 | $37.50 | $48.37 | $37.50 | $50.48 |
| Percentage Explained | ALS | Fully explained | 56.04% | 45.47% | 60.48% | 45.04% |
| Part B – Contract Rate | BLS | $(8.86) | $13.35 | $17.09 | $23.70 | $28.12 |

---

[30]     Trinity's 56.1 Statement of Facts appears to have erroneously transcribed Peterson's analysis of CoMed's Medicare Part B rates; the Court has noted the error and used Peterson's actual figures.  (*See* D.E. 239, Peterson Trinity Report at 12-13.)

| | | | | | | |
|---|---|---|---|---|---|---|
| Percentage Explained | BLS | Fully explained | 52.47% | 42.90% | 31.90% | 26.95% |

(*Id.* ¶ 24.)

Harder certified Trinity's cost reports until he departed for St. Bernard in 1993. (D.E. 301 ¶¶ 334-35.) However, Trinity's first contract with the Ambulance Defendants was in 1994, and the record does not indicate who certified Trinity's cost reports after Harder departed.

9.     Bethany

Bethany is located at 3435 W. Van Buren St., in the Garfield Park neighborhood of Chicago. Bethany's estimated patient-population mix during the relevant period was about 60% Medicaid enrollees, between 10-20% Medicare enrollees, and 20-30% uninsured. (D.E. 301 ¶ 85.) Bethany is operated by Advocate. (D.E. 283 ¶ 1.)

Bethany had written contracts with the Ambulance Defendants from 1995-1998.[31] (D.E. 283 ¶ 7.) In the early stages of the negotiations, Jerald Gordon represented CoMed and Lena Shields ("Shields") represented Bethany. (D.E. 301 ¶ 189.) However, before the terms of the first contract were finalized, Gordon was pulled off the Bethany Hospital account and was replaced by Cybulski. (*Id.* ¶ 190.) Lena Dobbs-Johnson (formerly known as Lena Shields), Bethany's Chief Executive, signed Bethany's contracts (*id.* ¶ 25); prior to signing the contract, Dobbs-Johnson had the opportunity to question any of the terms of the agreements that she was not comfortable with. (D.E. 301 ¶ 26.)

Bethany's January 1, 1996 contract includes the Standard Section 3.1(a) Language. (D.E. 294, Ex. 1A at CMT000045.) Section 4.2(b) states that invoices not paid beyond 60 days are subject to retail rates. (*Id.* at CMT000046.) However, the fee schedule did not indicate any discounts nor did it specify any retail rates. (D.E. 294, Ex. 1A at CMT000050.) The contract does not include quick-pay discounts. (*See generally id.*) The BLS rate of $68.25 for a

---

[31]     This fact was admitted even though first contract date is January 1, 1996.

roundtrip transport stated in the Bethany Hospital contract was not the rate that Gordon proposed

to Shields prior to him being removed from negotiations; the rate reflected in the contract

represented a substantial cost savings for Bethany.  (D.E. 301 ¶ 191.)  Shields signed the January

1, 1996 contract.  (D.E. 294, Ex. 1A at CMT000048.)

In Bethany's 1997 contract[32], Section 4.2(b) was changed to require payment within 30

days of receipt of an invoice in order to obtain contracted rates.  (D.E. 294, Ex. 1B at

CMT000054.)  The fee schedule does not indicate any discounts.  (*Id.*)  Shields and Brian Kelly

("Kelly") signed the 1997 contract.  (*Id.* at CMT000059.)

The Medicare and Medicaid ambulance payment rates (in dollars and cents) which

CoMed received from the government payors for non-contract transports for the years in which

Bethany had contracts with the Ambulance Defendants were:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------|------|------|------|------|------|------|
| Part B | ALS | $157.94 | $195.00 | $205.87 | $195.00 | $207.98 |
| Medicaid | ALS | $123.17 | $129.33 | $129.33 | $142.58 | $149.70 |
| Part B | BLS | $96.14 | $118.35 | $122.09 | $128.70 | $133.12 |
| Medicaid | BLS | $77.31 | $81.18 | $85.23 | $89.49 | $93.96 |

(D.E. 239 ¶ 11.)

The Peterson analysis reflects that the differences between CoMed's Medicare Part B

reimbursement rate and Bethany's contract rate were, in dollars and cents:

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|-------|------|------|------|------|------|------|
| Part B | ALS | $157.94 | $195.00 | $205.87 | $195.00 | $207.98 |
| Bethany | ALS | $102.37 | $102.37 | $102.37 | $102.37 | $157.18 |
| Part B | BLS | $96.14 | $118.35 | $122.09 | $128.70 | $133.12 |
| Bethany | BLS | $68.25 | $68.25 | $68.25 | $68.25 | $98.65 |

(*Id.* ¶ 14.)  The Peterson analysis further reflects that the differences between CoMed's

Medicaid reimbursement rate and Bethany's contract rates were:

---

[32] The contract is not dated and the 56.1 statements do not indicate the precise date.

| Payor | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|
| Medicaid | ALS | $123.17 | $129.33 | $129.33 | $142.58 | $149.70 |
| Bethany | ALS | $102.37 | $102.37 | $102.37 | $102.37 | $157.18 |
| Medicaid | BLS | $77.31 | $81.18 | $85.23 | $89.49 | $93.96 |
| Bethany | BLS | $68.25 | $68.25 | $68.25 | $68.25 | $98.65 |

(D.E. 239 ¶ 17.)

Peterson, after taking into account the cost-shifting provisions in Bethany's contracts, estimated the actual gap between the Medicare Part B rates and what he determined were the effective contract rates, as follows:

| BETHANY | Type | 1993 | 1994 | 1995 | 1996 | 1997 |
|---|---|---|---|---|---|---|
| Part B – Contract Rate | ALS | $55.57 | $92.63 | $103.50 | $92.63 | $50.80 |
| Percentage Explained | ALS | 50.58% | 31.38% | 32.01% | 34.78% | 76.97% |
| Part B – Contract Rate | BLS | $27.89 | $50.10 | $53.84 | $60.45 | $34.47 |
| Percentage Explained | BLS | 33.59% | 19.34% | 20.51% | 17.77% | 37.81% |

(*Id.* ¶ 24.)

Dobbs-Johnson understood that a below fair-market-value contract may give the appearance that the hospital is receiving something of value. (D.E. 301 ¶ 226.) Furthermore, it is Dobbs-Johnson's understanding that, if the hospital is in the position under the terms of the contract to refer Medicare business, and if the provider perceived that it received something of value, that could be a violation of Medicare regulations and guidelines. (*Id.* ¶ 227.) Dobbs-Johnson also attended seminars during which kickback schemes were discussed, and someone opined that it was illegal to take kickbacks, including discounts, from companies in exchange for referring business. (*Id.* ¶¶ 262-63.) The record does not indicate who certified Bethany's cost reports during the relevant years.

E.     Litigation History

In 1996, Relators filed suit under seal alleging that CoMed violated the False Claims Act, 31 U.S.C. § 3729(a)(1), and the Illinois Whistleblower Reward and Protection Act, 740 ILCS

175/3.  (D.E. 1.)  The case remained under seal for a number of years while the United States investigated the allegations; ultimately, the United States intervened with respect to allegations that certain Ambulance Companies and certain Individual Defendants fraudulently billed Medicare for unnecessary ambulance transports, principally concerning kidney dialysis patients. (D.E. 55.)  As previously explained, the United States did not intervene to join the instant claims against the Hospital Defendants, which are predicated on a materially different set of factual materials and a different theory than the "medically unnecessary overbilling" theory underlying the other portion of the case, against other Defendants, that the United States did join.

On August 31, 2001, Judge Andersen granted in part and denied in part a joint motion to dismiss the operative claims variously advanced by the United States or by the Relators alone. (D.E. 80.)  In the course of rendering this opinion, Judge Andersen determined that, under certain circumstances, violations of the Medicare Anti-Kickback Statute could act as predicates for FCA violations.  (*Id.* at 6-7.)  In analyzing the few applicable cases, the court agreed that "the False Claims Act was intended to cover not only those situations in which the claims themselves are false, but also those situations in which a claimant engages in fraudulent conduct with the purpose of inducing payment by the government."  (*Id.* at 9 (quoting *United States of America ex rel Pogue v. Am. Healthcorp., Inc.*, 914 F. Supp. 1507, 1511 (M.D. Tenn. 1996).)[33]  Judge

---

[33]     The Court applies Judge Andersen's legal rulings as rendered—consistent with precedent that addresses situations where one district court has inherited a case from another.  In this regard, precedent teaches that the "second judge in a case in which there has been a reassignment [is] to abide by the rulings of the first judge unless some new development, such as a new appellate decision, convinces him that his predecessor's ruling was incorrect." *Fujisawa Pharm. Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1339 (7th Cir. 1997); *accord, e.g., Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997) (similar, and stating that prior rulings should be disturbed only "for compelling reasons (such as new controlling law or clear error)."). The Court has not been presented with any argument that Judge Andersen's rulings on the points addressed herein implicate such circumstances.  In the interests of completeness, the Court notes that the United States filed a reconsideration motion concerning two discrete legal issues implicated by the claims it did not join.  (D.E. 81)  Specifically, the United States objected to Judge Andersen's determination that Relators would have to show that the government would not have paid a false claim if it knew of the alleged false statement, as opposed to a lower standard under the FCA that would merely require a showing that the alleged false statement was capable of inducing payment by the United States.  (*See id.* at 4.)  The United States also argued that Judge Andersen erred in his construction of the general FCA *mens rea* standard.  (*See id.* at 5.)  Judge Andersen later denied the United States' motion.  (D.E. 100.)  None of the bases for the instant

Andersen also noted that, in other circumstances, the violation of another federal statute may render claims false for the purposes of FCA liability.  (*Id.* at 14.)  However, the court determined that "a plaintiff must show that defendants engaged in fraudulent conduct with the purpose of inducing payment from the government.  Put another way, a plaintiff must show that defendants concealed their fraudulent activity in an effort to convince the government to pay Medicare claims it would not otherwise have paid."  (*Id.* at 17 (citation omitted).)

Judge Andersen further explained that "[not] every violation of a federal regulation or law governing the program under which the claim is brought should automatically constitute a violation of the FCA."  (*Id.* at 18.)  Instead, "the plaintiffs must plead (and ultimately prove) that had the government known about the kickback scheme, it would have refused payment of the claims and, further, that the defendants were aware that this was the case when they engaged in their fraudulent conduct."  (*Id.*)  On the basis of the aforementioned legal principles, the court dismissed Relators' complaint because Relators did not "allege facts which suggest that any of the defendants entered into this arrangement for the purpose of obtaining payment of the claims which otherwise would not have been paid had the government known of the scheme."  (*Id.* at 19-20.)

On October 1, 2001, Relators filed their Second Amended Complaint.  (D.E. 85.)  The allegations were, among other things, that the Hospital Defendants violated the FCA (*id.* ¶¶ 78-84) (Count V).  In accordance with Judge Andersen's prior ruling, Relators made specific allegations with respect to the Hospital Defendants' mental state and pleaded facts suggesting that Medicare would not have paid out on claims if Medicare was aware that the presented

---

decision implicates the issues raised by the Government's Reconsideration motion, and the Court expresses no opinion on the propriety of Judge Andersen's rulings on those issues, which are not relevant for present purposes because the Court has determined that the Hospital Defendants did not violate the Anti-Kickback Statute, which is a necessary precondition for Relators' purported claims under the False Claims Act.  (*See* D.E. 80 at 4-5.)

claims resulted from an illegal kickback arrangement. (*See*, *e.g.*, *id.* ¶¶ 49, 54-56.) On September 6, 2002, Judge Andersen denied a number of motions to dismiss, finding that they did not meet the standards of Fed. R. Civ. P. 12(b)(6). (D.E. 147.)

II.     Expert Testimony

On June 18, 2004, the Hospital Defendants moved to exclude the reports of Relators' proffered expert witnesses—Frank Nagorka ("Nagorka") and Eva Jo Sparks ("Sparks"). (D.E. 180.) The Hospital Defendants' motion did not address the expertise of these purported experts or other, often-called *Daubert* issues; rather, the Hospital Defendants sought to exclude any testimony as to the ultimate legal issues in the case, and also sought to strike any speculation by the Relators' experts concerning the Hospital Defendants' knowledge or state of mind. (*Id.* at 7-8.) The Court granted the motion to exclude in substantial part ("First Expert Order"). (D.E. 204 at 2.) Specifically, the Court barred Relators' purported experts from offering opinion testimony as to the ultimate issues of law in the case, including whether Defendants violated the AKS or the FCA. (*Id.* at 8-9; *see generally id.* at 8-18 (discussing numerous precedents.)

However, the Court did not entirely exclude Relators' experts' reports at that time. The Court determined that the limited portion of Nagorka's report that "opines concerning market conditions in the ambulance services industry" was not excludable on the grounds identified in Defendants' motion, although it was potentially subject to additional challenges, including *Daubert* challenges. (*Id.* at 21-22.[34]) The Court also made a preliminary conclusion that Sparks's proposed testimony providing background information about the Medicare system,

---

[34]     The Court agreed to resolve the Hospital Defendants' threshold objections to Plaintiffs' proffered experts (*e.g.*, that they were impermissibly attempting to testify to ultimate and impermissible legal conclusions in contravention of applicable precedent) because (1) if the challenges were found to be well-founded, it would obviate the need for the parties to expend considerable amounts of time and money concerning experts that would be secured by the defense and would offer different legal opinions; and (2) the Hospital Defendants' threshold challenges appeared to be largely well-taken. As a result, the Court resolved the threshold objections (which were the subject of extensive briefing, even as to address only those objections) and did not address further objections that the Hospital Defendants variously offered or suggested would be applicable to the Plaintiffs' experts.

provider reimbursement, and hospital cost reports at least could potentially be helpful to the trier of fact.  (*Id.* at 22.)  The Court declined to admit or exclude such testimony, and the Court reserved ruling on other challenges or expert issues that were alluded to but were not fully explored or developed in court or in the briefs.  (*See*, *e.g.*, *id.* at 22 n.14; *see also* footnote 34 of this opinion, *supra*.)  Finally, the Court determined that Relators' purported experts would not be permitted to testify "as to subjects that are not fairly encompassed within or relate to the portions of their reports that are appropriate under the law."  (*Id.* at 24.)  In so ruling, the Court determined that Relators would not be permitted to submit additional reports prepared by their purported experts.  (*Id.* at 24-25; *see also id.* at 24 n.18.)

A.     Legal Standards for Expert Testimony

Parties are not entitled to present allegedly expert testimony if it is subject to legitimate challenge under the law.  Rather, the party offering a putative expert's testimony must establish by a preponderance of the evidence that the expert testimony is admissible and that the expert is qualified.  *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 593 (1993); *accord*, *e.g.*, *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999); *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, No. 01 C 4366, 2003 WL 21506808, *1 (N.D. Ill. Jun. 27, 2003) (explaining that the proponent of purported expert testimony "bears the burden of establishing its admissibility by a preponderance of the evidence.").

"The admission of expert testimony is specifically governed by Federal Rule of Evidence 702 and the principles announced in *Daubert*."  *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2001).  Rule 702 provides: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto

in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

"The Supreme Court in *Daubert* interpreted [Rule 702] to require that 'the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Smith*, 215 F.3d at 718 (quoting *Daubert*, 509 U.S. at 589). Put somewhat differently, a district court judge is to act "as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 869 (7th Cir. 2001) (citing *Daubert*, 509 U.S. at 589).

Rule 702 contemplates the admission of testimony by expert witnesses whose knowledge is based on experience. *See*, *e.g.*, *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). "Thus, a court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith*, 215 F.3d at 718.

An expert must possess "sufficient specialized expertise to render his opinion on the topic . . . reliable, as required by *Daubert.* [An expert's] competence in the general field [at issue] must extend to his specific testimony on the matter before the Court." *Ty, Inc. v. Publ'ns Int'l, Ltd.,* No. 99 C 5565, 2004 WL 2359250, at *5 (N.D. Ill. Oct. 19, 2004); *accord*, *e.g.*, *Carroll v. Otis Elevator Co.,* 896 F.2d 210, 212 (7th Cir. 1990) ("Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony.") (citing *Gladhill v. Gen'l Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984)). As the Seventh

Circuit has explained, even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are" well-founded and comport with the requirements of, *inter alia*, *Daubert*. *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).

All purported expert opinions are governed by the *Daubert* standard, "whether [the opinion] relates to areas of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise." *Smith*, 215 F.3d at 719 (citing *Kumho*, 526 U.S. at 141). Factors that may illuminate the analysis include: (1) whether the theory or technique can be and has been verified by the scientific method through testing; (2) whether the theory or technique has been subject to peer review and publication, (3) the known or potential rate of error of the technique, and (4) whether the theory or technique has been generally accepted by the relevant scientific community. *Daubert,* 509 U.S. at 590-91. These factors are merely guides, however, and do not serve as a series of prerequisites; their applicability depends on the particular facts and circumstances of each case. *See United States v. Cruz-Velasco,* 224 F.3d 654, 660 (7th Cir. 2000).

A district court must focus on the expert's methodology, not the factual underpinnings or the substance of the expert's conclusions. *Smith*, 215 F.3d at 718 (citing *Daubert*, 509 U.S. at 595); *see also Smith*, 215 F.3d at 719 ("It is not the trial court's role to decide whether an expert's opinion is correct. The trial court is limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound.") (citation omitted).

Finally, a district court must determine whether the proposed expert testimony would assist the trier of fact in understanding the evidence or determining a fact in issue. *See* Fed. R. Evid. 702. Expert testimony does not assist the trier of fact when the jury is able to evaluate the

same evidence and is capable of drawing its own conclusions without the introduction of a proffered expert's testimony.  *See Taylor v. Illinois Cent. R.R. Co.*, 8 F.3d 584, 586 (7th Cir. 1993) ("Notwithstanding Dipprey's lengthy experience in the railway industry, any lay juror could understand this issue without the assistance of expert testimony.  Therefore it was proper for the district court to exclude Dipprey's [proffered expert] testimony.") (collecting cases); *accord*, *e.g.*, *Hoffman v. Caterpillar, Inc.*, 368 F.3d 709, 713-714 (7th Cir. 2004) (affirming district court's exclusion of purported expert's opinion based upon a videotape because "the videotape could be played for the jury and entered into evidence, and consequently, jurors could make a determination for themselves . . . [b]ased upon this independent assessment . . . . the jury could then draw [its own] inferences . . . . and expert testimony would be of no help.").  Expert testimony is not necessary to summarize voluminous documents or records—Rule 1006 provides such a mechanism without the use of expert testimony.  *See* Fed. R. Evid. 1006; *see also United States v. Hevener*, 382 F. Supp. 2d 719, 728 (E.D. Pa. 2005).  Similarly, one need not qualify as an "expert" to testify as a summary witness pursuant to Fed. R. Evid. 1006.  *See*, *e.g.*, *id.* at 728-29 (collecting authorities).

B.  Relators' Purported Experts

1.  Frank W. Nagorka

The Court's May 26, 2005 order excluded the bulk of Nagorka's expert report and his proposed testimony on the grounds that it was opinion testimony concerning the ultimate issues of law in this case, which is improper under settled precedent.  (*See*, *e.g.*, D.E. 204 at 8-9; *see also id.* at 4 (explaining that Nagorka's proffered report "reads more like a legal brief than an expert report").)  The Hospital Defendants now jointly move to exclude the remainder of Nagorka's proposed testimony and his expert report on the grounds that Nagorka is not qualified

to testify as an expert witness as proposed, his proffered testimony is not reliable, and his proposed testimony would not be useful to the trier of fact.  (D.E. 230 at 2.[35])

Mr. Nagorka is a paramedic and a lawyer.  (D.E. 204 at 4.)  As an attorney, Nagorka represented at least five ambulance companies in the Chicago area, and in his capacity as an attorney, he reviewed some contracts with hospitals to attempt to ensure that the contracts complied with Medicare billing practices.  (D.E. 291 at 4-5.)  Nagorka also started an EMS practice group at a former Chicago-area law firm.  (*Id.* at 4; *see also* Nagorka Dep. at 13.)  Since the early 1990s, Nagorka has attended American Ambulance Association conferences, some regarding Medicare reimbursement practices with respect to hospital contracts.  (*Id.* at 5.)  While formerly employed as a paramedic with the Lansing Fire Department and the Cicero Fire Department, Nagorka went on at least one ride with the Chicago Fire Department.  (D.E. 300 (citing D.E. 294, Ex. 15 (Nagorka Dep.) at 6-9).)

After reviewing the expert materials and the briefs submitted by the parties, the Court concludes that Nagorka lacks the expertise to perform a quantitative analysis of the market conditions in the ambulance-services industry—which relates to his proffered testimony on the commercial reasonableness of the Hospital Defendants' contracted rates.  (*Id.* at 4.)  In one sense, this point is of limited relevance: Nagorka's expert report does not reflect that he conducted or even *attempted* to conduct a systematic or scientific survey/analysis of market conditions in the relevant market during the relevant time period (*see* D.E. 230, Ex. B (Nagorka report).)  (The Court also has already stated that Relators may not supplement their expert reports at this late juncture.  (D.E. 204 at 25-26.))  Nonetheless, the Court concludes that

---

[35]     As previously explained (*see* footnote 34, *supra*), to make the issues more manageable and to promote a more thoughtful briefing and decision-making process, the Court directed that these issues would be resolved after the Hospital Defendants' prior objections to the Relators' proffered expert witnesses (*e.g.*, that Mr. Nagorka was trying to impermissibly testify to ultimate legal conclusions) were resolved.

Nagorka is not qualified to render opinions with respect to the reasonableness of the contract rates that are derivative from other sources than his practical experience, as Nagorka has no formal or other training in economics or other quantitative discipline that would ground such testimony in any meaningful way.

The Court also concludes that Relators have failed to demonstrate that Nagorka's actual proposed testimony concerning the commercial reasonableness of the Hospital Defendants' contracted rates is reliable. *Daubert* identifies nonexhaustive factors that the court may consider in determining whether an expert's testimony is reliable: "(1) whether the theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the theory in the scientific community." *Id.*, 509 U.S. at 593-94. Relators have made no showing of reliability with respect to any of these factors. To be sure, this is not fatal, as these nonexhaustive factors are not well-suited to proposed testimony based upon experience. Nonetheless, Nagorka's proposed testimony is not reliable, as his knowledge base is not sufficiently broad to form a reasoned opinion as to market conditions during the relevant time period. Nagorka admitted at his deposition that he had no knowledge of what rates CoMed's competitors charged to similar hospitals for similar transports. (Nagorka Dep. at 163.) Even in instances where a formal scientific method is not necessary, a purported expert must consider obviously relevant information in forming his opinion. *See*, *e.g.*, *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-20 (7th Cir. 2005); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001). Put somewhat differently, such supposed "expert" testimony cannot be a hunch or a gut feeling—it must be based on some specific data. *See*, *e.g.*, *Zenith Elecs. Corp.*, 395 F.3d at 418; *Smith*, 215 F.3d at 719 (citation omitted). To form an opinion based upon experience, Nagorka

would need, at a minimum, to have a rough estimate of the costs of providing various services, the typical prices for such services in the relevant market, and the details of the contracts that might warrant a departure from the typical prices. It is clear from his deposition testimony that Nagorka has not considered any of these points. Nagorka does not maintain that he remembers the prices of various services for the contracts, nor has he considered whether the contracts shift costs, nor has he considered whether the hospitals are the payors of last resort. Such defects render his testimony unreliable and therefore unhelpful to a factfinder.

Finally, and independently, Nagorka's purported expert opinion would not assist the trier of fact because it is not derivative of his purported expertise. Relators admit that Nagorka has simply looked at the "retail rate" specified in the contract, compared it with the "contract rate" and has concluded that the contract rates were commercially unreasonable. (*See* D.E. 291 at 7 ("Therefore, by examining the fee schedules attached to each contract, which included the contracted and non-contracted rates, Nagorka knew what the usual and customary rate was in the Chicagoland ambulance industry in the mid-90's.").)[36] Not only is this conclusion dubious—CoMed has never maintained that it, or any other provider in the area, charged what it called "retail rates" to any contracting party—Nagorka is drawing simple arithmetical conclusions that a jury, if so inclined, could easily draw on its own. Put differently, Relators have not demonstrated that Nagorka's conclusion as to the reasonableness of the rates derives from his knowledge and experience in the ambulance-services business, and thus his proposed testimony is not helpful to the trier of fact. *See*, *e.g.*, *Hoffman*, 368 F.3d at 713-714. His proposed testimony is respectfully excluded. Relators have failed, with all respect, to convince

---

[36]       In passing, Relators maintain that Nagorka's analysis is based upon his personal knowledge as well, but without any underlying data on market conditions, a speculative opinion would not assist the finder of fact. *See, e.g., Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419-20 (7th Cir. 2005).

the Court that an appropriate application of the *Daubert* analysis justifies allowing such proffered "expert" testimony.[37]

> 2.      Eva Jo Sparks

Ms. Sparks is a Certified Fraud Examiner who is also offered as a purported expert in Medicare and Medicaid billing. The First Expert Order excluded all of Sparks's purported testimony concerning any of the Hospital Defendants' respective states of mind or knowledge. (D.E. 204 at 5, 23.) The First Expert Order "similarly [struck Sparks's] report to the extent that it opines that the Defendants committed fraud within the meaning of the operative statutes" and held that, *inter alia*, Sparks "may not testify as to whether any of the Defendants intended to commit an alleged fraud. (*Id.* at 23-24.) Defendants have moved to strike the rest of Sparks's report on the grounds that she is not qualified to provide background testimony on Medicare and Medicaid billing and cost-reporting and that her proposed testimony would not assist the trier of fact. (D.E. 230 at 9.)

Relators have not demonstrated that Ms. Sparks is qualified as an expert to provide background information on Medicare and/or Medicaid billing and cost accounting in a manner relevant to this case. Specifically, Sparks lacks any and all of a number of qualifications or experiences that might permit her to provide background information in an expert capacity: for example, (1) she has never worked at any government agencies involved in administering Medicare and/or Medicaid programs; (2) she has never worked at a private firm involved with Medicare and/or Medicaid billing or cost accounting; (3) she has never published any articles or books related to Medicare and/or Medicaid reimbursement or cost accounting; (4) she is unaware of any authorities in the areas of Medicare reimbursement or cost accounting; (5) she has never

---

[37]      As previously mentioned, most of Nagorka's testimony was excluded as being improper legal testimony under Seventh Circuit law. To the extent it is material, the Court incorporates by reference its discussion and reasoning from its prior 26-page opinion discussing Nagorka and Ms. Sparks. (D.E. 204.)

presented any seminars on Medicare or Medicaid fraud and abuse; and (6) her deposition

testimony was not clear as to the basic workings of the Medicare system, including DRGs and

cost-based reimbursement. (*See, e.g.,* D.E. 300 at 6-7; *see also* D.E. 294, Ex. 21 (Sparks Dep.)

at 28, 48-49, 66, 74, 190-91.) This is not an area where she has demonstrated colorable

expertise—at least as to the subjects on which she would propose to present "expert" testimony

in this case.

Furthermore, Sparks alleged expertise in forensic accounting is only tangentially related

to the alleged fraud in this instance. This is significant, because precedent warns against a

proffered expert's taking an actual expertise or basis to offer competent expert testimony in one

area and improperly attempting to use that basis to offer "expert" testimony about materially

distinct subjects. *See*, *e.g.*, *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005)

("[P]ossessing requisite credentials alone is not enough to render [proffered] expert testimony

admissible.") (citing *Takata Corp.*, 192 F.3d at 759 n.5).[38] Ms. Sparks testifies that she has

experience in examining "books of account, the cost reports, the reimbursement, the daily per

diem; to trace the funds to make certain that things are as they should be." (D.E. 294, Ex. 21

(Sparks Dep.) at 33-34.) In Sparks's single only other Medicare case, in which she was a court-

appointed expert for a criminal defendant in a Medicare fraud case, she "testified to the money

that he received, the amount of money that Medicare reimbursed the facility based on their cost

reports, their patient census. I traced using the books of account, the disbursement journals,

receipts journals, check registers, using the cost reports, the intermediary auditor's work papers.

I took all of those documents, put them together and do what I call 'close the loops.'" (*Id*. at 36-

40).) However, the alleged fraud in this case does not involve missing funds, cash-flow

---

[38]     The Seventh Circuit's opinion *in Fuesting v. Zimmer, Inc.*, 421 F.3d 528 (7th Cir. 2005) was modified on
other grounds in *Fuesting v. Zimmer, Inc.*, 448 F.3d 996 (7th Cir. 2006). The subsequent modification is not
germane here.

analyses, any alleged accounting scheme, or other conduct that necessitates opening up the Defendants' books to examine money flowing in and out and to "close the loops." It appears that Ms. Sparks's knowledge of the Medicare and Medicaid system for purposes of this case was largely gained in anticipation for her tendering an "expert" report in the case on subjects otherwise beyond her ken, and Relators have failed to show that her past experience is of anything more than *de minimis* relevance to the instant case. They also have failed to show, relatedly, that the past experience is of any meaningful relevance to the "expert" testimony that she would purport to give here.

Furthermore, Ms. Sparks's proposed testimony does not add any value—the background section of her report merely quotes verbatim or summarizes the applicable laws and the Provider Reimbursement Manual. (D.E. 230, Ex. D (Sparks Report) at 1-6.) With respect to Sparks's damages calculations, a summary chart concerning the volume and value of false claims may be presented in accordance with Rule 1006, but expert testimony is not necessary or helpful on this matter.

Accordingly, for the various, largely independent reasons discussed above, the Court respectfully concludes that Ms. Sparks's expert testimony is excluded. Relators have failed to discharge their burden of demonstrating that the testimony is admissible and appropriate, even under the fairly capacious standards traced out in *Daubert* and related caselaw.

C.  Hospital Defendants' Proffered Experts

The Hospital Defendants have offered three proffered experts, Jon Peterson, Bernard Patashnik, and Dr. Larry Isley. The Relators also filed *Daubert* motions to exclude Mr. Peterson and Dr. Isley. (D.E. 292.) The Relators seemed to essentially abandon these motions—electing not to file, for example, any reply brief in the case, notwithstanding that the parties have

generally litigated with ardor whenever an opportunity presented itself. That seeming

abandonment may reflect the fact that the Relators' initial arguments about Messrs. Peterson and

Isley—while ultimately unpersuasive after review and analysis—did, at least at times, seem to

beg questions about the propriety of the Relators' own proffered experts, Mr. Nagorka and Ms.

Sparks. In any event, the Court respectfully rejects any tendered *Daubert* challenges to the

Hospital Defendants' experts. After reviewing the filed briefs and supporting materials, the

Court believes the Hospital Defendants have discharged their burden of showing admissibility

under *Daubert* and related caselaw, and the Court exercises its discretion so as to admit the

expert testimony.

        1.     Jon Peterson

Mr. Peterson holds an MBA in marketing and finance from the University of Chicago and

he is a Certified Public Accountant, a Certified Valuation Analyst, and a member and Fellow in

the Health Care Financial Management Association. (D.E. 239, Ex. C at 45.) Prior to founding

his own health-care consulting firm, Mr. Peterson was a Manager in Cap Gemini Ernst &

Young's Health Care Transaction Services Group. (*Id.* at 43.) He has also served as a Vice

President at Valuation Counselors, where he performed and directed regulatory consulting

services, litigation support, and transaction analysis and structuring services for large hospital and

health care clients. (*Id.*) Peterson has made presentations on health care financing and is an

instructor for HFMA Fellowship Professional Certification Courses. (*Id.* at 43.)

Given Peterson's substantial experience and training with respect to financial accounting

in the health care industry, Relators do not challenge Peterson's qualifications as an expert as

proposed in this case. Instead, Relators maintain that Peterson's proposed expert testimony is

inadmissible under Rule 702 because of alleged incomplete data and a flawed methodology.

(D.E. 292 at 4-5.) In this regard, Relators first argue that Peterson's methodology is suspect because he has never performed a similar cost analysis and he did not rely upon an accepted methodology in performing his analysis. (*Id.* at 5.) While Peterson's specific task was unique, Relators do not maintain that he departed from fundamental cost-accounting principles during the course of his analysis. Expert testimony is admissible if the expert applies well-established principles or techniques to novel issues presented by the case. *See*, *e.g.*, *Smith*, 215 F.3d at 720 ("If [the expert] was merely applying well-established engineering techniques to the particular materials at issue in this case, then his failure to submit those techniques to peer review establishes nothing about their reliability."). As a result, this objection is not well-taken.

Relators also argue that Peterson used the wrong data in performing his calculations. (D.E. 292 at 6.) According to Relators, Peterson should have used the cost of CoMed's billing process rather than the Hospital Defendants' costs in performing his calculations. (*Id.*) However, Relators have not shown that Peterson's methodology was flawed, they merely dispute (albeit without meaningful or persuasive elaboration) the conclusions of Peterson's analysis. It is valid to look at the price the hospitals paid and subtract any costs shifted to the hospitals under the terms of the contracts, including billing costs and bad debts, to assess whether an illicit motive can be reasonably ascribed or attributed to the Hospital Defendants on the basis of the contracts alone.

Finally, Relators (perfunctorily) argue that Peterson relied upon incomplete data. (D.E. 292 at 8.) However, no study has perfect data, and Relators do not meaningfully challenge Peterson's estimation techniques. *See generally Guardians Assoc. of New York City Police Dep't., Inc. v. Civil Service Com.*, 633 F.2d 232, 240 (2d Cir. 1980) ("The science of statistical analysis encompasses more than the mere notation of directly observed phenomena. Necessity

often dictates that the composition of a given population be estimated by projecting data gathered by less than optimal means from only a sample of that population.").  Relators do not maintain that Peterson deviated from accepted methodologies in cost accounting when he calculated estimates of missing data.  (*See* D.E. 307 at 13-15.)  At best, Relators have raised an argument about the weight or probative value of the Peterson testimony.

Accordingly, the Court respectfully rejects the Relators' Daubert challenge as to Peterson. The Hospital Defendants have carried their burden of explaining why his testimony is licit under *Daubert*.

>    2.    Dr. Larry Lee Isley

Isley has a Ph.D. in Public Health from the University of Tennessee.  (D.E. 298, Ex. 3 at 4.)  From 1995-1998, Isley served as the Director of Emergency Medical Services for WestCare Health System in North Carolina.  (*Id*. at 3.)  From 1998-July 2004, Isley was WestCare's Chief Operating Officer.  (*Id.* at 2.)  From July 2004 to the present, Isley has served as the Chief Administrative Officer of Morristown-Hamblen Healthcare System in Tennessee.  (*Id.*)  Relators do not maintain, in light of his academic training and his professional experience, that Dr. Isley is not qualified as an expert as proposed in this case.

Relators maintain that Dr. Isley's opinions are not reliable because the methodology he employed is his "unsupported opinion" rather than a generally-accepted technique.  (D.E. 292 at 9-10.)  Relators' argument in this regard is perfunctorily developed—it spans slightly more than one page of their brief—and is seemingly abandoned given that Mt. Sinai filed an insightful and detailed response to which Relators failed to respond.  Even giving Relators the benefit of doubt with respect to potential waiver issues, the substantive basis for and the ultimate relevance of

Relators' objections to Dr. Isley's testimony is not pellucid. It is respectfully rejected, as explained below.

Relators maintain that "Isley states that Mt. Sinai's ability to discern the market value of Part A transports would be based on three principles:

1. Part A transports are a "different good or service" from a Part B ambulance transport;
2. The rate paid for Part A transports was a "below market" payment and therefore the difference between the rates [the hospital] paid and the rate Medicare pays for Part B transports was an unjustifiable discount or below market price offered in return for referral of Part B transports; and
3. CoMed could make up the deep discounts offered through increased Part B volume, which were assured through an "exclusive" component of the contract.

(D.E. 292 at 9 (citing D.E. 294, Ex. 13 (Isley Dep.) at 2; *id.*, Ex. 13A (Isley Report).) Relators further maintain that Isley admits that the three principles are an unsupported opinion and are not shared by other experts in the field. (D.E. 292 at 9-10 (citing D.E. 294, Ex. 13 (Isley Dep.) at 24-25).)

As an initial matter, it appears that Relators have misstated Dr. Isley's testimony and expert report. Dr. Isley explicitly stated in his deposition that it was not his opinion that Mt. Sinai should have done an analysis using the so-called "three principles." (*See* D.E. 294, Ex. 13 at 23 ("Q: Well, you came up with these three principles that you said you had to evaluate in order to discern the market value of the Part A transport, correct? A: Correct. Q: Is it your opinion that at the time of contracting, Mt. Sinai should have done the same analysis as you did? A: No."); *see also id.* at 41 (stating that Mt. Sinai could not have used principle #2 "because at the time it was almost impossible to know what the Medicare allowable was for any ambulance provider.").)

Moreover, and independently, even if Relators had accurately described Dr. Isley's opinion with respect to the three principles, a number of Dr. Isley's conclusions nonetheless would be permissible under *Daubert*. In fact, it appears that Relators are using the so-called

"three principles," which are not the ultimate import or substance of Dr. Isley's opinion, as a red herring because they are unable to challenge his well-founded opinion on a number of issues that meaningfully undermine Relators' case.[39]

For example, Relators have failed to challenge Dr. Isley's opinion with respect to the relationship between the Medicare allowable rate and fair market value for ambulance transports.[40]  Relators have also failed to meaningfully undermine Dr. Isley's informed opinion that the cost of Part B transports for which Medicare rejected payment can be factored into the true cost of the contracts (*see* D.E. 294, Ex. 13A at 19-20).  (Such information then can be considered in connection with the *scienter* analysis under the AKS and other summary judgment issues.)  Finally, Relators have not addressed Dr. Isley's expert opinion that Part A transports are more desirable business than are Part B transports because Part A transports are more easily scheduled, the transports are less difficult, the transports generally were for shorter distances, and there were significant reimbursement issues with Medicare.  (*Id.* at 20-21.)

Given Dr. Isley's professional experience and academic training, such opinions are well-founded and admissible.  (*See* D.E. 298, Ex. 3; *see also* D.E. 294, Ex. 13A (Isley Report) at 1-2 ("In these roles I have been involved in the management, development and the lead on contract issues involving physician contracting, EMS contracting, merging entities, the investment of durable medical equipment companies, physician recruitment, the establishment of new service

---

[39]     Mt. Sinai observed the same defect in Relators' motion in its response to Relators' motion, to which Relators declined to file a reply.  (*See* D.E. 298 at 2 ("While Relators focus on the underlying framework for Isley's expert opinions, they ignore the opinions themselves").)

[40]     Isley's uncontradicted opinions in the record concerning the Medicare allowable rate for ambulance transports are:  (1) during the 1990s, the Rates for Part B ambulance transports experienced unexplained and wide variances and did not consistently hold to any clear business principles (D.E. 294, Ex. 13A at 8); (2) Medicare's methodology of payment based on historical charges allowed providers operating in overlapping service areas to be reimbursed at different rates (*id.* at 14); and (3) during the 1990s, hospitals could not have been reasonably expected to calculate fair market value based upon Medicare's allowable rates (*id.* at 16-17.)  (The Court notes that Dr. Isley's testimony does not suggest that this situation persists today.)  All of these conclusions are derivative of Dr. Isley's professional and economic expertise.  (*See* D.E. 298, Ex. 3 at 4.)  Furthermore, these opinions are supported by OIG's assessment of Medicare payments for ambulance transports.

lines, joint ventures and limited liability companies, and I have worked as lead on major construction projects."); *see also id.* at 2 ("Additional work I have been involved with includes ambulance system design and consulting services for Moore County, North Carolina, South Hills Health System in Pittsburgh, Pennsylvania and Halifax Memorial Hospital in Halifax County, North Carolina.").)

Accordingly, the Court respectfully rejects the *Daubert* challenge to Dr. Isley's expert testimony.

III.    Legal Standards

A.    Summary Judgment

Under Fed. R. Civ. P. 56(c), summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The Court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmovant.  *See* Fed. R. Civ. P. 56(c); *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).  However, the nonmovant may not rely on conclusory allegations, unsupported by the record, in order to defeat summary judgment.  *See*, *e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Furthermore, the nonmovant cannot rest on the pleadings alone, but must identify specific facts, *see Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993), that raise more than a scintilla of evidence to show a genuine triable issue of material fact.  *See Senner v. Northcentral Tech. Coll.*, 113 F.3d 750, 757-758 (7th Cir. 1997); *accord*, *e.g.*, *Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, (7th Cir. 2004) ("As we have often stated, summary judgment 'is

the "put up or shut up" moment in a lawsuit, where a party must show what evidence it has that would convince a trier of fact to accept its version of events.'") (collecting cases).

Precedent teaches that the Court properly enters summary judgment on a claim "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-323 (citation omitted); *see also Koszola*, 385 F.3d at 1111 (collecting cases); *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999) (Summary judgment is the movement in the lawsuit "when a party must show what evidence it has that would convince a trier of fact to accept its version of events.")).

B. Anti-Kickback Statute—42 U.S.C. § 1320a-7b

The AKS only prohibits "knowing" and "willful" acceptance of remuneration in return for referrals of Medicare or Medicaid business. 42 U.S.C. § 1320a-7b(b)(2). It is important to be mindful of these elements, because they help to frame the analytical field and because, if Relators have not assembled a triable case on the specific record presented, then the Hospital Defendants are entitled to summary judgment.[41]

1. "Knowingly"

---

[41] Relators also have a related claim under the Illinois Whistleblower Reward and Protection Act ("IWRPA"), 740 ILCS 175/3. (D.E. 85 ¶¶ 85-90.) In moving for summary judgment, the Hospital Defendants have also sought summary judgment on any IWRPA claims, noting that those claims rely on essentially the same theory as Relators' AKS claims. (D.E. 270 at 10 n.4.) The Seventh Circuit has repeatedly instructed that "summary judgment is the 'put up or shut up' moment in a lawsuit," such that the non-movant's failure to identify a triable case when challenged justifies summary judgment dismissal of the claim. *Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004) (collecting cases; further internal quotation marks and citations omitted). Relators here have not offered any basis or argument concerning the IWRPA claims beyond those offered on their AKS claims, so the Court considers waived any further argument about specific bases that might save any IWRPA claim beyond those actually offered by the Plaintiffs concerning the AKS claims. The Court also finds the Relators' defense, as argued with respect to the AKS, to be unpersuasive for all of the reasons stated in this opinion.

The Anti-Kickback Statute does not specifically define the term knowingly, but it is not a unique term in the law. The Seventh Circuit Pattern Jury Instruction on knowingly provides that "[w]hen the word 'knowingly' is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake, or accident." Federal Criminal Jury Instructions of the Seventh Circuit, No. 4.06 (1998). The pattern instruction on knowingly includes what is often referred to as an "ostrich clause"—specifically, an instruction that, "[i]f you [the factfinder] find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word." *Id.*

In this regard, precedent instructs that knowledge may be inferred when a person, like an ostrich burying its head in the sand, takes deliberate steps in order to avoid learning the truth. *See*, *e.g.*, *United States v. Carrillo*, 435 F.3d 767, 779-780 (2006). A person does not act knowingly simply because a reasonable person in the defendant's position should have been strongly suspicious, or should have been aware of criminal activity or knowledge. *See id.* at 782 (collecting cases). Thus, *Carrillo* recently underscored, in discussing the propriety of even presenting an ostrich instruction to the factfinder, that: "[g]reat caution must be exercised in determining which circumstances support the inference of deliberate ignorance. The most important principle for the district court to keep in mind is that the ostrich instruction is not meant to allow" the factfinder to find liability "for negligence." *Id.* at 781 (collecting cases; internal quotation marks and citations omitted). The Seventh Circuit has also taught that an ostrich analysis is not meant to ground liability or a conviction "of one who merely suspects that he may be involved with wrongdoers." *United States v. Giovanetti*, 919 F.2d 1223, 1227 (7th Cir. 1990);

*see also id.* at 1227-28 (person is not knowing participant in wrongdoing, under ostrich analysis, unless that person takes deliberate efforts to avoid acquiring unpleasant knowledge); *Carillo*, 435 F.3d at 780 (requiring that the defendant "strongly suspects he is involved in criminal activity"). Put somewhat differently, the factfinder should not make a finding of knowledge predicated upon a finding of mere negligence. Seventh Circuit Pattern Instruction 4.06 (collecting cases); *accord, e.g.*, *Carillo*, 435 F.3d at 782 ("[T]he instruction should only be given where there are facts and evidence that support an inference of deliberate ignorance"); *id.* at 780 (requiring the defendant to have engaged in "overt physical acts," i.e., "evidence that the defendant physically acted to avoid knowledge," or psychological avoidance, i.e., "a cutting off of one's normal curiosity by an effort of will"); *id.* at 782 ("[e]vidence merely supporting a finding of negligence—that a reasonable person would have been strongly suspicious, or that a defendant should have been aware of criminal knowledge—does not support an inference that a particular defendant was deliberately ignorant.").

        2.      "Willfully"

The AKS also requires a showing of willfulness by a defendant to ground liability. The Supreme Court recently affirmed the giving of an instruction on "willfulness" which stated that: "A person acts willfully if he acts intentionally and purposely and with the intent to do something that the law forbids, that is, with the bad purpose to disobey or disregard the law. Now, the person need not be aware of the specific law or rule that his conduct may be violating. But he must act with the intent to do something that the law forbids." *Bryan v. United States*, 524 U.S. 184, 190 (1998); *see also id.* at 192 n.12 (collecting various formulations from precedent, including one which stated that: "'Doing or omitting to do a thing knowingly and wilfully,

implies not only a knowledge of the thing, but a determination with a bad intent to do it or omit doing it.'") (quoting *Felton v. United States*, 96 U.S. 699, 702 (1877)).

*Bryan* was construing a federal firearms law, but its definition of willfully is can be logically applied in this case, although there is good argument that the specific nature of the alleged violations in this case might, under precedent, suggest a more defendant-friendly formulation. More specifically, *United States v. Starks*, 157 F.3d 833 (11th Cir. 1998), applied the *Bryan* formulation of willfully in an AKS case, as the Court will do here. *Id.* at 838. *Starks*, however, involved an alleged violation where the AKS defendants were alleged to have personally accepted substantial amounts of bribe monies or commercial kickbacks in exchange for patient referrals, and the defendants in that case took pains to transfer the payments at remote parking lots or restaurants so that others would not see what was occurring. *See id.* at 836. Under such circumstances, the *Starks* court found that the *Bryan* formulation was appropriate—as compared to other, more defense-friendly formulations of "willful" that would be appropriate in a case where the alleged AKS violation concerned an alleged transgression of a highly technical issue or an issue implicating more opaque government regulation, such that there would be "a danger of ensnaring persons engaged in apparently innocent conduct." *Id.* at 838 (discussing cases such as *Ratzlaf v. United States*, 510 US 135 (1994), which concerned the anti-money-structuring provisions of federal law); *see also Cheek v. United States*, 498 U.S. 192 (1991) (establishing heightened wilfulness requirement for alleged violations of federal tax laws in order to protect citizens from liability for mistakes made due to the complexity of the tax code).

As previously alluded to, Relators' AKS theory (at least with respect to the Hospital Defendants) is not fairly likened to people personally pocketing bribes, transferred in remote parking lots so others could not see what was transpiring, in return for medical referrals. There is

no allegation in this case that anyone, at any of the Defendant Hospitals, personally profited from any alleged transgression of the AKS or any other law.  There is no allegation that any services were billed that were not provided, nor that any services were provided (at least on this aspect of the case, which the United States declined to join) that were not medically necessary.  (In the interests of clarity, there also never has been any contention that any of the Hospital Defendants or their employees should have realized that medically unnecessary services were being provided in the other portion of the case, against other defendants, that the United States did in fact join.)  Instead, the allegation, in its essence, is that the Defendant Hospitals failed to abide by Medicare regulations, in that they accepted alleged discounts on ambulance services, discounts that (if they occurred) would lower the operating expenses of hospitals that were serving a largely underprivileged patient-base rather than lining any person's pockets at the hospitals, in exchange for referring the hospitals' ambulance business to the Ambulance Defendants.

Such a violation—if actually supportable on a developed record, which is *not* the case here—could certainly constitute an AKS violation; but this species of AKS violation is arguably more fairly liked to a violation of a detailed regulatory framework or a highly technical area of regulated activity than the practice of personally taking cash bribes in purposefully secluded locations, as was the case in *Starks*.  *See id.*, 157 F.3d at 838 (describing the bribe-taking there as "more clearly *malum in se*, rather than *malum prohibitum*").

In any event, the Court will apply the *Bryan* standard for willfulness, which is, if anything, more favorable to the Relators than they otherwise might be entitled to in this context.  *See generally Bryan*, 524 U.S. at 191 ("The word 'wilfully' is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears."); *id.* at 194 (explaining that the tax setting in *Cheek* and the transaction-structuring setting in *Ratzlaf*

"involved highly technical statutes that presented the danger of ensnaring individuals engaged in apparently innocent conduct").[42] This issue is only of academic consequence, and can be reserved for a subsequent case where it actually is material, because even applying the more Relator-friendly option, the Relators' AKS case fails, as explained at length below.

Before moving on, the Court notes that a defendant may be deemed to acted "willfully" through circumstantial evidence. However, in practice, this evidence tends to be robust, *e.g.* proof that a defendant took several actions inconsistent with a good-faith belief that his conduct was legal. *See, e.g., Bryan*, 524 U.S. at 189 n.8 ("Why else would [the defendant] make use of straw purchasers and assure them that he would shave the serial numbers off the guns? Moreover, the street corner sales are not consistent with a good-faith belief in the legality of the enterprise"); *accord Starks*, 157 F.3d at 836 (defendant stated that "she did not want anyone to see her receiving" bribe checks, which therefore were delivered in a parking lot, a restaurant, or "at a twelve-step program"); *United States v. Muthana*, 60 F.3d 1217, 1222, (7th Cir. 1995) (affirming defendant's conviction for "knowingly and willfully using an export control document which contained a false statement and omitted a material fact to export defense articles" because, *inter alia*, the defendant told the shipper that his parcels contained only honey, even though he knew they contained large quantities of military grade ammunition being exported to the Middle East). Put somewhat differently, the circumstantial evidence in such instances tends to meaningfully exclude a legitimate (or negligent) explanation for the defendants'

---

[42] The Defendant Hospitals certainly have a good, and perhaps compelling, argument that the Medicare regulatory regime, as applicable to this case, involves technical statutes and regulations. Moreover, the Defendant hospitals have a legitimate argument that the case could present the danger of ensnaring individuals engaged in apparently innocent—as one might understand a cash-strapped urban hospital to be undertaking when it seeks lower-cost services for its patient base without any of its employees accepting or soliciting any personal remuneration in the process. Again, though, the question of whether a potentially more defendant-friendly standard for "willfully" applies is not material, as Relators' case, on the record they have assembled, fails under any standard, including the more Relator-friendly standard applied herein.

conduct—consistent with the heightened scienter requirement imposed by a "knowing and willfully" standard.

IV.    Global Failures of Proof In Relators' Case Warrant Summary Judgment in Favor of the Hospital Defendants

    A.  Introduction

As explained below, the Relators' case suffers from a global failure of proof—or perhaps, more accurately, failures of proof—concerning the general portion of the case briefed as to all of the Hospital Defendants.  Such failures warrant summary judgment in favor of all of the Hospital Defendants.  In addition, virtually all of the individual Hospital Defendants filed individual, supplemental summary judgment motions—to which Relators filed no responses at all.  Those individual summary judgment motions highlighted, at least at times, individualized and additional failures of proof by the Relators and deficiencies in the Relators' case against the respective individual Hospital Defendant.  The additional bases warranting summary judgment in favor of the respective individual Hospital Defendants are discussed following the section explaining the general failure of proof as to all the Hospital Defendants.

    B.  Global Failures of Proof

A 10,000 foot view of Relators' case reveals its fundamental weaknesses.  In order to infer the Hospital Defendants' knowing and willful participation in a criminal kickback scheme as alleged, the factfinder would have to believe that a number of officials from non-profit hospitals serving the Chicago area's neediest citizens, acting independently of each other, consciously risked their hospital's survival[43] and *personally exposed themselves to criminal liability* for no personal gain and for benign purposes.  The only "motive" suggested or ascribed to the Hospital

---

[43]    Pursuant to 42 U.S.C. § 1320a-7(a)-(j), the Secretary of the Department of Health and Human Services may exclude a provider from any Federal health care program as a sanction for violation of the AKS.  Given the Hospital Defendants' patient-payor mix, it appears that exclusion from Medicare or Medicaid would have a devastating effect on their already-strained finances.

Defendants is a desire to minimize costs on ambulance transports such that they presumably could serve more patients—there is not even a shred of evidence in the record suggesting that any of the individuals (on the hospital side) who allegedly knowingly and willfully participated in the putative kickback arrangement sought or obtained any illicit personal gain from the contracts. In sum, in order to believe Relators' theory, the factfinder would have to believe that the Hospital Defendants' agents knowingly and willfully were prepared to violate federal criminal law (and face all of the personal sanctions that might entail) so that the hospitals could more readily continue to provide low-cost medical care to the needy.

This is not to say that such an illicit endeavor could not be proven, if there were a legitimate record to support such a claim. However, the Relators' approach to the case, with all respect, appears to have been to ride the Government's coattails to the extent the Government was prepared to spearhead the efforts, and then, when the Government declined to join the aspect of the case at issue here, to rely on a pair of experts who would improperly propose to testify to: (1) ultimate legal conclusions in the case (*see*, *e.g.*, D.E. 204 at 4-5); and (2) the Hospital Defendants' supposed states of mind during the period of the alleged misconduct and knowledge—notwithstanding that the expert had no involvement at all in the underlying activities at issue (*see*, *e.g.*, *id.* at 23 & n.15). That prior expert testimony was excluded as inappropriate, *see* D.E. 204, and Relators otherwise have done little to attempt to develop a meaningful or persuasive record that would justify a liability finding against the Hospital Defendants. (Recall, please, the applicable standard of proof requires that a factfinder can find a knowing and willful violation of the law—and, in this regard, a showing of potential negligence is decidedly not enough.) Accordingly, on the record assembled, summary judgment is warranted in favor of the Hospital Defendants.

### C. Relators Have Also Independently Failed to Set Forth Competent Evidence that the Hospital Defendants' Received Illicit Remuneration

The AKS does not criminalize referrals for services paid for by Medicare or Medicaid—it criminalizes knowing and willful acceptance of remuneration in return for such referrals. Remuneration, for purposes of the AKS, is defined broadly, meaning "anything of value." In many cases, remuneration is not at issue because the defendant has accepted cash or a cash equivalent such as a bribe. The statute does not, however, define "value" in the context of discounts for services. In the case *sub judice*, the only alleged remuneration is a "discount" for services, which raises the critical question—a discount compared to what?

Relators' initial argument is that a discount off a higher price is something of value for the purposes of the AKS. Relators have not cited any cases in support of this argument, nor have they provided a meaningful conceptual defense of using the Ambulance Defendants's "non-contracted" or "usual and customary" rates as the proper baseline for assessing whether a price is a "discount," and thus "something of value." (If a vendor states that its "usual and customary" rate is one price, but that price is 150% of the prevailing market rate, a person is not agreeing to any illicit kickback if he or she accepts a "discount" from the vendor down to the market rate; such gimmickry may evoke images of a flea market, a bazaar, or a traveling salesperson, but it does not constitute evidence of a willful and knowing violation of federal law or acceptance of illicit remuneration.) In addition, Relators have not systematically adduced proof that the rates listed on the contracts—variously referred to as "retail rates," "non-contracted rates," and "BLS and ALS rates"—were the rates that the Ambulance Defendants would have charged the signatory hospital were it not for the contract. Any assumption that so-called "non-contracted rates" have any substantial meaning is dubious given the custom and practice reflected in the record that most vendors did not charge their retail rates to customers. (D.E. 256 ¶ 30.)

Putting aside Relators' specific failure of proof in this regard, Relators' theory is fundamentally defective because it presumes that the value of a service is defined by what one firm proposes to charge for that service, rather than by all of the participants in the market. Firms cannot establish prices by fiat, at least not in a competitive industry. This is why fair market value, "the price a willing buyer would pay a willing seller . . . . when neither is under compulsion to buy or sell," is the widely accepted metric of value. *See United States v. Draves*, 103 F.3d 1328, 1332 (7th Cir. 1997) (collecting cases). In the context of the Anti-Kickback Statute, courts use "fair market value" as the gauge of value when assessing the remuneration element of the offense. *See, e.g.*, *United States ex rel. Obert-Hong v. Advocate Health Care*, 211 F. Supp. 2d 1045, 1049 & n.2 (N.D. Ill. 2002) ("To comply with the statute, the hospital must simply pay fair market value for the practice's assets.") (Moran, J.).

Relators cannot prove that the Hospital Defendants received remuneration—something of value—without comparing the contracted rates with fair market value. Relators have failed in this regard. Without the testimony of their putative expert, Relators have no admissible evidence to offer at trial with respect to fair market value. Relators have not even attempted to define fair market value for ALS transports, BLS transports, mileage, oxygen, or anything else. For example, there is no meaningful comprehensive evidence even comparing CoMed's ambulance rates to that of its competitors. Instead, there are snippets of evidence suggesting, for example, what one vendor was offering to charge one hospital during one year (*see* Mt. Sinai contracts); however, this smattering of proof is insufficient to set any baseline against which contract rates should be judged. That is particularly true because ambulance services are not fungible commodities with inherent value—rates differ based upon, *inter alia*, the location of the hospital,

the hospital's patient profile, the distance and time involved in transporting patients, and the relative quantity of buyers and sellers. (D.E. 294, Ex. 13A at 8-10.)

Perhaps in recognition of the fallacy that any discount off supposed "retail" rates is "something of value," Relators attempt to identify the proper comparison for determining value as the amount CoMed billed Medicare for Part B transports (CoMed's Medicare allowable rate). (D.E. 281 at 30-31, 34-35.) Yet Relators have not demonstrated that the Medicare allowable rate is equivalent to fair market value for Part A transports. Dr. Isley provided a detailed opinion in his report—not rebutted by Relators—that the Medicare allowable rate during the relevant period was not equivalent to fair market value because it was based on historical costs rather than market data. (D.E. 294, Ex. 13A (Isley Report) at 8-10.) In addition, a second reason why the Medicare allowable rate is not equivalent to fair market value (at least on the record presented) is that the Part A transports at issue were less costly for the ambulance companies because they could be scheduled in advance. (D.E. 294, Ex. 13A (Isley Report) at 14-15.) Third, the Medicare allowable rate has not been shown to be equivalent to "fair market value" because the contracts shifted administrative and/or billing costs and the risk of bad debts to the hospitals; moreover, Part A charges were generally paid in full, whereas Part B transports were commonly subject to denial by Medicare on medical necessity grounds. (*See*, *e.g.*, *id.*) Thus, again, Relators have failed to explain why they are not attempting to improperly compare apples to oranges in this regard. Relators must do at least this much in response to the summary judgment challenge. *See*, *e.g.*, *Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir.2004) ("As we have often stated, summary judgment is the 'put up or shut up' moment in a lawsuit . . . .") (collecting cases; further internal quotation marks and citations omitted).

At times, Relators maintain that anything below the Medicare allowable rate is remuneration, regardless of whether the Medicare allowable rate accurately tracks fair market value.  (*See*, *e.g.*, D.E. 301 ¶ 157 (citing Werfel).)  However, the record reflects that "[t]here is generally no requirement that [a] discount be offered to Medicare" and that "[t]here's no absolute guidelines that I'm aware of for setting that standard."[44]  (D.E. 294, Ex. 17 at 16-17.)  Furthermore, the statutory exception for discounts does not require that Medicare receive the same discount, just that any discount is properly accounted for and disclosed on the cost reports.  42 U.S.C. 1320-7b(b)(3).  Finally, the "safe harbor" for discounts does not require that Medicare receive the same rate—it states that a reduction in price does not qualify as a discount if it is not offered to "Medicare or Medicaid."  42 C.F.R. 1001.952(h).  Thus, again, on the record assembled, Relators have not established or explained any reasonable basis for concluding that a discount below the allowable rate is *per se* unlawful remuneration, as their theory proposes.

Finally, even if the so-called "usual and customary rates" were a proper comparison point to determine value, the expert testimony of Messrs. Peterson and Patashnik both suggest that contractual rates cannot be compared without first ensuring that the contracts are offering the same services.  (*See generally* D.E. 317 (Peterson Reports); *see also* D.E. 294, Ex. 17 (Patashnik Dep.) at 12-13.)  Relators have not attempted with respect to the Mt. Sinai contracts (some of their identified examples) to demonstrate that the AMR proposal, which Relators' maintain is proof that Mt. Sinai knew CoMed's rates were below fair market value, shifted administrative costs and the risk of bad debts to Mt. Sinai.  As a result, Relators are attempting to compare apples to oranges, or more precisely, have not established that they are comparing apples to apples in any sufficiently meaningful sense.  As such, their argument is unpersuasive.

---

[44]     This testimony was from Defendants' expert Bernard Patashnik, who, for ten years, was the Director, Division of Medical Services Payment, for the federal Health Care Financing Agency (HCFA) (now the Center for Medicare Services).

D. Relator's Indirect Evidence Is Insufficient to Support any Inference that the Hospital Defendants Knowingly and Willfully Accepted Kickbacks, Which Independently Justifies Summary Judgment in the Hospitals' Favor

Each of the Hospital Defendants has denied that they knowingly and willfully accepted any putative remuneration in return for referrals of Part B transports. In this regard, there is no evidence indicating that any of the relevant agents knew what CoMed billed Medicare—and Relators have not meaningfully denied this premise. (*See*, *e.g.*, D.E. 239 ¶ 26 (Advocate); D.E. 254 ¶ 34 (Holy Cross); D.E. 231 ¶ 30 (Jackson Park); D.E. 260 ¶¶ 29-30 (Loretto); D.E. 267 ¶ 18 (Mt. Sinai); D.E. 238 ¶¶ 26-27 (St. Bernard).) Beyond the generalized premise that hospitals have an incentive to minimize costs for Part A transports, Relators have not set forth any evidence specifically concerning the state of mind or intent of any of the relevant agents of the Hospital Defendants. For example, there is not a single comment, email, memo, or other indication by any relevant agent that suggests the Hospital Defendants individually or collectively were knowing and willful participants in any kickback scheme.

Relators have thus been forced to attempt to establish a trial-worthy record of illicit *scienter* circumstantially. In this regard, Relators' suggest, at least at times, that the rates in the contracts were so low that the only reasonable inference to draw is that the Hospital Defendants knew they were receiving illegal remuneration in the form of discounted rates, in violation of federal law, in exchange for referrals. As explained above, this theory fails at the outset because the theory requires a comparison point—no inference can be drawn from "low" prices unless there is some higher price for a similar service to which the Hospital Defendants should have compared the contract rates. In this regard, Relators have adduced no evidence that a 25% discount off "non-contracted" rates (which was the most common discount applied in the CoMed contracts) was so unusual or out of line in the industry that a hospital administrator "must have

known"—not just in the sense of negligence, but in the sense to reasonably draw an inference of willful and knowing *scienter*—that the CoMed discounts were unlawful remuneration illicitly provided in return for referrals. As explained, if CoMed's non-contracted rates were materially higher than its competitors, then the "discounts" may have simply been bringing CoMed's rates in line with the market.

Moreover, there is no evidence that any of the Hospital Defendants' agents even knew what CoMed was billing Medicare. With respect to St. James, the only hospital that did not affirmatively deny any knowledge of Medicare rates during this period, Relators have not adduced any evidence suggesting that St. James was aware of the Medicare allowable rate during the period it had negotiated rates with the Ambulance Defendants. Thus, even if the Medicare allowable rate is a proper comparison point for the contract rates, none of the Hospital Defendants knew the Medicare allowable rate, and thus no inference of illicit knowledge and willfulness can be drawn from the alleged fact that the contract rates were lower than the Medicare allowable rate.

Furthermore, all of the hospitals testified either that they believed contracts were commercially reasonable, or made clear that they did not have sufficient knowledge of the market to know or believe that the contracts were (supposedly) commercially unreasonable. (*See*, *e.g.*, D.E. 239 ¶¶ 26-28 (Advocate); D.E. 254 ¶¶ 33-35 (Holy Cross); D.E. 231 ¶¶ 28-31 (Jackson Park); D.E. 260 ¶¶ 28-30 (Loretto); D.E. 267 ¶¶ 18-19 (Mt. Sinai); D.E. 238 ¶¶ 27-30 (St. Bernard); D.E. 241 ¶ 15 (St. James).) Relators have not presented meaningful evidence that the Hospital Defendants knew what fair market value was for services, and thus must have known that the contracts were supposedly below fair market value. At best, Relators might be able to argue that the Hospital Defendants were negligent for not investigating market rates; however,

Relators have not shown that the Hospital Defendants actively avoided acquiring such information, and, as discussed above, precedent clearly teaches that negligence alone does not support an inference of criminal knowledge.

E. Relators' Failure to Adduce a Triable Case Concerning Scienter Is Confirmed By the Fact That They Have Not Meaningfully Discredited Other, Valid Justifications for the Contracts

As explained, given that they have failed to adduce direct evidence of knowledge or willfulness, Relators have sought to prove their case through circumstantial evidence. This does not, in itself, suggest that Relators case is weak or otherwise problematic. It does mean, however, in the context of a statute with the heightened *mens rea* requirement of knowingly and willfully, that Relators circumstantial proof must at least meaningfully discredit other, valid justifications for the contracts. Indeed, Relators implicitly frame their argument in this light—their case is premised upon the notion that the *only* reasonable inference from the "low" contract rates, free or allegedly severely discounted ancillary services, and CoMed's alleged non-enforcement of various payment deadlines, is that the Hospital Defendants knowingly and willfully violated the AKS.

There is a dearth of precedent addressing a plaintiff's use of circumstantial evidence to prove a willful and knowing violation of the AKS. The Court therefore applies the orthodox standards discussed earlier in the opinion. In an effort to provide further context and mooring to other areas of the law, the Court notes that broader lessons from other areas of federal law dealing with indirect proof of *scienter* confirm the fact that Relators have failed to present a triable case. For example, in the federal employment law context, there is a fulsome body of law dealing with direct and indirect proof of an employer's alleged unlawful intent. Furthermore, in the federal antitrust law context, there is a well-developed body of law concerning inferences that can be

drawn from parallel conduct in Section 1 cases. The analytical frameworks of employment law or antitrust law do not control the analysis in an AKS case, of course, but a review of such principles is at least worthwhile to provide further context from federal precedent.

1. Federal Analysis of Intent from the Employment Law Context

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) ("Title VII") makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. § 2000e-2(a)(1). In the Title VII context, "[t]here are two ways in which a plaintiff can avert summary judgment for the defendant." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997). "These two methods of proof constitute different evidentiary paths available to a plaintiff seeking to prove the ultimate issue of defendant's discriminatory intent." *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir. 1989) (internal quotations omitted); *accord Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001) (holding that a plaintiff bears the "ultimate burden to prove intentional discrimination.")

The first way a plaintiff may avoid summary judgment is known as the "direct method," under which the plaintiff sets forth sufficient evidence, either direct or circumstantial, "to create a triable issue of whether the adverse employment action of which he complains had a discriminatory motivation." *Wallace*, 103 F.3d at 1397. The second way is the burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wallace*, 103 F.3d at 1397. Under the burden-shifting method, plaintiff must first establish a prima facie case of employment discrimination. *See*, *e.g.*, *Michas v. Health Costs Control of Ill.*, 209 F.3d 687, 693 (7th Cir. 2000). If the plaintiff establishes a prima facie case of discrimination in this manner, the burden then shifts to the defendant to articulate a legitimate reason for the adverse

employment action.  *See*, *e.g.*, *Taylor v. Canteen Corp.*, 69 F.3d 773, 780 (7th Cir. 1995).  If that evidence is unrebutted by the plaintiff or if she fails to raise a triable issue as to whether the offered reasons are pretextual, the defendant is entitled to summary judgment.  *See, e.g., Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2002).

   2.  Federal Analysis of Intent from the Sherman Act, Section 1 Context

   Section 1 of the Sherman Act prohibits "contract[s], combination[s] ..., or conspirac[ies]" in restraint of trade.  15 U.S.C. § 1.  Where the concerted action is the result of an express agreement, the plaintiff of course may prove it by direct evidence.  However, a plaintiff may also attempt to prove an agreement by drawing certain inferences from the defendants' conduct.  *See*, *e.g.*, *Market Force, Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1171 (7th Cir. 1990).  If the plaintiff tenders sufficient evidence to infer the existence of an agreement, the defendant may rebut that inference to demonstrate that the conduct is as compatible with legitimate business practices as it is with an illegal agreement, and the plaintiff must then point to evidence that "tends to exclude the possibility that the defendants were pursuing their legitimate independent interests."  *Id.* at 1171-72; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (noting that the plaintiffs in the case "must show that the inference of conspiracy is reasonable in light of the competing inferences" that would not give rise to liability.)

   3.  Analysis of Inferences Under the AKS on the Assembled Record

   Assuming *arguendo* that Relators have presented sufficient evidence to support even a preliminary inference that the Hospital Defendants knowingly and willfully entered into a kickback scheme with the Ambulance Defendants—and the Court makes no such finding, as there are gaps in the record, as discussed above to preclude any such finding—the Hospital

Defendants have set forth uncontradicted evidence that the contracts were as compatible with legitimate business purposes as they were with an illegal agreement. This failing also further undermines any notion that there is a triable case concerning whether the heightened "willful and knowing" standard could be met on the record assembled.

First, the Hospital Defendants have shown that Medicare guidelines encourage providers to make bulk purchases and "gain discounts because of the size of its purchases." *Medicare Provider Reimbursement Manual* § 2103. Relators do not deny that Medicare providers of services are expected to use leverage to obtain better prices, nor do they deny that it is common practice in the medical services industry to obtain discounts for volume purchases of goods or services. (*See*, *e.g.*, D.E. 294, Ex. 18 at 21.)

Second, Relators do not deny that preferred-provider agreements were the norm in the industry (D.E. 303 at 12); in fact, Relators' own putative expert admitted at his deposition that it was customary in the industry for hospitals to enter into contracts with a single ambulance provider. (D.E. 294, Ex. 15 at 138-39 ("Q. And I believe you would say that that arrangement between a hospital and ambulance provider where the ambulance provider is the sole provider is the norm? A. It is very common.").) As a result, Relators get little mileage—in terms of showing evidence of any putative knowing and willful violation of a federal criminal prohibition—out of any exclusivity provision in the written contracts. Furthermore, any value of such evidence is further diminished, when looking at the evidence of intent within the aggregate period of time encompassed by the Relators' allegations, because of the fact that the record shows that the Hospital Defendants in practice sometimes used other ambulance companies where the circumstances made it appropriate or desirable for a patient. (*See, e.g.,* D.E. 254 ¶ 6 (Holy Cross); D.E. 233 ¶ 20 (Jackson Park); D.E. 286 ¶ 15 (Loretto).)

Third, with respect to any exclusivity provisions, the Hospital Defendants have also provided unrefuted evidence that they wanted to contract with an individual provider to ensure that they received reliable coverage. Ensuring reliable ambulance coverage was a problem for many of the hospitals—which often were located in economically poor areas that many providers perceived as undesirable. (*See*, *e.g.*, D.E. 294, Ex. 18 at 23.) In fact, this was such an important issue that St. Bernard's was willing to terminate its contractual relationship with Vandenburg over service concerns and contract instead with Tower, which had a better reputation for service, in spite of the fact that Vandenburg offered lower rates. (*See* D.E. 254 ¶¶ 15, 33.) Loretto selected CoMed as its ambulance provider in order to secure quality and prompt services so that its patients would not have to endure excessive waits for ambulance services. (D.E. 286 ¶ 12.)

Fourth, the Hospital Defendants have explained that working with a primary ambulance provider kept costs low by simplifying billing and related administrative tasks. (*See*, *e.g.*, D.E. 254 ¶ 5.) This also negates the alleged basis for any triable case of willful and knowing criminal intent.

Finally, Peterson's analysis illuminates the differences in contract prices such that a kickback arrangement is not the only, or even the most plausible, inference from the contracts. (*See* D.E. 294, Ex. 18 at 19-20.) While the Court does not require the Relators to establish that the record shows that an inference of willful and knowing criminal intent is the only or most plausible reading of the record, it is noteworthy that the suggested inference is not even particularly sensible, even within the narrow confines of the financial data in the contracts and ignoring all of the other evidence of non-culpable intent. This factor thus further militates in favor of summary judgment for the Hospital Defendants.

F. Relators Have Not Demonstrated that the Quickpay Discounts Support an Inference of a Kickback Scheme

Relators maintain that the quick-pay discounts in some of the contracts were a "scam" because hospitals could obtain the discounts even if they did not pay promptly. (*See*, *e.g.*, D.E. 290 ¶¶ 208-209.) As with many other aspects of the case, Relators rhetoric is not adequately supported by the record evidence cited. Mr. Cybulski indicated that he believed Stat afforded discounts to hospitals even if they did not pay promptly, but Cybulski did not indicate whether that was the case only for the Hospital Defendants or if it was a general Stat policy. (D.E. 294, Ex. 13 (Cybulski Dep.) at 45.) Mr. Orze, who formerly worked in CoMed's billing department made a similarly generic statement with respect to the quick-pay discounts—he believed that there was no time restriction, but did not identify specific contracts nor did he indicate which of the Hospital Defendants, if any, took advantage of the discounts or the frequency of any such discounts. (*See id.*, Ex. 16 (Orze Dep.) at 136.) CoMed issued a "Billing and Collection Audit" in April 1998 stating that "a system should be developed to assure that contract hospitals pay full 'usual and customary' rates when they fail to pay within the grace discount period. Currently, [CoMed] is accepting discounted payments from contracted hospitals regardless of the timing of receipt of payment." (D.E. 29 ¶ 210; D.E. 294, Ex. 16-20 (Orze Dep., Ex. 20) at 21.) Again, this evidence suggests that either CoMed did not have the technical capacity to enforce the penalty in the contracts, or that, for other reasons, it had a company-wide practice with respect to quick-pay discounts.

Even if Relators' evidence were stronger with respect to CoMed's practices, their argument would still suffer from a fatal shortcoming—the absence of evidence that Hospital Defendants actually took advantage of the quick-pay discounts. The Hospital Defendants were not automatically given a discount—they had to take affirmative steps to claim the quick-pay discount. (*See*, *e.g.*, D.E. 294, Ex. 12-3 (St. Bernard invoice).) Under the Ambulance

Defendants' billing procedures, the Hospital Defendants would be billed the contract rate, and the bill would indicate that they could take off an additional percentage if they paid within a certain time period. Peterson's examination of the Hospital Defendants' records revealed no instances in which a hospital took a quick-pay discount, even if they were entitled to it. (D.E. 294, Ex. 18 at 95.) Neither Cybulski nor Orze testified that the Hospital Defendants took a discount. Relators also argue that the Ambulance Defendants' failure to enforce the late-payment penalties is probative of a kickback arrangement. However, if the contract rates themselves were reasonable, and CoMed had a uniform practice of not enforcing these contract provisions, then CoMed's practice with respect to the Ambulance Defendants is not probative of an illicit arrangement. Relators have similarly failed to demonstrate that it was industry custom to enforce late-payment penalties, such that the alleged non-enforcement practice, properly valued, resulted in a discount over fair market value. These shortcomings render unpersuasive the Relators' proposed significance of such general evidence concerning so-called quick-pay discounts.

G. OIG 99-2 Does Not Support an Inference of a Kickback Scheme

In 1999, the Office of the Inspector General of the Department of Health and Human Services issued an advisory opinion on a proposed contractual relationship between a long-term care facility and an ambulance company.[45] *See* OIG Advisory Opinion No. 99-2 (issued February 26, 1999) (available at http://oig.hhs.gov/fraud/docs/advisoryopinions/1999/ao99_2.htm) (last visited September 29, 2006).

---

[45] "An OIG advisory opinion is a legal opinion issued by the Office of Inspector General ("OIG") to one or more requesting parties about the application of the OIG's fraud and abuse authorities to the party's existing or proposed business arrangement. An OIG advisory opinion is legally binding on the Department of Health and Human Services (the "Department") and the requesting party or parties. It is not binding on any other governmental department or agency. A party that receives a favorable advisory opinion is protected from OIG administrative sanctions, so long as the arrangement at issue is conducted in accordance with the facts submitted to the OIG. However, no person or entity can rely on an advisory opinion issued to someone else." *See* HHS Office of the Inspector General, *Frequently Asked Questions (FAQs) About the Advisory Opinion Process* (available at http://oig.hhs.gov/fraud/advisoryopinions/aofaq.html) (last visited September 29, 2006).

Section Four of OIG Advisory Opinion No. 99-2 sets forth a number of limitations: (1) "[t]his advisory opinion has no application, and cannot be relied upon, by any other individual or entity"; (2) "[t]his advisory opinion may not be introduced into evidence in any matter involving an entity or individual that is not a requester to this opinion."; (3) "[t]his advisory opinion is limited in scope to the specific arrangement described in this letter and has no applicability to other arrangements, even those that appear similar in nature or scope.; and (4) "[n]o opinion is expressed herein regarding the liability of any part under the False Claims Act or other legal authorities for any improper billing, claims submission, cost reporting, or related conduct." *Id.* In light of these limitations, it is difficult to envisage how this letter can support any inferences concerning the specific contracts in the case *sub judice*.

H.  The Werfel Opinion Letters Do Not Support an Inference of a Kickback Scheme

David Werfel is an attorney who has served as counsel to various ambulance constituencies.  In certain writings, he has expressed concern about the propriety of ambulance providers offering discounts to hospitals in a position to refer Medicare or Medicaid business. (D.E. 301 ¶¶ 135, 174.)  In addition, Werfel, in July 2003, wrote an opinion letter to an ambulance company regarding the level of discounts that can be offered to hospitals (for DRGs), and opined, "you want to tie your lowest rates to facilities to the Medicare allowable or, very slightly below the Medicare allowable."  (*Id.* ¶ 177.)  Significantly, there is no allegation or evidence that anyone at the Defendant Hospitals communicated with Mr. Werfel or even knew of his opinions concerning the AKS.  His July 2003 opinion letter, of course, was written years after this case was filed and the activity at issue in it concluded.  As a result, while the evidence might be generally relevant to issues unrelated to the gravamen of this opinion—*e.g.*, that the United States might have been influenced (in the sense of a materiality assessment) if an AKS scheme

were proven—the evidence does not meaningfully bear on the various defects in the record assembled that preclude any sensible or reasonable conclusion from it that the Hospital Defendants willfully and knowingly participated in a criminal AKS scheme.

Moreover, and independently, the value of the Werfel statements is minimal, even as to the issues to which he speaks. Werfel's advice is inherently conservative—he is, in essence, advising his clients not to go below the Medicare allowable rate in order to retain the protection afforded by the "safe harbors." This may be sound advice in terms of avoiding any risk of liability, but it is not probative of whether the contracts in the case *sub judice* violated the AKS. The various Medicare "safe harbors" define a subset of clearly legal conduct, but that does not mean that anything outside of the "safe harbors" violates the AKS. *See, e.g.*, *United States v. Shaw*, 106. F. Supp.2d 103, 115 (D. Mass. 2000); *see also* 64 Fed. Reg. 63518.

I. The 1997 Letter from AMR to Mt. Sinai Does Not Support an Inference of Knowing and Willful Conduct

Relators maintain that the 1997 letter that AMR sent to Mt. Sinai during the course of contract negotiations supports an inference that the Hospital Defendants knowingly and willfully accepted remuneration in return for referrals. (*See* D.E. 301 ¶ 221 ("no ambulance provider is legally permitted, nor is any contracting facility legally permitted, to enter into a contractual arrangement lower than the current Medicaid reimbursement rates.").)

The probative value of this letter is extremely limited. First, there is no evidence that any other hospital received this letter, or a similar letter, during the course of business. Second, even with respect to Mt. Sinai, the record does not reflect whether the persons responsible for negotiating the contract with CoMed ever read or were aware of the AMR letter. (D.E. 294, Ex. 22 (Volkmar Dep.) at 33.) Finally, the letter does not appear to be a correct statement of the law or the facts. For example, it seemingly confuses the requirements for the "safe harbor" exception

with the statutory exception for discounts—the latter does not require that Medicaid or Medicare are offered the same discounts. 42 U.S.C. § 1320a-7b(b)(3). With respect to the letter's factual premise, Peterson determined that the Medicaid reimbursement rate in 1997 was $149.70 for ALS and $93.96 for BLS. (*See, e.g.,* D.E. 254 ¶¶ 25-26.) While this may be comparable to AMR's pricing in "unit hours," it is certainly not self-evident, and Relators have made no attempt to compare the rates. The cited AMR/Mt. Sinai letter does not alter the propriety of summary judgment in its favor, given all of the other defects in the Relators' case.

J. The Hospital Defendants' Certification of the Cost Reports Does Not Support an Inference of Knowing and Willful Acceptance of Remuneration

The Hospital Defendants, as Medicare Part A providers, were required to submit annual cost reports to Medicare. *See* 42 U.S.C. § 1395g; 42 C.F.R. § 413.20(b). "The following statement must immediately precede the dated signature of the provider's administrator or chief financial officer: 'I hereby certify that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet Statement of Revenue and Expenses prepared by (Provider Name(s) and Number(s)) for the cost reporting period beginning and ending and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.'" *Id.*

Relators seemingly argue that "knowingly" and "willfully" can be inferred from the mere fact that the Hospital Defendants certified the cost reports. (*See*, *e.g.*, D.E. 230, Ex. 4 at 17 ("The Defendant Hospitals knew that their arrangements with the Defendant Ambulance Companies

103

were kickback schemes because by entering into the "Provider Agreements" the Defendant Hospitals agreed to abide by the Medicare rules and regulations."); D.E. 281 at 45.) As explained below, however, this assertion is unpersuasive.

First, Relators' attempt to infer knowing and willful from the certification is circular. The Relators' proffered reason why the Hospital Defendants' certifications were false is because the Hospital Defendants' knowingly and willfully accepted remuneration in return for referrals. Relators cannot infer knowing and willful from a so-called "false" certification because the certification is only false if Relators can *first* prove knowing and willful acceptance of remuneration in return for referrals. Put somewhat differently, the AKS's "knowing" and "willful" requirements modify the phrase "accept remuneration in return for"—they do not govern certification requirements imposed by 42 U.S.C. § 1395g and 42 C.F.R. § 413.20(b).

Second, Relators are effectively attempting to use the certification requirements to transform the AKS's "knowing" and "willful" *scienter* requirements into strict liability for any errors concerning the AKS that appear on certified cost reports. However, "the elements 'knowingly and willfully' were added to the statute in 1980 to reflect Congressional concern that penalties could "be imposed under [then] current law to an individual whose conduct, while improper, was inadvertent.'" H.R. Rep. No. 1167, 96th Cong., 2d Sess. 59 (1980), reprinted in 1980 U.S.C.C.A.N. 5526, 5572; *see also* See Pub. L. No. 96-499, Title IX, 917, 94 Stat. 2599, 2625 (1980). Relators' theory runs contrary to this clear Congressional statement, expressed through a legislative amendment imposing a heightened *scienter* requirement, that the AKS does not impose strict liability.

Third, Relators' argument often is framed as though proof of negligence would be sufficient to ground liability, or that a "reasonable person" would understand that the contracts

were allegedly dubious under the AKS. However, as explained elsewhere, analogous precedent teaches that negligence does not support a finding of knowledge. *See*, *e.g.*, *Carrillo*, 435 F.3d at 782 (noting that the ostrich instruction "specifically cautions the jury against finding knowledge on a mere finding of negligence"); *id.* ("[e]vidence merely supporting a finding of negligence—that a reasonable person would have been strongly suspicious, or that a defendant should have been aware of criminal knowledge—does not support an inference that a particular defendant was deliberately ignorant."); *accord Giovanetti*, 919 F.2d at 1228. In other words, Relators' assertion that the Hospital Defendants *should* have known that the AKS supposedly would prohibit the contracts is not enough to infer that the Hospital Defendants knowingly and willfully accepted remuneration in return for referrals. Nor does the assembled record otherwise support such an inference in the case, as discussed elsewhere. In addition, Relators have not adduced any evidence that the Hospital Defendants took any measures inconsistent with a good-faith belief in the legality of their conduct, nor have Relators adduced any evidence that the Hospital Defendants actively avoided obtaining information that would have revealed the allegedly-illegal nature of the contracts.

Fourth, to the extent Relators seek to draw inferences from the Hospital Defendants' certification of the cost reports independent of any record evidence concerning knowledge or willfulness (or, more accurately, the lack thereof), it is equally if not more reasonable to draw counter-inferences concerning the Hospital Defendants' thought processes. Put somewhat differently, because Relators have no direct evidence of any illicit agreement to swap discounts for referrals, or even meaningful circumstantial evidence in that regard, they are attempting to draw abstract inferences from what appears to be an objective or "reasonable hospital administrator" standard: upon reviewing the contracts, a reasonable administrator must have

known that he or she was engaging in criminal misconduct by signing the contracts but nonetheless signed the contracts and certified the cost reports anyway.  (*See* D.E. 281 at 45.)  If this is Relators' theory, then (to the extent this sort of "reasonable person" analysis is even appropriate in a regime where negligence is insufficient), it would seem appropriate to consider how a "reasonable hospital administrator," when certifying the Hospital Defendants' cost reports, might otherwise view the ambulance contracts.

In this regard, a reasonable hospital administrator, without direct knowledge of market rates or the Medicare allowable rate, might believe that the discounts (typically 25%) off the "non-contracted rate" or "ALS/BLS rate" specified on the rate sheet seemed to be a reasonable bulk-volume discount and was in line with the hospital's obligations to act as a prudent purchaser of services.  The administrator might also, upon review of the contract's cost-shifting provisions, realize that a facial comparison of the non-contracted and contracted rates was a meaningless comparison of apples and oranges without accounting for the additional costs and financial risk assumed by the hospitals under the terms of the agreements.

A reasonable administrator also might hold a reasonable belief that the purported discounted in the contracts qualified for the statutory exception for discounts.  *See* 42 U.S.C. § 1320a-7b(b)(3).  A reasonable administrator might also hold a good-faith belief that the purported discounts were protected by the so-called discount "safe harbor" provided by a detailed federal regulatory regime.  *See* 42 C.F.R. 1001.952(h).[46]

---

[46]  The aforementioned discussion immediately above does not assume that the Hospital Defendants, as a matter of fact, believed that the contracts were protected by the statutory exception for discounts or the discount safe harbor provided in the regulations.  The Hospital Defendants have not built an adequate record in that respect and Relators, in turn, have not built a record that forecloses this possibility—consistent with the otherwise-divorced-from-the-evidentiary-record nature of Relators' argument that the contracts themselves and the certification reports alone establish putative liability.   Rather, to the extent that Relators maintain that a hospital administrator must have known that the contracts were an illegal kickback arrangement, Relators have failed to discredit a variety of reasonable explanations why the Hospital Defendants believed that the cost reports were compliant with the AKS.  If there are numerous legitimate counter-inferences to draw from the Hospital Defendants' certification of the cost reports, Relators' argument, which is based upon eliminating legitimate explanations for the Hospital Defendants' conduct, fails to persuade.

Relators' "reasonable administrator" analysis is dubious, given that the statute does not punish negligence but instead requires the establishment of a record sufficient to meet a heightened "knowing and willful" *scienter* requirement with respect to involvement in criminal misconduct—a record not assembled by Relators here. Nonetheless, to the extent that such an analysis is even appropriate, Relators false certification theory fails to address numerous other reasonable options that would occur to a reasonable person signing the contracts and/or certifications.

Finally, the Court notes that Relators' entire false certification theory, if believed, would only prove *scienter*. Summary judgment would still be warranted due to an independent global failing in Relators' case—namely, a failure to adduce proof that the Hospital Defendants accepted illicit remuneration in return for referrals. The applicable standard for assessing remuneration on the record assembled is fair market value, and Relators have not even attempted to build a record with respect to market rates for various services during the relevant time period. Relators' attempt to use the Medicare allowable rate as a proxy for fair market value cannot overcome the uncontradicted testimony in the record that, during the relevant time period, the amount Medicare reimbursed ambulance companies for Part B transports was not a reliable indicator of fair market value.

K.  Relators Have Not Demonstrated that Part B Referrals Were Lucrative

The AKS does not, in the abstract, require that Relators prove that the Ambulance Defendants profited from the arrangement; a foolish kickback arrangement would still be illegal. However, Relators have built their case on inferences derived from an alleged *quid pro quo*—the Ambulance Defendants got a high volume of lucrative Part B transports and, in exchange, they were willing to provide heavy discounts on Part A transports. (*See* D.E. 281 at 3-4.)

Relators have not adduced any evidence concerning CoMed's profit margin on Part B transports. The claim that CoMed received a steady stream of "lucrative referrals" is thus mere speculation. Furthermore, Relators did not meaningfully contradict Isley's opinion that Part A transports are more desirable because they are more predictable and a transporter does not have to deal with Medicare payment issues, including a substantial risk of claim denial. (D.E. 294, Ex. 13A at 14-15.) Finally, Relators have ignored Medicaid patients in constructing their scenario of an alleged kickback scheme. Relators do not deny that the Medicaid payment rate, even before applying Peterson's adjustments, was in many cases lower than the contracted rates. (*See generally* D.E. 317 (Peterson Reports).) Coupled with the fact that many of the Hospital Defendants had a much higher proportion of Medicaid patients than they had Medicare patients, Relator's inference of an alleged *quid pro quo* is on shaky logical grounds. One would also expect that, if the scheme existed, the Ambulance Defendants would offer less preferable rates to hospitals with a high ratio of Medicaid-to-Medicare patients, and would offer even greater discounts to hospitals with high volume of Medicare-to-Medicaid patients. Relators have not adduced any evidence suggesting this is the case.

V.     Various Individualized Reasons Further Justify as Summary Judgment as to Various Individual Hospital Defendants, As Argued in Individual Briefs to Which Relators Did Not Even Attempt to Respond

The Hospital Defendants have filed supplemental memoranda identifying specific reasons that each individual hospital is entitled to summary judgment.[47] Relators have not responded to any of these individualized briefs or motions. As explained below, the Court finds that at least some of the arguments presented in such individual summary judgment motions and briefs

---

[47]     St. Bernard filed a supplemental brief that was joined by the three Advocate hospitals (Bethany, South Suburban, and Trinity). (*See* D.E. 237).

provide additional reasons justifying summary judgment in favor of the respective Hospital Defendants.

A.  Holy Cross

Relators' proof with respect to Holy Cross is deficient in a number of respects such that no rational jury could determine that Holy Cross knowingly and willfully violated the AKS. First, Relators have no explanation for why Holy Cross chose Tower over Vandenburg and Stat, competing ambulance companies, in 1995.  (*See* D.E. 254 ¶ 9.)  If Holy Cross were entering into contracts in order to obtain a kickback in the form of a discount, it should have been choosing the lowest-cost provider, which it did not.  (*See id.*)  Holy Cross's behavior with respect to the 1995 contract proposals also demonstrates that Holy Cross did not knowingly and willfully accept any supposedly illicit remuneration; if other bidders came in lower than Tower, which they did, then under Relators' logic, Holy Cross would have no reason to suspect that Tower's rates were not fair market value, even putting aside all of Relators' other deficiencies trying to make such a showing.  (*See* D.E. 281 at 30-31 (Relators' asserting that Mt. Sinai must have known that it was getting below-market rates because other bidders came in higher).)

Second, Relators have provided no evidence in opposition to Holy Cross' legitimate reason for entering into preferred-provider contracts—namely, to ensure quality service.  Holy Cross believed that preferred-provider contracts promoted better service and standards of service for its patients.  (D.E. 254 ¶ 5.)  This justification is backed up by the hospital's actual practice: Holy Cross was willing to switch providers when its existing provider was not providing adequate service, even if it meant higher contract rates.  (*See id.* ¶ 9.)

Relatedly, there are other problems in the record (from Relators' perspective at least) that militate against any reasonable basis to conclude that Holy Cross was prepared to engage in any

knowing and willful criminal misconduct. Mr. Corkery, who negotiated the contracts for Holy

Cross, had no knowledge of what Tower billed Medicare for Part B transports. (*Id.* ¶ 34.)

Corkery also had no knowledge of Tower's contracted rates with other hospitals in the area. (*Id.*

¶ 35.) Relators have perhaps created—*at best*—a triable issue concerning whether Holy Cross

was negligent in its contracting practices; however, extensive precedent instructs that knowledge

of participation in alleged criminal misconduct cannot be inferred from mere negligence. *See*,

*e.g*, *Carrillo*, 435 F.3d at 781; *Giovanetti*, 919 F.2d at 1227-28. In this regard, Relators have not

identified any facts that would support a finding that Holy Cross took deliberate steps to avoid

learning the truth. Furthermore, Relators have not identified any behavior by Holy Cross that is

inconsistent with their asserted good-faith belief that the contracts were legal. Under *Starks*, in

order to violate the AKS, a person must act intentionally and purposefully with the purpose to

disobey or disregard the law. Relators have not set forth evidence that tends to exclude or even

meaningfully discredit Holy Cross's legitimate explanations for its conduct.

### B. Jackson Park

Relators' proof with respect to Jackson Park is deficient in a number of respects such that

no rational jury could determine that Jackson Park knowingly and willfully violated the AKS.

First, Jackson Park's contract rates were higher than the Medicaid reimbursement rates for 1993

to 1998 for ALS and BLS, save for the 1998 ALS rate, which was only slightly lower than the

Medicaid rate. (D.E. 233 ¶ 33.) Such evidence independently refutes any inference of criminal

knowledge—under Relators' theories as proposed—because Jackson Park would have no reason

to believe that rates higher than the Medicaid rate were unreasonable discounts off any putative

fair market value.

Second, Relators do not deny that, in practice, Jackson Park was the payor of last resort for non-Part A transports.  (*Id.* ¶ 19.)  Regardless of whether the contract required Jackson Park to guaranty the payments as a matter of law, the hospital' actual practice from the onset demonstrates that the contract rates fairly should be adjusted, at least from the perspective of Jackson Park's knowledge and intent, to account for this intended and performed "guaranty" of payment.   It is also independent evidence that no kickback scheme existed, because if Jackson Park were willing to violate federal criminal law to obtain low-cost ambulance transports, it would make little sense for the institution to take substantial costs back when it was not contractually obligated to do so.  Again, Relators may have created a case that Jackson Park and its personnel were arguably negligent, or could have done their jobs better, but this is not a record from which one could colorably conclude that the institution or its agents knowingly and willfully engaged in criminal misconduct.

Third, Jackson Park never took a quick-pay discount.  (*Id.* ¶ 18.)  Relators' generic statements that hospitals were always given the discount if it was taken do not refute Jackson Park's position; in this regard, Peterson, upon reviewing Jackson Park's records, independently determined that there was no evidence that Jackson Park took a quick-pay discount.  (D.E. 233, Ex. B at 16.)  This serves to further undermine any inference Relators would seek to draw from the "quick pay discount" arguments—again, when viewed vis-a-vis any putative knowing and willful participation by Jackson Park in supposed criminal misconduct.

Fourth, Jackson Park has demonstrated that the referrals to the Ambulance Defendants were not because of the contractual arrangements.  Instead, the Ambulance Defendants were preferred by Jackson Park staff because they showed up consistently and provided good service, not because they had a contract with the administration or because they offered low rates.  (D.E.

233 ¶¶ 20, 22.)  Relators have failed to adduce any evidence demonstrating that the contracts caused any referrals in the assembled record.

Finally, Relators have set forth insufficient evidence that the flat-rate for transports to the Tinley Park facility (a Jackson Park-specific issue) creates a triable issue as to this hospital. Relators have not denied that Jackson Park did not know what fair market value was for transports to Tinley Park.  (*Id.* ¶¶ 25-32.)  The objective evidence from Cybulski, who negotiated for the ambulance companies, suggests that the rates were not unreasonable because the Ambulance Defendants could transport multiple patients on a single run.  (*Id.* ¶ 25.)  Since Relators have not established CoMed's cost structure, nor have they adduced evidence on what competing firms would charge for runs to Tinley Park, the flat-fee rate cannot support an inference of an AKS violation on the summary judgment record assembled as to Jackson Park.

C.  Loretto

Relators' proof with respect to Loretto is also deficient in a number of respects under applicable summary judgment standards.  First, the rate sheet on the only Loretto contract did not identify CoMed's retail or non-contracted rates nor did it even purport to offer a quick-pay discount off the contracted rates.  (D.E. 294, Ex. 1M at CMT000129.)  Given that Relators have not documented Loretto's contract rates under its prior agreements with AMR and Andres (other ambulance companies), Relators have failed to establish a baseline against which Loretto could have assessed the CoMed rates.  Without such information, there is no basis to infer that Loretto "knew" that CoMed's rates were below fair market value—even putting aside the Relators' other problems in establishing that standard in the first place.  Relators also have not offered any evidence that Loretto knew CoMed's reimbursement rate from Medicare, nor have Relators offered proof that Loretto knew what CoMed billed other hospitals.

Second, Loretto acted as the payor of last resort, *i.e.*, it would pay CoMed for the transports provided to those patients that had no coverage and no means to pay the bills. (*Id.* ¶ 14.) Relators have not demonstrated that, once this aspect of the contract (in practice) is accounted for, that Loretto's contract rates are below fair market value. To the contrary, Peterson determined that for the period 1998-2001, the entirety of the difference between the Medicaid rates and the contract rates were accounted for by the cost-shifting provisions of the contracts. (D.E. 260 ¶ 24.) This too undermines any idea of a kickback scheme on the record presented and argued, much less Loretto's knowing and willful participation in such putative criminal misdeeds.

D. Mt. Sinai

Relators' proof with respect to Mt. Sinai is deficient in a number of individual respects, such that no rational jury could find any knowing and willful violation of the AKS by Mt. Sinai. First, Mt. Sinai put the contract out for a competitive bidding process (D.E. 267 ¶¶ 22-23), which Dr. Isley opined is the fairest measure of market value. (D.E. 294, Ex. 13A.) Relators have not demonstrated that it is uncommon for one bidder to come in below other bidders and have not adduced any evidence that Mt. Sinai should have been suspicious about the results of the bidding process. From Mt. Sinai's perspective (the relevant lens, in this setting where *scienter* is relevant and negligence cannot ground liability), it had paid high rates in the June 1997 contract because it had not put the contract out for bidding. (D.E. 267 ¶ 9.) Looking at the process from Mt. Sinai's perspective, it reasonably would be expected that a competitive process would produce lower rates, and that there would be a range of bids, varying in part based on how much the transporter wanted or needed Mt. Sinai's business. Relators have not meaningfully responded (indeed, they have not responded at all to the individual summary judgment brief) to the assertion that this evidence strongly militates against any notion of knowing and willful criminal misconduct.

Second, Relators have not shown that Mt. Sinai's contracted rates were lower than the Medicaid reimbursement rate, which is what the AMR letter used as a benchmark. The rate schedule for the December 27, 1997 contract identified the contracted ALS and BLS rates as $157.18 and $98.65, respectively. (D.E. 294, Ex. 1O at CMT000141.) Peterson stated that, in 1997, the Medicaid reimbursement rates for ALS and BLS were $149.70 and $93.96, respectively. (*See, e.g.,* D.E. 233 ¶ 33.) Given that the contract did not include a quick-pay discount, these were the effective rates that Mt. Sinai paid for services. (*See generally* D.E. 294, Ex. 1O.) Given that Relators, on many occasions, claim that rates below the Medicaid reimbursement rate are illicit "remuneration," it is difficult to see how they can dispute, even under their own, otherwise flawed approach, that rates above the Medicaid reimbursement rate are not "remuneration." Relatedly, there is no evidence that Mt. Sinai officials, during the relevant time, were aware of what CoMed charged Medicare or any competing hospital in the area. This too cuts against any finding of a knowing and willful receipt of any illicit remuneration.

Third, Relators have not set forth sufficient evidence with respect to the retroactive rates to create a triable issue on the issue of whether Mt. Sinai knowingly and willfully accepted remuneration in return for referrals. Put somewhat differently, the underlying issue of the retroactive rates at Mt. Sinai involves certain disputed facts, but those particularized disputes are not material to the assessment at hand concerning the AKS. Even if Relators were correct that the retroactive rates were not, in fact, justified, they have not meaningfully refuted Mt. Sinai's position that it believed that the retroactive rates settled any prior billing disputes.[48] (*See* D.E.

---

[48] Relators objections with respect to Hoekstra's affidavit is overruled as baseless. With respect to Relators' other objection, Relators identify a June 2, 1997 letter from Cybulski to Miller that offered less than what Mt. Sinai ultimately received in order to settle the billing dispute. (*See* D.E. 288 ¶ 31.) However, the contract that Mt. Sinai maintains resolved the billing dispute was not signed until December 27, 1997. It thus appears that Cybulski's letter confirms that CoMed was negotiating to resolve past overbilling, and that this was an early offer that was later supplanted by the retroactive application of the contracted rates from the December 27, 1997 contract. *See* D.E. 267

288 ¶¶ 26-31.)  A reasonable jury could not infer that Mt. Sinai knowingly accepted illicit remuneration if Mt. Sinai believed that the retroactive rates were reasonable compensation for prior billing disputes.  That is all the record justifies, and accordingly presents no triable case of any knowing and willful violation of the AKS.

E.  St. Bernard

Relators' proof with respect to St. Bernard further fails, within the context of the summary judgment analysis, because St. Bernard passed its savings from the contracts back to Medicare and Medicaid by accurately reporting the cost of transport services on its cost reports.  (D.E. 237 at 4.)  Relators have not shown that St. Bernard otherwise failed to comply with the "safe harbor" requirements—which is inconsistent with the idea of any knowing and willful AKS violation and also independently negates liability.  Furthermore, if St. Bernard accurately disclosed the discounts, it would also qualify for the statutory exception for discounts.

F.  St. James

Relators have adduced almost no evidence supporting an inference that St. James violated the AKS.  Even under Relators' own theories, there is no triable case on the record assembled that can be asserted as against St. James.

First, because St. James did not have a written contract, Relators' argument that knowledge of remuneration can be inferred from the rate schedules is inapplicable to St. James.  (D.E. 241 ¶ 7.)  Relators make no attempt to address this issue, which is fundamentally inconsistent with many of the Relators' arguments.

Second, Relators have failed to adduce proof suggesting that the negotiated rate of $80, which was for a 250-foot transport to an MRI center in the case of St. James, was commercially unreasonable.  St. James believed the rate was commercially reasonable because of the short

¶¶ 30-31.)

distance of the transport and the proximity of Daley's ambulance barn to the hospital.  (*Id.* ¶ 9.) As Mr. Senesac, a St. James administrator, noted in his deposition, it is very difficult for a hospital to affix a value to a 250-foot transport, and thus they had to make their best guess.  (D.E. 294, Ex. 19 at 59 ("Q: Did you have any concerns from a Medicare regulations and guidelines standpoint? A: No, because, again, it's a 250 foot transport.  What is the fair market value of a 250 foot transport?  I don't think there's anywhere in the market we could go find out what the fair market value of that [ambulance service] was.").)  Relators present no argument as to how heightened "knowing and willful" *scienter* could fairly or reasonably be found on the record assembled in this case given this deficiency.

Third, Relators have not shown that the other customary rates charged to St. James were below fair market value, nor have they shown that St. James actually knew that the rates were below fair market value.  (*Id.* ¶ 13.)  Relators had the opportunity to depose Mr. Senesac, as well as officials from CoMed, and they were unable to adduce even a scintilla of evidence with respect to St. James's knowledge that any of the rates were supposedly below fair market value. Precedent teaches that summary judgment is warranted when a plaintiff has failed to "make a showing sufficient to establish the existence of an element to that party's case"—here, St. James's knowing and willful acceptance of remuneration.  *See Celotex*, 477 U.S. at 322.

Fourth, St. James was never offered any forgiveness of debt nor was it offered a quick-pay discount.  (*Id.* ¶¶ 13-14.)  Relators consistently maintain that the quick-pay discounts were an essential element of the kickback scheme (*see*, *e.g.*, D.E. 281 at 24); it follows that an unexplained absence of a quick-pay discount suggests that the contract was not part of a kickback scheme.

Fifth, Relators have not demonstrated that St. James referred patients to CoMed because of the rates offered by CoMed. The record evidence suggests that St. James' patients did not exclusively select Daley's or CoMed, and that the reasons that St. James' staff preferred Daley's were perfectly legitimate: it had a nearby ambulance barn and a good reputation for service. (*Id.* ¶¶ 10, 12.) In addition, there is no evidence suggesting that the St. James' personnel who negotiated the service rates had any influence over the staff or patients when it came to choosing an ambulance service, nor is there any evidence that St. James' explicitly or implicitly agreed to provide referrals in exchange for lower rates.

Finally, a reasonable jury could not draw an inference of a kickback scheme from St. James's decision to own and operate an ambulance service (Alverno) (*see* D.E. 301 ¶ 106) because Relators have not built a record with respect to Alverno's operations. Relators' theory is seemingly that, because Alverno was profitable, in part, due to its Medicare Part B business, it follows that CoMed must have made substantial profits from the referrals. However, Relators have not adduced sufficient evidence concerning Alverno's operations to draw any inferences with respect to CoMed's operations. For example, Relators have not adduced Alverno's revenues, its profit margin, or the portion of Alverno's profits that derived from Medicare Part B business. Relators have also failed to adduce Alverno's contract rates, its Medicare allowable rate, or its Medicaid reimbursement rate. Simply put, the record is deficient as to Alverno, and no reasonable inferences can be drawn from the superficial and vague statement by Relators that some of Alverno's profit margin derived from Part B transports.

G.  South Suburban

Relators's proof with respect to South Suburban is lacking in additional ways that further justify summary judgment. First, in each of the contract years, South Suburban's unadjusted ALS

and BLS rates exceeded both the Medicare allowable rate and the Medicaid reimbursement rate; in many instances, South Suburban's rates were significantly higher. (*See* D.E. 239 ¶¶ 15, 18.) The record evidence with respect to rates does not support an inference that South Suburban received any remuneration under the terms of the contracts, even within the lens of Relators' own theories.

Second, South Suburban's contract rates are not consistent with a kickback scheme. The May 1994 contract between Stat and South Suburban had significantly lower ALS and BLS rates than the June 11, 1996 contract; the respective ALS rates were $157.50 and $258.75 and the respective BLS rates were $105 and $135. (*Compare* D.E. 294, Ex. 1U at CMT00257 *with id.*, Ex. 1T at CMT000250). Relators have not explained why, if South Suburban and the Ambulance Defendants agreed to a kickback arrangement, that South Suburban's rates would have risen so sharply from one contract to the next. There is also no explanation why, if South Suburban was engaged in a kickback scheme, it would have accepted rates far above the Medicare allowable and the Medicaid reimbursement rate for the duration of the contracts.

H. Trinity

Relators's proof with respect to Trinity is deficient in additional respects that militate in favor of summary judgment for Trinity. First, in each of the contract years, Trinity's unadjusted ALS and BLS rates exceeded the Medicaid reimbursement rate. (*See* D.E. 239 ¶ 16.) Relators have not adduced any evidence suggesting that Trinity would have or should have known that the rates were supposedly remuneration in light of their exceeding the Medicaid reimbursement rate.

Second, Trinity's patient-payor mix is not consistent with Relator's description of the kickback scheme; less than 50% of the patients were Medicare patients, undermining one of the basic premises of the alleged scheme. (*See* D.E. 281 at 5.) To the extent that Relators seek to

draw inferences from certain patterns in the contracts, it is proper to draw contrary inferences when the contracts do not conform to Relator's depiction of the alleged kickback scheme.[49]  Such evidence further militates against any idea of concluding that there was any knowing and willful violation of the AKS by Trinity.

---

[49]  Bethany Hospital has not adduced specific arguments that further warrant summary judgment on its behalf. Nonetheless, it joined the general summary judgment briefing submitted on behalf of all of the Hospital Defendants and sought summary judgment on such bases.  Thus, while Bethany does not have individualized reasons further and independently justifying summary judgment, as is the case with the other individual Hospital Defendants, summary judgment is nonetheless warranted for the global reasons explained above.

CONCLUSION

For the foregoing reasons independent reasons, the Court grants the Hospital Defendants' joint motion to exclude Relators' putative experts (D.E. 230) and the Hospital Defendants' individual summary judgment motions. (D.E. 234, 235, 236, 240, 252, 259, 265.)

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois


Date:          September 30, 2006